RECORD NO. 13-2137

# In The
# United States Court of Appeals
## For The Fourth Circuit

**BEYOND SYSTEMS, INC.,**

*Plaintiff-Appellant*,

v.

**KRAFT FOODS, INCORPORATED; VICT. TH. ENGWALL & CO.;
KRAFT FOODS GLOBAL, INCORPORATED; and
CONNEXUS CORPORATION,**

*Defendants-Appellees*.

**ON APPEAL FROM THE U.S. DISTRICT COURT
FOR THE DISTRICT OF MARYLAND AT GREENBELT**

---

**BRIEF OF APPELLANT BEYOND SYSTEMS, INC.**

---

Richard K. Willard
Jill C. Maguire
Benjamin B. Watson
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, NW
Washington, DC 20036
(202) 429-3000

Of Counsel:
Stephen H. Ring                    Michael S. Rothman
LAW OFFICES OF                     LAW OFFICE OF
  STEPHEN H. RING, P.C.              MICHAEL S. ROTHMAN
506 Main St., Ste. 215             401 E. Jefferson St., Ste. 201
Gaithersburg, MD 20878            Rockville, MD 20850
(301) 563-9249                     (301) 251-9660

*Counsel for Appellant Beyond Systems, Inc.*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of all parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. ___13-2137___    Caption: _Beyond Systems, Inc. v. Kraft Foods, Inc., et al._____

Pursuant to FRAP 26.1 and Local Rule 26.1,

_Beyond Systems, Inc._____
(name of party/amicus)

_____

who is _____Appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.      Is party/amicus a publicly held corporation or other publicly held entity?   ☐YES ☑NO

2.      Does party/amicus have any parent corporations?                              ☐YES ☑NO
        If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

3.      Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                              ☐YES ☑NO
        If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?  ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☐YES ☑NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
    If yes, identify any trustee and the members of any creditors' committee:

Signature:  /s/ Richard K. Willard          Date:  01/09/2014

Counsel for:  Beyond Systems, Inc.

## CERTIFICATE OF SERVICE
**************************

I certify that on ___01/09/2014___ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

J. Douglas Baldridge
Ari N. Rothman
VENABLE LLP
575 7th Street, NW
Washington, DC 20004-1601

Counsel for Appellee Connexus Corp.

John K. Roche
PERKINS COIE LLP
700 13th Street, NW, Suite 600
Washington, DC 20005-3960

Counsel for Appellees Kraft Foods Inc., Kraft Foods Global, and Vict. Th. Engwall & Co.

/s/ Jill C. Maguire
(signature)

01/09/2014
(date)

- 2 -

# TABLE OF CONTENTS

DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

TABLE OF AUTHORITIES ...................................................................iv

ABBREVIATIONS KEY .....................................................................ix

JURISDICTIONAL STATEMENT ........................................................1

STATEMENT OF THE ISSUES............................................................1

STATEMENT OF THE CASE................................................................2

    A.    How Unlawful Commercial Email Works ...............................2

    B.    The Maryland and California Statutes ....................................4

        1.    Existing Landscape when Maryland and California Enacted Their Statutes .................................................4

        2.    Statutory Components.................................................7

        3.    ISPs' Response to this Legislation............................13

    C.    The Parties to this Suit ......................................................14

        1.    BSI............................................................................14

        2.    Connexus and Kraft ................................................17

    D.    Kraft-Hypertouch Settlement Agreement ...........................17

    E.    BSI's Complaint ................................................................18

    F.    Course of Proceedings.......................................................21

    G.    Disposition Below .............................................................24

SUMMARY OF ARGUMENT .............................................................27

STANDARD OF REVIEW ..................................................................30

ARGUMENT .................................................................................................30

I.  BSI HAS STANDING TO SUE UNDER THE CALIFORNIA AND
    MARYLAND STATUTES ..................................................................30

    A.   BSI Meets the Statutory Definitions of "EMSP" and "ICSP" ...........31

    B.   BSI Received Deceptive and Unsolicited Spam from Defendants .....33

    C.   Neither the CA-UCE nor the MD-CEMA Requires BSI to Prove
         Particularized Harm Caused by Deceptive Spam ...............................33

    D.   Standing Conferred by the CA-UCE and MD-CEMA
         Satisfies Article III ..............................................................................36

II.  THE DISTRICT COURT ERRED BY READING AN
     EXTRASTATUTORY "*BONA FIDE*" REQUIREMENT INTO THE
     CALIFORNIA AND MARYLAND STATUTES ........................................37

    A.   The Legislatures Contemplated that ISPs Would Shoulder the Burden
         of Enforcing the Statutes to Accomplish
         the End Goals of Deterrence ................................................................38

    B.   Courts May Not Alter the Elements of a Statutory
         Cause of Action ....................................................................................41

    C.   The Federal CAN-SPAM Act Has No Bearing Here ........................42

III. THE DOCTRINE OF *VOLENTI NON FIT INJURIA* DOES NOT
     APPLY TO BSI ....................................................................................44

    A.   BSI Did Not Consent to Receive Unlawful Spam
         from Defendants ...................................................................................45

    B.   Barring BSI's Claims on Consent Grounds Would Frustrate
         the Purposes of the CA-UCE and MD-CEMA and
         Depart from Well-Established Law ......................................................49

IV.  THE HYPERTOUCH-KRAFT SETTLEMENT AGREEMENT
     DOES NOT BIND BSI ...........................................................................51

    A.   BSI May Sue on Unlawful Spam Routed through Hypertouch's
         Servers Before the Settlement ..............................................................53

B.    BSI May Sue on Unlawful Spam Routed through Hypertouch's Servers After the Settlement ................................................. 56

CONCLUSION ........................................................................................ 57

REQUEST FOR ORAL ARGUMENT ................................................... 57

CERTIFICATE OF COMPLIANCE WITH RULE 28.1(e) OR 32(a)

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

## FEDERAL CASES

*Am. Online, Inc. v. Nat'l Health Care Disc., Inc.*,
  174 F. Supp. 2d 890 (N.D. Iowa 2001) .............................................................13

*Am. Online, Inc. v. LCGM, Inc.*,
  46 F. Supp. 2d 444 (E.D. Va. 1998) .................................................................13

*Antonio v. Sec. Servs. of Am., LLC*,
  701 F. Supp. 2d 749 (D. Md. 2010) ..................................................................35

*Asis Internet Servs. v. Subscriberbase Inc.*,
  No. 09-3503 SC, 2010 WL 1267763 (N.D. Cal. Apr. 1, 2010).............34, 44, 49

*Associated Industries of New York State v. Ickes*,
  134 F.2d 694 (2d Cir. 1943), *vacated on other grounds by*
  320 U.S. 707 (1943)......................................................................................11, 12

*Beyond Sys., Inc. v. Keynetics, Inc.*,
  422 F. Supp. 2d 523 (D. Md. 2006)..................................................................40

*DeMando v. Morris*,
  206 F.3d 1300 (9th Cir. 2000) ..........................................................................37

*Doe v. Chao*,
  306 F.3d 170 (4th Cir. 2002) ............................................................................35

*Facebook, Inc. v. Wallace*,
  No. C 09-798 JF (RS), 2009 WL 3617789 (N.D. Cal. Oct. 29, 2009)..............14

*Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*,
  204 F.3d 149 (4th Cir. 2000) ............................................................................36

*Gonzales v. Arrow Fin. Servs., LLC*,
  660 F.3d 1055 (9th Cir. 2011) ..........................................................................40

*Gordon v. Virtumundo, Inc.*,
  575 F.3d 1040 (9th Cir. 2009) ............................................................... 2, passim

iv

*Havens Realty Corp. v. Coleman*,
 455 U.S. 363 (1982)...................................................................51

*Kennedy v. Plan Adm'r for DuPont Sav. & Inv. Plan*,
 555 U.S. 285 (2009)...................................................................54

*Lujan v. Defenders of Wildlife*,
 504 U.S. 555 (1992)...................................................................36

*McEvoy v. IEI Barge Servs., Inc.*,
 622 F.3d 671 (7th Cir. 2010) ....................................................39

*Md. State Dep't of Educ. v. U.S. Dep't of Veterans Affairs*,
 98 F.3d 165 (4th Cir. 1996) ......................................................41

*Miller v. Wolpoff & Abramson, L.L.P.*,
 321 F.3d 292 (2d Cir. 2003) .....................................................36

*MySpace, Inc. v. Wallace*,
 498 F. Supp. 2d 1293 (C.D. Cal. 2007) ....................................13

*Rhodes v. E.I. du Pont de Nemours & Co.*,
 636 F.3d 88 (4th Cir. 2011) ......................................................27

*Van Alstyne v. Elec. Scriptorium, Ltd.*,
 560 F.3d 199 (4th Cir. 2009) ....................................................34

*Verizon Online Servs., Inc. v. Ralsky*,
 203 F. Supp. 2d 601 (E.D. Va. 2002) .......................................13

*Warth v. Seldin*,
 422 U.S. 490 (1975)...................................................................36

*Wilson v. Dollar Gen. Corp.*,
 717 F.3d 337 (4th Cir. 2013) ....................................................30

## STATE CASES

*Angelucci v. Century Supper Club*,
 158 P.3d 718 (Cal. 2007) ..............................................34, 42, 50

*Bd. of Cnty. Comm'rs of Garrett Cnty., Md. v. Bell Atlantic-Maryland, Inc.*,
 695 A.2d 171 (Md. 1997) ..........................................................35

*Commercial Disc. Co. v. Cowen*,
116 P.2d 599 (Cal. 1941) ...................................................................54

*Hypertouch, Inc. v. ValueClick, Inc.*,
192 Cal. App. 4th 805 (2011) ...................................... 12, passim

*Janelsins v. Button*,
648 A.2d 1039 (Md. Ct. Spec. App. 1994)........................................47

*Koire v. Metro Car Wash*,
707 P.2d 195 (Cal. 1985) ...................................................................37

*Munson v. Del Taco, Inc.*,
208 P.3d 623 (Cal. 2009) .............................................................41, 50

*Noble v. Draper*,
73 Cal. App. 4th 1 (2008) ...................................................................54

*Ordway v. Superior Court*,
198 Cal. App. 3d 98 (1998) ...............................................................47

*State v. Brantner*,
758 A.2d 84 (Md. 2000) .....................................................................41

## FEDERAL STATUTES

### *The CAN-SPAM Act*

15 U.S.C. § 7701 ................................................................................6

### *Consumer Protection Statutes*

15 U.S.C. § 1679g(a)(1)(B) ..............................................................36

15 U.S.C. § 1681n(a)(1) ....................................................................36

15 U.S.C. § 1692k(a)(1) ....................................................................36

47 U.S.C. § 227(b)(3).........................................................................36

15 U.S.C. § 1640(a)(1)........................................................................36

### *Judiciary and Judicial Procedure*

28 U.S.C. § 1291 .................................................................................1

28 U.S.C. § 1332(a)(1) ....................................................................1

## STATE STATUTES

### *California's Business & Professions Code*

Cal. Bus. & Prof. Code § 17529 .............................................5, 6, 11, 38

Cal. Bus. & Prof. Code § 17529.1 ..............................................9, 31, 33

Cal. Bus. & Prof. Code § 17529.5 ................................................ 4, passim

Cal. Bus. & Prof. Code § 17535 .....................................................34

### *Maryland's Commercial Law*

Md. Code Ann., Com. Law. § 14-3001 ......................................10, 32

Md. Code. Ann., Com. Law § 14-3002 ...................................4, 8, 18, 33

Md. Code Ann., Com. Law § 14-3003 ......................................9, 10, 55

### *Maine's Revised Statutes*

Me. Rev. Stats. tit. 10, § 1497 ......................................................11

### *Texas's Business & Commerce Code*

Tex. Bus. & Com. Code Ann. § 321.106 ......................................11

### *Revised Code of Washington*

Wash. Rev. Code § 9.190.090(2) ..................................................11

## FEDERAL LEGISLATIVE MATERIALS

S. Rep. No. 108-102 (2003), *reprinted* in 2004 U.S.C.C.A.N. 2348 ...................3, 4

## STATE LEGISLATIVE MATERIALS

Fiscal Note, H. 915, Md. Gen. Assemb., 2002 Session...........................10

## FEDERAL RULES

### *Fed. R. Civ. P.*

Rule 56(a)......................................................................30

### *Fed. R. App. P.*

Rule 4(a)(4).....................................................................1

## TREATISES, ARTICLES, AND DICTIONARIES

Antonin Scalia & Bryan Garner, *Reading Law: The Interpretation of Legal Texts* (2012) ...............................................................41

Roger A. Ford, *Preemption of State Spam Laws by the Federal CAN-SPAM Act*, 72 U. Chi. L. Rev. 355 (2005) .....................................7

William B. Rubenstein, *On What a "Private Attorney General" Is—And Why It Matters*, 57 Vand. L. Rev. 2129 (2004) ......................39

J. Maria Glover, *The Structural Role of Private Enforcement Mechanisms in Public Law*, 53 Wm. & Mary L. Rev. 1137 (2012)...........................38

*Merriam-Webster Dictionary* (4th ed. 2005)........................................23

## <u>ABBREVIATIONS KEY</u>

| | |
|---|---|
| Addendum | Statutory Addendum attached to this brief. |
| BSI | Plaintiff Beyond Systems, Inc. |
| CAN-SPAM Act | Controlling the Assault of Non-Solicited Pornography and Marketing Act of 2003, Pub. L. No. 108-187, 117 Stat. 2699 (2003), *codified at* 15 U.S.C. §§ 7701 *et seq.*, 18 U.S.C. § 1037 (2012). |
| Connexus | Connexus Corporation, a named defendant in this case. |
| EMSP | Electronic Mail Service Provider |
| JA | Joint Appendix |
| ICSP | Interactive Computer Service Provider |
| ISP | Internet Service Provider |
| Kraft | Kraft Foods, Incorporated, Kraft Foods Global, Incorporated, and Vict. Th. Engwall & Co., Inc., named defendants in this case. |
| MD-CEMA | Maryland Commercial Electronic Mail Act, Md. Code Ann., Com. Law §§ 14-3001 *et seq.* |
| CA-UCE | Restrictions on Unsolicited Commercial E-Mail Advertisers Act, Cal. Bus & Prof. Code §§ 17529 *et seq.* |

## JURISDICTIONAL STATEMENT

This action was filed in federal district court. The district court had original jurisdiction pursuant to 28 U.S.C. § 1332(a)(1). This Court has appellate jurisdiction over the appeal pursuant to 28 U.S.C. § 1291.

The district court entered final judgment in favor of Defendants Kraft Foods Incorporated, Kraft Foods Global, Incorporated, Vict. Th. Engwall & Co., Inc. ("Kraft"), and Connexus Corporation ("Connexus") on August 12, 2013. JA-766–67 (Final Order of Judgment at 1–2). Plaintiff Beyond Systems, Inc. ("BSI") filed a timely notice of appeal on September 10, 2013. JA-768–70 (Notice of Appeal at 1–3); *see also* Fed. R. App. P. 4(a)(4).

## STATEMENT OF THE ISSUES

1.  Whether a plaintiff that meets the explicit requirements for bringing suit under the Maryland and California anti-deceptive spam statutes may nevertheless be barred from doing so if it primarily or substantially engages in pursuing litigation under those statutes.

2.  Whether a plaintiff that satisfies the standing requirements of the Maryland and California statutes must, in addition, establish some particularized harm in order to have Article III standing.

3.  Whether a plaintiff's lawsuit may be barred by the doctrine of *volenti non fit injuria* on the ground that the plaintiff received and stored all email messages sent to it—including false and deceptive messages— and made insufficient efforts to block their receipt.

4.  Whether a plaintiff may be bound by a settlement agreement even though the plaintiff is not a party to the agreement and does not fall within the terms of the agreement.

## STATEMENT OF THE CASE

This appeal concerns the legislative efforts of Maryland and California to protect their citizens from false or deceptive commercial email advertisements, or "spam."[1]  Both states determined to enforce their statutory prohibitions of deceptive spam by incentivizing Internet service providers, as well as the ultimate recipients of such emails, to bring suit against the responsible parties.  The district court, however, impermissibly invaded their legislative domain by grafting extra-statutory requirements for bringing suit and by improperly applying the doctrine of *volenti non fit injuria* to bar BSI's claims in this case.

### A.    How Unlawful Commercial Email Works

An Internet service provider ("ISP") typically provides its clients with access to the Internet, email, web-hosting, domain name services, and other interactive computer services.  As the email gateways for their customers, ISPs receive and route significant amounts of spam—which constitutes a significant drain on an ISP's resources.

Spam email messages generally have the same structure as other email messages.  They have a "header," with the "To," "From," "Date," and "Subject"

---

[1] The term "spam" arose out of a skit by the British comedy troupe Monty Python, in which the conversation between patrons of a café is interrupted and overwhelmed by chants and choruses of "Spam."  *See Gordon v. Virtumundo, Inc.*, 575 F.3d 1040, 1044 n.1 (9th Cir. 2009).  Spam thus symbolizes the mindless, annoying repetition of mass commercial email.

2

lines familiar to all users of email.  Additional technical information may be
viewed in the header, depending upon the settings of both the ISPs along the
transmission path and the end-recipient.  Spam emails also have a "body" that
typically contains advertising text, one or more advertising images, or some
combination of both.  The goal of the advertisement is to have the end-recipient
click on a link in the email, after which the recipient's web browser is directed to a
web page where the recipient is asked to provide information such as an email
address, phone number, or mailing address—a "lead" in spam advertising
vernacular—or a credit card number and authorization—a "sale."  Those involved
in transmitting the email are paid after the lead or sale is generated.  Thus, the goal
of spam emails is to ensure that the email is delivered to, opened by, and then
clicked-through by the end-recipient.

Because the prime objective of spam advertisers is to generate a
compensable "lead" or "sale," they frequently use false or deceptive information in
their emails to trick recipients into opening the message and acting on it.  Indeed,
most commercial email advertising contains some form of falsity or deception.  In
an April 2003 report, *False Claims in Spam*, the Federal Trade Commission
("FTC") "found that 66 percent of all spam contains some kind of false, fraudulent,
or misleading information, either in the email's routing information, its subject
line, or the body of its message."  S. Rep. No. 108-102, at 2 (2003), *reprinted* in

2004 U.S.C.C.A.N. 2348, 2349.  Falsified information in the headers of commercial email "not only trick ISP's increasingly sophisticated filters," but "lure consumers into mistakenly opening messages from what appears to be people they know."  *Id*. at 3, 2004 U.S.C.C.A.N. at 2350.  Senders use false or misleading subject lines, for example, to "trick the recipient into thinking that the e-mail sender has a personal or business relationship with the recipient."  *Id*. at 4, 2004 U.S.C.C.A.N. at 2350.

### B.     The Maryland and California Statutes

In 2002, Maryland enacted the Maryland Commercial Electronic Mail Act ("MD-CEMA"), and, in 2003, California enacted the Restrictions on Unsolicited Commercial E-Mail Advertisers Act ("CA-UCE").  Both statutes prohibit falsity or deception in commercial email advertisements.  *See* Cal. Bus. & Prof. Code § 17529.5 (2008) (Addendum 6); Md. Code. Ann., Com. Law § 14-3002 (2013) (Addendum 10).

### 1.     Existing Landscape when Maryland and California Enacted their Statutes

Unique aspects of spam made regulation and enforcement particularly difficult: namely, the volume; the costs to society; the ease of creating and sending spam; and the difficulty in finding those responsible and deterring their conduct.

In the CA-UCE, for instance, the California legislature cited several specific problems driving its enactment of the statute.  *First: volume.*  By 2003, when the

4

CA-UCE was enacted, unwanted commercial email was overwhelming society—businesses and individuals alike. The sheer volume of spam was crushing mail servers and inboxes with all manner of unwelcome email. "Roughly 40 percent of all e-mail traffic in the United States is comprised of unsolicited commercial e-mail advertisements (hereafter spam) and industry experts predict that by the end of 2003 half of all e-mail traffic will be comprised of spam." Cal. Bus. & Prof. Code § 17529(a) (2008) (Addendum 1).[2]

*Second: economic costs.* Spam was not merely annoying but wreaking economic havoc. The California legislature noted that,

> [a]ccording to Ferris Research Inc., a San Francisco consulting group, spam will cost United States organizations more than ten billion dollars ($10,000,000,000) *this year* [2003], including lost productivity and the additional equipment, software, and manpower needed to combat the problem. California is 12 percent of the United States population with an emphasis on technology business, and it is therefore estimated that spam costs California organizations well over 1.2 billion dollars ($1,200,000,000).

*Id*. at § 17529(d) (emphasis added).

*Third: cost-shifting.* Not only was spam drowning out legitimate email, but the recipients of spam—not the spammers or advertisers benefitting from the

---

[2] By 2007, the year before BSI brought suit, "[s]pam volume increased 100 percent, to more than 120 billion spam messages daily. *That's about 20 spam messages per day for every person on the planet*." CISCO & Ironport, *2008 Internet Security Trends*: *A Report on Emerging Platforms for Spam, Viruses and Malware* 3 (2008) (emphasis added), http://www.computerworld.com/pdfs/ironport_security_report_wp.pdf.

spam—were bearing the brunt of the cost of spam, e.g., the lost storage space in an inbox, reduced bandwidth, and lost time and man-power—in addition to sheer annoyance and frustration. *Id*. § 17529(e). The California legislature also concluded that spam was responsible for "virus proliferation that can cause tremendous damage both to individual computers and to business systems." *Id*. § 17529(l) (Addendum 2).

*Fourth: cheap and easy to create*. The California General Assembly identified two attributes of spam that make it extremely problematic: it is easy and inexpensive to create, but difficult and costly to eliminate. *Id*. § 17529(g) (Addendum 2). Further, the legislature concluded that existing tools to combat— or at least to contain—spam, such as spam filters, were not proving themselves effective in stemming the deluge. *Id*. § 17529(f). Adding to the difficulty was the fact that spammers were not only becoming more technologically savvy in side-stepping barriers, but were also becoming so "adept at masking their tracks, that they are rarely found." *Id*. § 17529(i)–(j) (Addendum 2).

In response to these concerns, legislatures across the country—including Congress—acted to find solutions that would deter spammers and advertisers. Thus, by 2003, when Congress enacted the Controlling the Assault of Non-Solicited Pornography and Marketing Act of 2003, Pub. L. No. 108-187, 117 Stat. 2699 (2003), *codified at* 15 U.S.C. §§ 7701-7713 and 18 U.S.C. § 1037 (2012)

6

("CAN-SPAM Act"), **thirty-six states** had in place statutes regulating unlawful commercial email, including California's CA-UCE and Maryland's MD-CEMA. Roger A. Ford, *Preemption of State Spam Laws by the Federal CAN-SPAM Act*, 72 U. Chi. L. Rev. 355, 363 (2005).

Given the unique nature of the problem, legislatures responded with unique tools to deter unlawful spam. The California and Maryland legislatures, among others, crafted a statutory cause of action, permitting certain individuals and entities to sue on deceptive spam and to recover statutory damages.

### 2. Statutory Components

Both the California and Maryland statutes outlaw certain falsity or deception in commercial email advertisements. The CA-UCE prohibits an email advertisement that: (1) "contains or is accompanied by a third-party's domain name without the permission of the third party"; (2) "contains or is accompanied by falsified, misrepresented, or forged header information"; or (3) "has a subject line that a person knows would be likely to mislead a recipient . . . about a material fact regarding the contents or subject matter of the message." Cal. Bus. & Prof. Code § 17529.5(a) (Addendum 6).[3]

---

[3] In addition, the email must be either "sent from California or sent to a California electronic mail address." *Id.*

Likewise, the MD-CEMA prohibits commercial email that: (1) "[u]ses a third party's Internet domain name or electronic mail address without the permission of the third party"; (2) "[c]ontains false or misleading information about the origin or the transmission path of the commercial electronic mail"; or (3) "[c]ontains false or misleading information in the subject line that has the capacity, tendency, or effect of deceiving the recipient." Md. Code Ann., Com. Law § 14-3002(b)(2)(i)–(iii) (Addendum 10).[4]

Both state legislatures explicitly determined who may sue to enforce the statutes. In the CA-UCE, the legislature determined that:

> [i]n addition to any other remedies provided by any other provision of law, the following may bring an action against a person or entity that violates any provision of this section:
>
> (i)     The Attorney General.
>
> (ii)    An *electronic mail service provider*.
>
> (iii)   A recipient of an unsolicited commercial e-mail advertisement, as defined in Section 17529.1.

Cal. Bus. & Prof. Code § 17529.5(b)(1)(A) (emphasis added) (Addendum 6). The CA-UCE defines the term "electronic mail service provider" ("EMSP") as follows:

> "Electronic mail service provider" means any person, including an Internet service provider, that is an intermediary in sending or

---

[4] The email must be either "from a computer in the State or is sent to an electronic mail address that the sender knows or should have known is held by a resident of the State." *Id*. § 14-3002(b)(1).

8

receiving electronic mail or that provides to end users of the electronic mail service the ability to send or receive electronic mail.

*Id.* § 17529.1(h) (Addendum 4).  Further, under California's statutory scheme,

A person or entity bringing an action pursuant to subparagraph (A) may recover either or both of the following:

> (i)      Actual damages.
>
> (ii)     Liquidated damages of one thousand dollars ($1,000) for each unsolicited commercial e-mail advertisement transmitted in violation of this section, up to one million dollars ($1,000,000) per incident.

*Id.* § 17529.5(b)(1)(B) (Addendum 6–7).

Likewise, the Maryland legislature provided that:

> A person who violates this subtitle is liable for reasonable attorney's fees and for damages:
>
> (1) To the recipient of commercial electronic mail, in an amount equal to the greater of $500 or the recipient's actual damages; . . . and
>
> (3) To an *interactive computer service provider*, in an amount equal to the greater of $1,000 or the interactive computer service provider's actual damages.

Md. Code Ann., Com. Law § 14-3003 (Addendum 12) (emphasis added).

The MD-CEMA defines the term "interactive computer service provider"

("ICSP") as:

> (1)   "Interactive computer service provider" means an information service, system, or access software provider that provides or enables computer access by multiple users to a computer service.

9

> (2) "Interactive computer service provider" includes a service or system that provides access to the Internet and systems or services offered by a library or educational institution.

*Id*. § 14-3001(c) (Addendum 9).

In common parlance, EMSPs and ICSPs are referred to as "Internet service providers," or "ISPs." Both statutes define their concept of an ISP broadly. Neither statute limits the type or size of ISP that may bring a claim. Nor does either statute impose any additional requirements or affirmative steps the ISP must satisfy to bring a claim.

The California and Maryland statutes permit recipients of unlawful spam to sue those responsible for the deceptive spam. California further empowers its attorney general to bring a suit under the CA-UCE. Public enforcement, however, is discretionary. JA-652 (Senate Bill Analysis of SB-186, Dkt. 295-35 at 4.) Maryland did not expressly provide a cause of action to its Attorney General under the MD-CEMA. Rather, its Attorney General could seek to curb unlawful conduct that falls within the Maryland Consumer Protection Act.[5]

---

[5] *See* MD-CEMA's Fiscal Note, H. 915, Md. Gen. Assemb., 2002 Sess., *available at* http://mlis.state.md.us/2002rs/fnotes/bil_0005/hb0915.PDF, explaining that the Consumer Protection Division within the Office of the Attorney General is generally responsible for pursuing unfair and deceptive trade practice claims.

But tracking down offending spammers is difficult.  Spammers are "adept at masking their tracks" and thus are "rarely found"; their "return addresses . . . show up on the display as 'unknown'" or are "obvious fakes" and many are "located offshore."  *See* Cal. Bus. & Prof. Code § 17529(i)–(j) (Addendum 2).  Further, end-users do not have the time, money, or expertise to determine who the spammers and other entities involved in sending the spam are, much less the ability to collect enough information or bring to bear sufficient resources to successfully prosecute an action against advertising networks.  As the FTC has explained, the "primary law enforcement challenge" in these cases is "identifying and locating the targeted spammer."  FTC, *National Do Not Email Registry: A Report to Congress* at 23–24 (June 2004), http://www.ftc.gov/sites/default/files/documents/reports/can-spam-act-2003-national-do-not-email-registy-federal-trade-commission-report-congress/report.pdf.

Together, these factors present significant hurdles to enforcement of the statutes.  Accordingly, California and Maryland, among other states[6], elected to confer standing on ISPs to bring claims for unlawful spam precisely to undertake the heavy-lifting and to enforce the statute—much like a private attorney general.[7]

---

[6] *See*, *e.g.*, Wash. Rev. Code § 9.190.090(2); Tex. Bus. & Com. Code Ann. § 321.106; Me. Rev. Stats. tit. 10, § 1497.

[7] The concept of a "private attorney general" was first recognized in *Associated Industries of New York State v. Ickes*, 134 F.2d 694 (2d Cir. 1943),

11

As they did with the remedies made available to recipients, the California and Maryland statutory schemes also permit an ISP to recover statutory damages or actual damages.  Statutory damages accomplish two purposes:  (1) they incentivize ISPs to collect sufficient unlawful spam to make it worth their while to invest their time and resources in bringing litigation against the offending parties; and (2) where awarded, they deter unlawful conduct.

Indeed, the legislative history of the CA-UCE makes clear that the statute was designed to have a significant deterrent effect on entities sending or advertising in unlawful spam:

> This bill will get at the real solution to unsolicited e-mails by allowing people to sue the advertisers of unsolicited e-mails.  SB 186 seeks to get to the heart of the matter by penalizing the actual advertiser of the spam e-mails. . . . We need to go after the companies that are profiting by these e-mails and allow recipients to hold the advertisers financially responsible.

*Hypertouch, Inc. v. ValueClick, Inc.*, 192 Cal. App. 4th 805, 821 (2011) (internal citation and punctuation omitted) (omission in original).  Likewise, proponents of the Maryland bill eyed the deterrent effect of the proposed legislation, explaining, "[i]f enough victims in Maryland and other states use laws such as this proposed

---

*vacated on other grounds by* 320 U.S. 707 (1943).  "Instead of designating the Attorney General, or some other public officer, to bring [an action], Congress can constitutionally enact a statute conferring on any non-official persons, or on a designated group of non-official persons, authority to bring a suit . . . even if the sole purpose is to vindicate the public interest.  Such persons, so authorized, are, so to speak, private Attorney Generals [sic]."  *Id*. at 704 (footnote omitted) (omission in original).

12

bill, the use of unsolicited commercial email as a sales tool might be reduced." JA-496 (Defendants' Ex. 10, S.B. 538 – Commercial Law Electronic Email–Prohibitions explanation sheet). The CA-UCE and the MD-CEMA create both a means and an incentive for an ISP to retain unlawful spam emails and bring suit on them.

### 3.    ISPs' Response to this Legislation

Numerous ISPs, including BSI, have done exactly as these legislatures intended and have brought suit under state anti-deception statutes to combat spam.[8] Even prior to the enactment of these statutes, ISPs such as America Online sought to combat spam through other causes of action, such as trespass to chattels and conspiracy.[9]

These ISPs have utilized the legal tools available to them to protect their users and themselves from the scourge of spam. Nor have they hesitated in seeking the maximum amount of damages available to them. For instance, in one case, Facebook sought over *$7 billion dollars* in damages from alleged spammers.

---

[8] *See*, *e.g.*, *MySpace, Inc. v. Wallace*, 498 F. Supp. 2d 1293 (C.D. Cal. 2007) (§ 17529.5 claims); *Am. Online, Inc. v. Nat'l Health Care Disc., Inc*., 174 F. Supp. 2d 890 (N.D. Iowa 2001) (claim under Washington's Commercial Electronic Mail Act).

[9] *See*, *e.g.*, *Am.Online, Inc. v. LCGM, Inc*., 46 F. Supp. 2d 444 (E.D. Va. 1998); *Verizon Online Servs., Inc. v. Ralsky*, 203 F. Supp. 2d 601 (E.D. Va. 2002).

*Facebook, Inc. v. Wallace*, No. C 09-798 JF (RS), 2009 WL 3617789, at *2 (N.D. Cal. Oct. 29, 2009).

### C.    The Parties to this Suit

#### 1.    BSI

BSI is a Maryland corporation that provides Internet-related services to companies, non-profit organizations, and individuals in the greater Washington, D.C. area. JA-739 (Memorandum Opinion, hereinafter "Op." at 11). Founded in 1996 by Paul Wagner, BSI provides its users with email, listserv, webpage hosting, and domain name services, and provides and maintains wireless networks and other forms of Internet access. JA-739, 743 (*id.* at 11, 15). Since 2000, BSI has had at least 20 paying customers. JA-743 (*id.* at 15). BSI has also provided its services free of charge to local charities, including St. Luke's House. *Id.* Since 2005, BSI has earned over $300,000 from its business operations. JA-739–40 (*id.* at 11–12).

In addition to providing Internet services, BSI tries to protect its network services from abuse by suing companies who initiate or advertise in unlawful spam. BSI has been actively involved in anti-spam litigation since shortly after Maryland passed the MD-CEMA in 2002. JA-739 (*id.* at 11). Such litigation has, at times, occupied a substantial portion of Paul Wagner's time. *Id.* It has also, at times, been successful. BSI has collected over $1 million from anti-spam lawsuits

14

since 2005; in recent years these lawsuits have accounted for roughly 90% of BSI's annual gross revenue.  JA-731, 739 (*id.* at 3, 11).

Since it began providing email services in the late 1990s, BSI has retained virtually all email sent to its servers not addressed to a user, including both misaddressed emails and spam.[10]  JA-181–84 (6/20/12 A.M. Trial Tr. at 44–47 (Paul Wagner Cross-Examination)).  As part of its efforts to litigate effectively against spammers, BSI separates and then archives those messages that appear to be spam.  To assist it in identifying spam, BSI has used "spam-trap" addresses, which are unique, unused email addresses that help identify and track spam already targeted at BSI's servers.[11]  JA-741 (*id.* at 13).

One thing that BSI does *not* do, however, is solicit spam.  To the contrary, BSI consistently communicates to spammers that it does not want to receive their

---

[10] BSI uses "wildcard," or "catch-all," addresses.  A wildcard address retains emails that are sent to a particular server but not to an existing account.  This is helpful for retaining misaddressed emails—for example, an email intended for "janedoe@x.com" but sent to "janeddoe@x.com."  *See* JA-180-84 (6/20/12 A.M. Trial Tr. at 43–47 (Paul Wagner Cross-Examination)).

[11] Because spam-trap addresses are not actually used by anyone for communication, any emails they receive can be safely considered unsolicited.  Additionally, most spam-trap accounts are published in locations typically invisible to humans—such as a web page's HTML code—thus increasing the likelihood that the party sending the email obtained the address through an automated e-mail address harvester.  *See* Wikipedia, *Spamtrap*, http://en.wikipedia.org/wiki/Spamtrap.  Both Microsoft and the State of New York have used spam traps to assist in their anti-spam litigation.  JA-645 (BSI Ex. 81, Clickz article at 1).

emails.  For example, BSI has used the "opt out" feature in some spam, which purportedly removes the recipient from the spammer's address book.[12]  BSI's servers also broadcast an SMTP banner[13] to all upstream servers for incoming email that expressly warns against the sending of unsolicited commercial email. JA-761–62 (*id.* at 33–34).

In both its business and its litigation activities, BSI sometimes coordinates with Hypertouch, Inc. ("Hypertouch"), a California corporation owned and operated by Paul Wagner's brother, Dr. James Joseph ("Joe") Wagner.  JA-731 (*id.* at 3).  Like BSI, Hypertouch is an ISP that provides Internet services to its users. *Id.*  Also like BSI, Hypertouch has, at times, been substantially involved in anti-spam litigation since 2005.  *Id.*

During the relevant time period in this case, Hypertouch and BSI maintained an email routing arrangement between their servers.  Under this arrangement, messages addressed to "hypertouch.com," a domain name registered to BSI, would first go through Hypertouch servers.  JA-740  (*id.* at 12).  Hypertouch would sort

---

[12] At times, BSI has also used this feature to help identify spammers and gather additional evidence against them.  *See* JA-762 (Op. at 34).

[13] "Simple Mail Transfer Protocol" is "one of the three principal protocols for email."  JA-763 (Op. at 35).  Though an email's sender never sees an SMTP banner, it is recognized by the sending computer.  *See generally* Wikipedia, *Simple Mail Transfer Protocol*, http://en.wikipedia.org/wiki/Simple_Mail_Transfer_Protocol.

16

incoming emails and deliver them to customer accounts. If an email was not addressed to an actual customer account—for example, addressed to "johndoe@hypertouch.com" when in fact "John Doe" was not a customer—Hypertouch would route the email to BSI's servers. *See* JA-401–04 *(*6/27/12 Trial Tr. at 82–85 (Joseph Wagner Redirect Examination)). Routing eased the burden that such emails placed on Hypertouch's processing and storage capacity, which had previously caused Hypertouch's servers to crash. JA-398–99 (*id.* at 47–48).

Many of these routed messages were deceptive spam. BSI and Hypertouch treated this spam no differently than if it had been sent directly to their servers. When they could identify those entities involved in sending the unlawful spam, either company might bring suit under California or Maryland law. JA-742 (Op. at 14).

### 2.    Connexus and Kraft

Connexus is a California-based company that provides Internet marketing services. Kraft, a food and beverage conglomerate, advertises its Gevalia coffee in commercial emails. JA-732 (*id.* at 4). As part of advertising Gevalia, Kraft hired Connexus to send emails promoting the Gevalia brand. *Id.*

### D.    Kraft-Hypertouch Settlement Agreement

In the mid-2000s, Hypertouch began receiving unsolicited emails advertising Gevalia coffee. In 2005, Hypertouch sued Kraft Foods Global, Inc. and Vict. Th.

17

Engwall & Co., alleging that they had advertised using deceptive spam in violation of the CA-UCE.  Kraft eventually settled the case pursuant to a confidential June 29, 2006, settlement agreement ("Settlement Agreement")  JA-553–66 (Settlement Agreement at 1–12).

### E.  BSI's Complaint

BSI brought suit in this present case against Kraft, Connexus, and another Internet advertising company named Hydra LLC (collectively, "Defendants").[14] JA-082 (Complaint, hereinafter "Compl." at 3).  BSI alleged that the Defendants had either initiated or conspired to initiate false and misleading spam within the meaning of both Maryland Commercial Law Code § 14-3002 and California Business & Professions Code § 17529.5(a).  JA-098–102 (Compl. at ¶¶ 66–89). Specifically, BSI alleged that since February 14, 2005 it had received over 62,000 unsolicited emails from Kraft, Connexus, and Hydra. JA-092 (*id.* at ¶ 42).  Of these

---

[14] The district court entered default judgment against Hydra as to liability, but refused to award damages to BSI for the same reasons it granted summary judgment to Kraft and Connexus—that BSI lacked standing to sue and that the doctrine of *volenti non fit injuria* applied to bar BSI's claims.  JA-658 (Order of Default at 1); JA-732,764 (Op. at 4, 36); JA-766 (Final Order of Judgment at 1) (denying BSI's Renewed Motion for Default Judgment Damages as to Hydra LLC).  Should the Court reverse the grant of summary judgment as to Kraft and Connexus, it should likewise reverse the district court's denial of the motion for default judgment damages as to Hydra.

18

62,000 emails, BSI alleged that 34,000 were linked to Connexus and that 11,000 advertised Gevalia coffee. JA-092 (*id.* at ¶¶ 42–43).[15]

BSI alleged that Defendants' emails were misleading and deceptive in numerous ways, all familiar to anyone who has ever received spam. First, BSI alleged that the emails' "header" sections gave false information about the sending computer. JA-093 (*id.* at ¶ 52). For example, some emails would appear to be from one computer but actually originate from the IP address of a different computer, such that discerning the actual sender's identity was difficult, if not impossible. *Id.*

Second, BSI alleged that the emails used fictitious names in their "From:" lines, falsely suggesting to the recipient that they were sent by someone other than Defendants. JA-093–94 (*id.* at ¶ 53). For example, Connexus sent over 4,300 emails falsely claiming to be from "Apple Store." JA-094 (*id.* at ¶ 55).

Third, BSI alleged that many emails were sent from domain names that were registered either to non-existent entities or to companies with false addresses or telephone numbers. JA-095–96 (*id.* at ¶ 58). For example, one email was sent from a domain name registered to a company ostensibly located on the *fourth* floor

---

[15] In its opinion, the district court states "that in excess of 600,000 emails" are at issue in this case, and "hence, based on $1000 per item, Kraft's exposure is to more than $600 million." JA-732 (Op. at 4). As the above discussion of BSI's complaint demonstrates, this statement is inaccurate. JA-092 (Compl. ¶¶ 42–43).

of a *three-story* building.  *Id.*  This too made finding the message's actual sender difficult, if not impossible.  *Id.*

Fourth, BSI alleged that Defendants' spam emails were deceptive and misleading in their content.  Some of the emails contained false and misleading Subject lines, such as "Free Stainless Steel Coffeemaker & 2 Travel Mugs from Gevalia," when, in fact, a purchase was required.  JA-097 (*id.* at ¶ 62).  Others asserted that the recipient had won a "free" gift.  *Id.*

BSI alleged that its efforts to ask Defendants to stop sending it spam were ineffective.  For some emails, the return address was linked to an invalid domain or non-working account, making any reply impossible. JA-096 (*id.* at ¶ 59).  Other emails contained links to an "opt-out" list, which promised that if the recipient signed up the deluge of messages would stop.  JA-097 (*id.* at ¶ 63).  But many email addresses submitted for "opt-out" almost immediately began to receive new unsolicited emails.  JA-097 (*id.* at ¶ 64).  Thus, opting out actually resulted in *more* spam.

Defendants' flood of deceptive spam harmed BSI in several ways.  The sheer number of messages devoured bandwidth and burdened BSI's servers.  JA-097–98 (*id.* at ¶ 65).  To keep up, BSI had to make expensive upgrades to both its hardware and its software.  *Id.*  Moreover, spam was the top complaint of BSI's customers.  *Id.*  As relief, BSI sought statutory damages under the MD-CEMA in

20

the amount of $1,000 per email, statutory damages under the CA-UCE in the amount of $1,000 per email, attorney's fees, and injunctive relief.  JA-102–03 (*id.* at ¶¶ A–G).

### F.    Course of Proceedings

BSI's second amended complaint was followed by a lengthy and contentious discovery period.  Kraft, and Connexus, moved for summary judgment on several issues, including that some of BSI's claims were barred by the Kraft-Hypertouch Settlement Agreement.  JA-019, 40, 43 (District Ct. Dkt. Report at Dkt. Nos. 83, 257 and 283).  In a June 16, 2010 order, the district court granted partial summary judgment in favor of Kraft on "any claims based on the same emails that were the subject of Hypertouch's June 29, 2006 Settlement Agreement with Kraft" and "any claims based on emails sent directly to Hypertouch after the Settlement Agreement, where Hypertouch failed to notify Kraft within twenty days of receipt."[16]  JA-655 (Dkt. 370, Order at ¶ 3).

Discovery proceeded on the remaining emails, which still numbered in the thousands.  Apparently anxious about the evidentiary issues the damages portion of the lawsuit could raise, the district court decided to split the trial into two parts. JA-061 (District Ct. Dkt. Rpt. at Dkt. No. 440).  The first part—referred to as the

---

[16] In the same order, the district court also granted partial summary judgment to Defendants, finding that BSI's claims on certain emails were barred by California's one-year statute of limitations.  *Id.*  BSI does not appeal this ruling.

"mini-trial"—would concern only: (1) whether BSI was a "bona fide ICSP and EMSP under the California and Maryland anti-spam laws"; (2) whether BSI was a "*bona fide*" resident of Maryland under the MD-CEMA; and (3) "the nature of the relationship" between BSI and Hypertouch. *Id.* The second phase, if reached, would determine all remaining issues. *Id.*

The district court subsequently divided the "mini-trial" into two sub-phases of its own and impaneled a jury for this "preliminary" trial. JA-733 (Op. at 5). Phase I of the mini-trial would be limited to whether BSI met the definitions of ICSP and EMSP "according to BSI's theory of those requirements." JA-067 (District Ct. Dkt. Rpt. at Dkt. No. 498). Phase II would concern both "Defendants' theory of the case as to whether BSI" was an ICSP and ESMP as well as whether BSI was a resident of Maryland within the meaning of the MD-CEMA. *Id.* In Phase II, the jury would be permitted to consider, among other things, BSI's litigation activities and its relationship with Hypertouch. *Id.*

During Phase I, both BSI and Defendants presented evidence of BSI's business model, equipment, customers, billing practices, and efforts to protect itself from spam. JA-734 (Op. at 6). The jury did not, however, hear evidence about BSI's anti-spam litigation or about its routing relationship with Hypertouch. *Id.* At the conclusion of Phase I, the jury found that BSI was an "interactive

22

computer service provider" under the MD-CEMA and an "electronic mail service provider" under the CA-UCE.  JA-663 (Phase I Special Verdict Form at 2).

Phase II immediately followed.  Defendants presented evidence about BSI's prior litigation activities and its relationship with Hypertouch.  Over BSI's objection, the district court instructed the jury that it was to determine whether BSI was a "*bona fide*" ICSP and EMSP:

> A *bona fide* ICSP or EMSP is an entity that primarily and substantially provides the services set forth in the Maryland and California statutes.

> An entity is not a *bona fide* ICSP or EMSP if it primarily or substantially engages in bringing anti-spam litigation.

JA-666–67 (Phase II Jury Instruction No. 18 at 20–21); *see also* JA-438–39 (6/28/12 Trial Tr. at 5–6 (Phase II Jury Instructions)).[17]

The court explained that it would reserve judgment on whether such a requirement existed under the statutes until after the mini-trial.  JA-443 (*id.* at 10).  Ultimately, the jury concluded that BSI was not a *bona fide* ICSP under the MD-CEMA or EMSP under the CA-UCE.  JA-735 (Op. at 7); *see also* JA-674 (Phase II Special Verdict Form at 2).

---

[17] This peculiar definition of "*bona fide*" finds no home in a typical dictionary.  *See*, *e.g.*, *Merriam-Webster Dictionary* 165 (4th ed. 2005) (defining "bona fide" as "real or genuine.").

### G.    Disposition Below

Both sides filed post-trial motions.  BSI, in its motion for judgment as a matter of law, argued (as it had many times previously) that neither the CA-UCE nor the MD-CEMA *contained* a "*bona fide*" ICSP/EMSP requirement.  JA-075 (District Ct. Dkt. Rpt. at Dkt. No. 584).  Kraft, in its motion for summary judgment, responded that the statutes contained a "*bona fide*" requirement and that BSI had consented to the receipt of Kraft's emails.  JA-075 (District Ct. Dkt. Rpt. at Dkt. No. 587).  Connexus joined Kraft's motion and filed its own motion for summary judgment arguing that BSI had consented to whatever injury it suffered under the CA-UCE and MD-CEMA.  JA-075 (District Ct. Dkt. Rpt. at Dkt. No. 585).

The district court denied BSI's motion for judgment as a matter of law and granted Kraft's and Connexus's motions for summary judgment.  According to the district court, BSI's claims under the MD-CEMA and the CA-UCE failed for two separate reasons.  First, BSI was not a "*bona fide*" ICSP or EMSP and therefore did not have standing to sue under either statute.  Second, the tort doctrine of *volenti non fit injuria*—that is, consent—barred BSI's statutory claims.

The district court determined that both the California and Maryland statutes were ambiguous with respect to whether an ICSP or EMSP must be "*bona fide*" in order to sue.  JA-750–51 (Op. at 22–23).  Relying on *Gordon v. Virtumundo*, *Inc.*,

24

575 F.3d 1040 (9th Cir. 2009), in which the Ninth Circuit held that the federal

CAN-SPAM Act contained a "*bona fide*" requirement, the district court concluded

that the two state statutes likewise contained a "*bona fide*" requirement. Though it

conceded that no such requirement actually appeared in either statute's text, the

district court explained that "[a] legislature need not insert the equivalent of 'real,'

'genuine,' or 'actual' as a pre-qualifier for every type of entity it invests with a

private cause of action." JA-751 (Op. at 23). Rather, "[a]s a matter of common

sense, legitimacy of the entity is presumed." *Id.*

The district court was apparently concerned that a literal reading of the

definitions of "ICSP" and "EMSP" as drafted could otherwise encompass a large

group of potential plaintiffs, such as an individual who provides Internet access

through an in-home wireless router, and could lead to preemption issues under the

CAN-SPAM Act. JA-752–53 (*id.* at 24–25).

Finding a "*bona fide*" requirement to exist in both statutes, the district court

concluded that BSI did not satisfy it, and that the jury's Phase II verdict made clear

as much. JA-754 (*id.* at 26). According to the court, the jury's verdict was

supported by evidence presented in Phase II about the extent of BSI's anti-spam

litigation. *Id.*

The district court also concluded that although BSI presented statutory

claims, it was nonetheless subject to the "ancient tenet" of *volenti non fit injuria*—

25

"the man who is the author of his own hurt has no right to complain." JA-758 (*id.* at 30). Again citing *Gordon*, the court concluded that BSI had consented to its injuries under the CA-UCE and MD-CEMA by purposefully taking steps to increase its receipt of spam. JA-760–61 (*id.* at 32–33). According to the court, "BSI actively sought to receive and trap Kraft's Gevalia emails" by, among other things, knowingly receiving spam routed from Hypertouch's servers, creating "spam-trap" email addresses, and failing to employ sufficient spam filtering devices. JA-761 (*id.* at 33).

The court further concluded that there were no genuine issues of material fact about BSI's consent. Though BSI had sent "opt-out" requests to Defendants, the court discounted them on the ground that BSI knew the requests would result in the sending of more spam. JA-762 (*id.* at 34 & n.18). The court similarly dismissed BSI's SMTP banner, which it likened to "a homeowner posting a sign on his rear basement window saying 'No housebreaking' while leaving the doors and windows wide open and jewelry in open sight." JA-763 (*id.* at 35). In sum, these communications to Defendants, even though they stated that BSI did not wish to receive spam, nonetheless failed to raise a material issue about BSI's consent because "[t]here is no reason to assume that commercial e-mailers, spammers or otherwise, would be deterred by a simple request that they not send it." *Id.*

26

In addition to its principal holdings, the district court reaffirmed its prior grant of partial summary judgment, dismissing a portion of the emails at issue on the ground that the Kraft-Hypertouch Settlement barred any claims against Kraft and Connexus that were based on Kraft emails routed through Hypertouch servers prior to the Settlement Agreement, as well as any claims against Kraft (but not against Connexus) based on Kraft emails routed through Hypertouch servers after the Settlement Agreement.  JA-732 (*id*. at 4 n.5).  The district court held, without explanation, that Hypertouch had released its pre-settlement claims "not only on its behalf but on behalf of its assignees, which would obviously include BSI."  *Id.* The court likewise failed to explain why the Agreement's release of post-settlement claims also bound BSI.

On August 12, 2013, the district court entered its order of final judgment in favor of Kraft and Connexus.  JA-766–67 (Final Order of Judgment at 1–2).  On September 10, 2013, BSI filed a timely notice of appeal.  JA-768–70 (Notice of Appeal at 1–3).

## **SUMMARY OF ARGUMENT**

 "A federal court acting under its diversity jurisdiction should respond conservatively when asked to discern governing principles of state law" and "should not interpret state law in a manner that may appear desirable to the federal court, but has not been approved by the state whose law is at issue."  *Rhodes v. E.I.*

27

*du Pont de Nemours & Co.*, 636 F.3d 88, 96 (4th Cir. 2011).  Yet this is precisely

what the district court did below.

Confronting the district court were two state statutes—the CA-UCE and

MD-CEMA—whose broad causes of action evince the California and Maryland

legislatures' intent to combat deceptive spam through robust private enforcement

by recipients or ISPs.  The district court plainly viewed BSI as an undesirable

professional plaintiff and evidently worried that such broad language might allow

BSI and similar litigants to bring suit and obtain statutory damages.  The district

court should have put these concerns aside and interpreted the state statutes as

drafted.  Instead, it inserted an additional "*bona fide* ISP" requirement into the

statutes' causes of action and applied a novel interpretation of the tort doctrine

*volenti non fit injuria* to bar BSI's claims.

This was error.  Neither the district court's interpretation of the CA-UCE

and the MD-CEMA nor its application of *volenti non fit injuria* finds a basis in

either state or federal law.  The court further erred in its interpretation of the

Hypertouch-Kraft Settlement Agreement.

I.     BSI has standing to bring suit under both the CA-UCE and MD-

CEMA.  To bring suit under these statutes, BSI must meet just two requirements:

(1) qualify as an EMSP/ICSP; and (2) be sent deceptive spam.  The latter

requirement is not at issue on this appeal.  With respect to the former, even the

28

district court admitted that BSI meets the "literal" language of the statutory

definitions for both an EMSP and an ICSP.  JA-752 (Op. at 24).

II.    The district court erred in holding that the CA-UCE and MD-CEMA

contain a "*bona fide* ISP" requirement.  Such a requirement appears nowhere in the

text of either statute.  While the district court may believe that a literal reading of

these statutes leads to undesirable policy outcomes, both California and Maryland

courts are clear that inserting additional elements into a statutory cause of action is

a job for the state legislature, not the courts.

III.   The district court further erred in holding that the common law

doctrine of *volenti non fit injuria* independently barred BSI's statutory claims.  BSI

never communicated to Defendants any willingness to be sent their deceptive

spam.  Moreover, even if BSI failed to filter and block Defendants' spam, no

principle of tort law requires that a plaintiff must try to protect itself from another's

intentional unlawful conduct before it can seek legal recourse.  Holding otherwise,

as the district court did, both departs from well-established law and upends the

private enforcement schemes that the California and Maryland legislatures sought

to create.

IV.   The district court finally erred in holding that the Settlement

Agreement between Hypertouch and Kraft bars any claims of BSI that are based on

Kraft emails routed to BSI through Hypertouch's servers.  BSI is not, as the district

court asserted without explanation, an "assign" of Hypertouch. And even if BSI were an assign of Hypertouch, it could still sue over any Kraft emails that Hypertouch routed *after* signing the Settlement Agreement, as Hypertouch did not release those claims on behalf of its assigns. Although the district court asserted that Hypertouch failed to comply with a related provision in its future claims release, it offered no explanation as to how or why this failure of *Hypertouch* would somehow bind *BSI* to the release of future claims.

## STANDARD OF REVIEW

This Circuit reviews *de novo* a district court's order granting a motion for summary judgment, "viewing all the evidence and reasonable inferences drawn therefrom in the light most favorable to the nonmovant." *Wilson v. Dollar Gen. Corp.*, 717 F.3d 337, 342 (4th Cir. 2013). Summary judgment is appropriate only if the moving party can show that there are no genuine disputes of material fact and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).

## ARGUMENT

### I.    BSI HAS STANDING TO SUE UNDER THE CALIFORNIA AND MARYLAND STATUTES

The CA-UCE and MD-CEMA are not complicated statutes. Aside from their jurisdictional elements,[18] both laws require a plaintiff like BSI to meet just

---

[18] BSI alleged in its complaint that it was a citizen of Maryland and that Defendants' deceptive spam was sent from or through California-based computers.

30

two requirements to have standing to sue.  First, the plaintiff must satisfy the definitions of an "electronic mail service provider" under the CA-UCE and an "interactive computer service provider" under the MD-CEMA.  Second, it must have received allegedly deceptive (and in the case of the CA-UCE, unsolicited) commercial email.  That is all.  BSI easily satisfies both requirements, and the district court erred in finding otherwise.

### A.    BSI Meets the Statutory Definitions of "EMSP" and "ICSP"

As explained above, *supra* at 8-10, the CA-UCE and MD-CEMA grant private rights of action to entities that enable other people to access and use electronic mail—commonly termed ISPs.  Neither the CA-UCE nor the MD-CEMA, however, elects to use that term.  Rather, each statute employs its own specialized title for such plaintiffs:  "EMSP" and "ICSP."  Under the CA-UCE, an EMSP is:

> any person, including an Internet service provider, that is an intermediary in sending or receiving electronic mail or that provides to end users of the electronic mail service the ability to send or receive electronic mail.

Cal. Bus. & Prof. § 17529.1(h) (Addendum 4).  Similarly, under the MD-CEMA, an ICSP is:

---

*See* JA-092 (Compl. at ¶¶ 45–46).  Neither of Defendants' post-trial motions for summary judgment challenged these claims.

> an information service, system, or access software provider that
> provides or enables computer access by multiple users to a computer
> service [and] . . . includes a service or system that provides access to
> the Internet and systems or services offered by a library or educational
> institution.

Md. Code Ann., Com. Law. § 14-3001(c) (Addendum 9).

BSI falls squarely within these definitions. Indeed, the jury made that express finding in its Phase I verdict,[19] and even the district court conceded that BSI "meets the minimal requirements to qualify as an ISP." JA-730 (Op. at 2).

Given the undisputed facts about BSI's business, it would be hard to conclude otherwise. As the district court noted, since 2000, BSI "has had at least 20 paying customers for its services, including services for email, back-up e-email and listservs." JA-743 (Op. at 15). BSI has additionally "set up wireless and other routers to provide at least a few companies with access to the [I]nternet," and at the time of the trial hosted email for four customers. *Id.* These services show that BSI "enables computer access" and provides "the ability to send or receive electronic mail" to multiple end users. *See* Md. Code Ann., Com. Law. § 14-3001(c)

---

[19] In fact, the jury concluded much more. Its Phase I verdict found in BSI's favor despite instructions from the district court that it should contemplate whether BSI "operates as a typical ISP" and consider factors such as BSI's "customer base," "marketing efforts," "location and type of offices," "existence or non-existence of privacy policies," "implementation of security and fire prevention methods," and efforts "to prevent or stop receipt of allegedly unwanted mails; i.e., the use of spam filters and blocking efforts." JA-288 (6/25/13 Trial Tr. at 20 (Phase I Jury Instructions)); *see also* JA-666-67 (Phase I Jury Instruction No. 18). These factors appear nowhere in the statutes.

(Addendum 9); Cal. Bus. & Prof. § 17529.1(h) (Addendum 4). BSI accordingly satisfies the first of the two requirements for standing to sue under the CA-UCE and MD-CEMA.

### B.     BSI Received Deceptive and Unsolicited Spam from Defendants

Once a plaintiff establishes that it qualifies as an EMSP or ICSP, it must prove one other fact to have standing under California and Maryland law: that it was sent deceptive commercial emails. *See supra* at 7-8; *see also* Cal. Bus. & Prof. Code § 17529.5 (Addendum 6); Md. Code Ann., Com. Law § 14-3002(b)(2)(i)-(iii) (Addendum 10).

That BSI was sent unsolicited email from Defendants is undisputed. BSI alleges that this email was deceptive within the meaning of the CA-UCE and MD-CEMA. *See supra* at 18-20; *see also* JA-098-102 (Compl. at ¶¶ 66–89). Whether the emails are in fact deceptive was not raised during summary judgment and is not currently before this Court. BSI accordingly satisfies its burden at this stage as to this requirement.

### C.     Neither the CA-UCE nor the MD-CEMA Requires BSI to Prove Particularized Harm Caused by Deceptive Spam

In holding that BSI did not have standing to sue under the CA-UCE or MD-CEMA, the district court suggested that the two statutes may require BSI to prove that Defendants' spam caused it actual damages. *See* JA-755 *(*Op. at 27). As the

33

statutes' plain language shows, the district court is incorrect—all that either requires is that the plaintiff was sent deceptive spam.

With respect to the CA-UCE, the California Court of Appeals has noted that the statute's damages provisions "are in the nature of a penalty" and are not "in any way based on the actual injury suffered by the entity seeking redress." *Hypertouch, Inc. v. ValueClick, Inc.*, 192 Cal. App. 4th 805, 843–44 (2011).[20]

With respect to the MD-CEMA, Maryland courts have not yet ruled on the issue. The Fourth Circuit, however, has used language substantially similar to the MD-CEMA's as an example of a statutory cause of action that does *not* require actual damages. *See Van Alstyne v. Elec. Scriptorium, Ltd.*, 560 F.3d 199, 205 (4th Cir. 2009) (contrasting federal statute that required proof of actual damages with example of hypothetical statute—containing no such requirement—that provides damages for "whichever is greater: actual damages sustained . . . or $1,000")

---

[20] The district court was incorrect to suggest that an action brought under § 17529.5 is subject to the heightened standing requirements of California Business & Professions Code § 17535. *See* JA-745 (Op. at 17). Section 17535 provides a distinct cause of action permitting injunctive relief for violations of California's False Advertising Law. Nothing in its language suggests that its standing requirements apply to other causes of action found in different statutory provisions. *See Asis Internet Servs. v. Subscriberbase Inc.*, No. 09-3503 SC, 2010 WL 1267763, at *8 (N.D. Cal. Apr. 1, 2010) (holding that § 17535 does not apply to claims brought under § 17529.5); *see also Angelucci v. Century Supper Club*, 158 P.3d 718, 727 (Cal. 2007) ("Standing rules for actions based upon statute may vary according to the intent of the Legislature and the purpose of the enactment.").

(internal quotation marks and citation omitted); *Doe v. Chao*, 306 F.3d 170, 178 (4th Cir. 2002) (same), *aff'd*, 540 U.S. 614 (2004).

The provision of statutory damages in the CA-UCE and the MD-CEMA is readily understandable. The collective harm of unlawful spam is enormous, but it may be difficult to calculate the economic injury caused by any particular unlawful email.[21]

Finally, while the district court also noted that BSI could not "make the Maryland statute one of strict liability," (JA-756 (Op. at 28)), BSI did not make such an argument. The cases cited by the district court involve "strict liability" in the traditional tort sense: liability without negligence. *See Bd. of Cnty. Comm'rs of Garrett Cnty., Md. v. Bell Atlantic-Maryland, Inc.*, 695 A.2d 171, 179–80 (Md. 1997); *Antonio v. Sec. Servs. of Am., LLC*, 701 F. Supp. 2d 749, 763 (D. Md. 2010). This issue is not relevant to BSI's standing to bring suit under the MD-CEMA. Rather, BSI simply contends that neither the MD-CEMA nor the CA-UCE requires proof of actual damages—an issue that this Court determines through straightforward statutory interpretation. *See Doe*, 306 F.3d at 177–79.

---

[21] In any event, BSI has alleged that Defendants' deceptive spam caused it actual damages, both in terms of the costs of handling the spam and in customer complaints. *See* JA-097-98 (Compl. at ¶ 65); *see also* JA-699-700 (Dkt. 593-5, Deposition Testimony of Paul Wagner at 40–41) .

35

### D.     Standing Conferred by the CA-UCE and MD-CEMA Satisfies Article III

The statutory standing requirements that ICSPs or EMSPs must meet under both the CA-UCE and MD-CEMA also satisfy Article III's constitutional standing requirements.  As this Court has held, "'injury required by Article III may exist solely by virtue of statutes creating legal rights, the invasion of which creates standing.'"  *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 156 (4th Cir. 2000) (en banc) (quoting *Warth v. Seldin*, 422 U.S. 490, 500 (1975)); *see also Lujan v. Defenders of Wildlife*, 504 U.S. 555, 578 (1992) (recognizing that legislatures may "elevat[e] to the status of legally cognizable injuries concrete, *de facto* injuries that were previously inadequate in law").  The "legal right" at issue here is the right not to be sent deceptive spam.

This type of statute is not unusual.  On the contrary, numerous federal statutes permit private plaintiffs to recover statutory damages regardless of actual damages.  *See, e.g.*, Fair Credit Reporting Act, 15 U.S.C. § 1681n(a)(1) (2012); Truth in Lending Act, 15 U.S.C. § 1640(a)(1) (2012); Fair Debt Collection Practices Act, 15 U.S.C. § 1692k(a)(1) (2012); Telephone Consumer Protection Act, 47 U.S.C. § 227(b)(3) (2006); Credit Repair Organizations Act, 15 U.S.C. § 1679g(a)(1)(B) (2012).

Plaintiffs have standing to recover statutory damages under these laws even if they have not suffered actual damages.  *See, e.g.*, *Miller v. Wolpoff & Abramson,*

36

*L.L.P.*, 321 F.3d 292, 307 (2d Cir. 2003) (agreeing with other courts "that actual damages are not required for standing under the FDCPA"); *DeMando v. Morris*, 206 F.3d 1300, 1303 (9th Cir. 2000) (holding that TILA plaintiff has Article III standing and noting that "a lender liable for a TILA violation is subject to statutory damages even in the absence of any actual damages"). The same is true for state law: California courts, for example, have interpreted the state's Unruh Civil Rights Act, Cal. Civ. Code § 51 *et seq.* (2007), to permit statutory damages even in the absence of actual damages. *See, e.g.*, *Koire v. Metro Car Wash*, 707 P.2d 195, 200 (Cal. 1985) ("Section 52 provides for minimum statutory damages of $250 for *every* violation of section 51, *regardless* of the plaintiff's actual damages.") (emphases in original).

In short, the CA-UCE and MD-CEMA chart no new ground by allowing recipients and ISPs to recover statutory damages for the mere receipt of deceptive spam. As an EMSP and ICSP that has received deceptive spam, BSI has standing to sue in federal court under both laws.

## II. THE DISTRICT COURT ERRED BY READING AN EXTRASTATUTORY "*BONA FIDE*" REQUIREMENT INTO THE CALIFORNIA AND MARYLAND STATUTES

The district court read into the CA-UCE and MD-CEMA a requirement that only a "*bona fide*" ISP has standing to bring suit, even while acknowledging that the statutes, as written, contain no such requirement. The district court thus

37

overrode the intent of the California and Maryland legislatures and effectively amended the statutes so that only ISPs that "provide[] broadscale internet services to a broad customer base" may bring suit under the CA-UCE and the MD-CEMA. JA-748 (Op. at 20). The district court was without any authority to do so.

### A. The Legislatures Contemplated That ISPs Would Shoulder the Burden of Enforcing the Statutes to Accomplish the End Goals of Deterrence

In 2002 and 2003, when confronted with a growing tide of deceptive spam that placed enormous strain on individuals and businesses, the California and Maryland legislatures created a statutory cause of action to deter spammers and advertisers alike. The legislatures well understood how difficult it would be to bring suit, against spammers especially. Spammers are "adept at masking their tracks" and thus "rarely found"; their "return addresses . . . show up on the display as 'unknown'" or are "obvious fakes" and many are "located offshore." *See* Cal. Bus. & Prof. Code § 17529(i)-(j) (Addendum 2).

A typical individual end-recipient is unlikely to have the resources, time, energy, and expertise necessary to identify who the spammers are (never mind all of the other entities involved in sending the deceptive spam) and to successfully prosecute an action against them. Government enforcement is discretionary—and likely subject to budgetary concerns and political maneuvering. *See*, *e.g.*, J. Maria Glover, *The Structural Role of Private Enforcement Mechanisms in Public Law*, 53

38

Wm. & Mary L. Rev. 1137, 1154–56 (2012) (noting difficulties facing public regulatory agencies).

The enforcement of those statutes, therefore, falls on the shoulders of ISPs—to whom the legislatures explicitly granted a private cause of action. *Cf. McEvoy v. IEI Barge Servs., Inc*., 622 F.3d 671, 674 (7th Cir. 2010) ("Setting standards is just the first step; without effective enforcement those standards would be so many words on a piece of paper.").

The legislatures effectively deputized ISPs to serve as private attorneys general to enforce the statutes. In this role, ISPs could supplement government enforcement efforts, using their expertise to ferret out the wrongdoers and build evidentiary cases against them. *See*, *e.g*., *McEvoy*, 622 F.3d at 674 ("Citizen-suit provisions in environmental laws empower individual persons to serve as private attorneys general and to enforce standards set at the federal or state level."); *see also* William B. Rubenstein, *On What a "Private Attorney General" Is—And Why It Matters*, 57 Vand. L. Rev. 2129, 2149 (2004) ("Private attorneys general are a necessary supplement to government enforcement because [they are] better at either discerning or pursuing private wrongdoing.").

To incentivize ISPs to take up the enforcement mantle, the legislatures permitted ISPs to recover statutory damages and attorney's fees. Indeed, the district court, in a separate matter, previously concluded as much. *See*, *e.g*.,

39

*Beyond Sys., Inc. v. Keynetics, Inc.*, 422 F. Supp. 2d 523, 535–36 (noting that "holding out the possibility of substantial statutory damages [to recipients] for each transgression [of the MD-CEMA] is a far more effective and efficient way to put the State's anti-spam policy into practice [than awaiting public enforcement through Maryland's criminal anti-spam statute or the CAN-SPAM Act]"). Statutory damages further serve the purpose of deterring the unlawful behavior. *See, e.g.*, *Gonzales v. Arrow Fin. Servs., LLC*, 660 F.3d 1055, 1067 (9th Cir. 2011) ("Statutory damages under the FDCPA are intended to 'deter violations by imposing a cost on the defendant even if his misconduct imposed no cost on the plaintiff.'") (citation omitted).

BSI's efforts fall squarely into the framework created by the legislatures and fulfill the enforcement role they contemplated in enacting the CA-UCE and the MD-CEMA. On this point, the district court's concern—that reading the CA-UCE and MD-CEMA any other way would lead "to patently unreasonable results," such that "a student who sets up the wireless router in her parents' home" could be considered an ISP—is misplaced. JA-752 (Op. at 24). Even assuming such a suit were brought, it would be entirely consistent with the purpose of the statutes: to deter unlawful spam.

Moreover, the district court's invocation of the absurdity doctrine was error. The doctrine has no place here. Rather, it may be invoked where the absurdity of

40

applying the provision as written would be "so gross as to shock the general moral or common sense. And, there must be something to make plain [the legislature's intent] that the letter of the statute is not to prevail." *Md. State Dep't of Educ. v. U.S. Dep't of Veterans Affairs*, 98 F.3d 165, 169 (4th Cir. 1996) (internal punctuation and citation omitted). It does not include "substantive errors arising from a drafter's failure to appreciate the effect of certain provisions." Antonin Scalia & Bryan Garner, *Reading Law: The Interpretation of Legal Texts* at 238 (2012).

There is nothing "shocking" in finding that the Maryland and California legislatures contemplated that ISPs—of all sizes—could and would sue.

## B.    Courts May Not Alter the Elements of a Statutory Cause of Action

The district court's mere (but very apparent) disagreement with the policy choices of the Maryland and California legislatures in defining the terms ICSP and EMSP does not give it the authority to graft an additional element to the statutory cause of action to "fix" the legislation. Maryland and California law are absolutely clear and consistent on this point: courts may not read in requirements beyond those expressly set forth by the legislatures. *See*, *e.g.*, *State v. Brantner*, 758 A.2d 84, 89 (Md. 2000) ("We shall not add an element to the statute to make criminal what otherwise would not be, or to give to the statute a meaning that it does not have."); *see also Munson v. Del Taco, Inc.*, 208 P.3d 623, 678 (Cal. 2009) ("Even

41

if we agreed with defendant that adding an intent requirement to the Unruh Civil

Rights Act would be warranted to curb abuse, we would not be free to substitute

our own judgment for that of the Legislature.").

Even in instances where defendants cite "abusive litigation" tactics by

plaintiffs as a reason to alter the express elements of a statute, courts are firm that

that would be a policy decision for the legislature, not the courts.  In addressing

this very argument, the California Supreme Court concluded:

> Although we share to some degree the concerns . . . regarding the
> potential for abusive litigation being brought under the [Unruh] Act,
> *these concerns do not supply a justification for our inserting*
> *additional elements of proof into the cause of action defined by the*
> *statute. It is for the Legislature (or the People through the initiative*
> *process) to determine whether to alter the statutory elements of proof*
> *to afford business establishments protection against abusive private*
> *legal actions and settlement tactics.*

*Angelucci*, 158 P.3d at 729–30 (emphasis added).  This principle is especially true

here where a federal court is interpreting—and overriding—state legislation.

## C.     The Federal CAN-SPAM Act Has No Bearing Here

The district court's concerns regarding the CAN-SPAM Act are misplaced.

The CAN-SPAM Act is not controlling here, nor is its legislative history even

relevant.  The *Gordon* court, on which the district court relied heavily, concluded

(correctly) that the standing requirements under the CAN-SPAM Act were *limited*

to the CAN-SPAM Act and did not apply to the plaintiff's standing under the

Washington statute.  *Gordon*, 575 F. 3d at 1057–58 (finding plaintiff did not have

42

standing under the CAN-SPAM Act, but permitting plaintiff to proceed under the Washington anti-spam statute—which does not contain a similar "adversely affected" requirement).

Indeed, the *Gordon* court based its decision—that the plaintiff did not have standing under the federal CAN-SPAM Act—on two specific features of the CAN-SPAM Act, neither of which exists in the CA-UCE or MD-CEMA. First was that the CAN-SPAM Act "conferred standing only on a narrow group of possible plaintiffs[:]" certain government agencies, state attorneys general, and certain Internet access service providers, but *not* end-recipients of spam. 575 F.3d at 1049; *see also id.* at 1069 (Gould, J., concurring) (distinguishing the CAN-SPAM Act from statutes where "Congress provided a broad standing provision for private actors"). The Ninth Circuit was concerned that a broad definition of "Internet access service provider" could create an end-run around Congress's decision to limit a CAN-SPAM claim to this "narrow group." *Id.* at 1050. In contrast, both the CA-UCE and MD-CEMA confer standing on all recipients of deceptive spam.

Second was that the CAN-SPAM Act conferred standing only to ISPs "adversely affected" by violations of the Act—language the Ninth Circuit interpreted as requiring "[a] harm . . . both real and of the type experienced by ISPs." *Id.* at 1053–54. The *Gordon* court was concerned that granting standing to an entity without any actual Internet services would effectively read "adversely

43

affected" out of the statute. *Id.* at 1057. But no such language—or any other language requiring particularized harm—is present in the CA-UCE or MD-CEMA.

Nor does conferring standing on BSI "implicate preemption concerns under CAN-SPAM." JA-753 (Op. at 25). "While the CAN-SPAM Act establishes a national standard for the *content* of commercial e-mail, that standard is simply not altered or frustrated by 'allowing variation in laws governing who may bring suit' or who those suits may be brought against." *Hypertouch*, 192 Cal. App. 4th at 830 (citations omitted) (emphasis added). Congress "'indicated no intent to limit the mechanisms that California may authorize to enforce [the CA-UCE].'" *Id.* at 810; *see also Asis Internet Services v. Subscriberbase Inc.*, 2010 WL 1267763, *14 (N.D. Cal. 2010) (rejecting argument that the CAN-SPAM Act preempted the CA-UCE's standing provision).

## III. THE DOCTRINE OF *VOLENTI NON FIT INJURIA* DOES NOT APPLY TO BSI

The district court also erred in holding that the doctrine of *volenti non fit injuria* applied to bar BSI's claims under the CA-UCE and MD-CEMA. According to the court, BSI cannot sue Defendants because it is "the author of its own hurt"—that is, BSI sought "to cause injury to itself, [and] then rely on that injury to satisfy standing requirements." JA-756 (Op. at 28). But BSI did not "cause injury to itself." To the contrary, it was Defendants, through their intentional and unlawful actions, that caused injury to BSI. Though the district

44

court asserted that BSI could "manufacture" injury under the CA-UCE and MD-CEMA, JA-755 (*id.* at 27), BSI's injury under either statute only occurs after another party decides to send deceptive spam and targets BSI's servers.

While BSI may choose to pursue vigorously the statutory damages afforded to it under the CA-UCE and MD-CEMA, such willingness to obtain a legal remedy should not—and does not—negate its underlying injury.  Neither California nor Maryland law requires a plaintiff to attempt all means of shielding itself from another's unlawful intentional conduct before it can seek to hold that person accountable in civil litigation.  Moreover, when litigants have presented claims like BSI's under other statutes, courts—including the Supreme Court—have permitted those claims to go forward.  And for good reason:  a contrary approach would vitiate the private enforcement schemes set forth in statutes like the CA-UCE and MD-CEMA.

### A.    BSI Did Not Consent to Receive Unlawful Spam from Defendants

According to the district court, BSI consented to receive Defendants' spam in several ways:  using spam-trap email addresses; failing to employ effective filtering devices; and receiving spam routed through Hypertouch.  These actions, the court explained, showed that BSI both "seek[s] to manufacture the receipt of spam," (JA-757 (Op. at 29)), and attempts to "actively solicit spam," (JA-764 (*id.*

45

at 36)).  Consequently, the court reasoned, *volenti non fit injuria* applies to BSI's claims.

This is a complete misunderstanding both of the record and of California and Maryland tort law.  First, BSI did not—and cannot—"manufacture" a claim under the CA-UCE or MD-CEMA.  BSI's injury under either statute depends entirely on another party making the deliberate decision to initiate and transmit deceptive spam.  BSI has a claim under the CA-UCE and MD-CEMA only if it receives deceptive spam, and BSI can only receive deceptive spam if a third party—here, Defendants—decides to send it to BSI.  Though the district court describes BSI as "trapping" spam, *every* message in this case was addressed to a BSI email account. This is true for the deceptive spam sent to BSI's "spam-trap" email addresses and for the spam routed through Hypertouch.  In each case, a BSI email account was the message's intended recipient.

Second, BSI has never "actively solicited" spam.  To the contrary, any communications BSI has ever had with Defendants have expressed a desire *not* to receive spam.  BSI's SMTP banner cautions not to send it unsolicited commercial email.  And BSI utilized "opt-out" mechanisms that were held out by Defendants as a way to *stop* spam, not to receive more of it.  While utilizing these features may have actually resulted in more spam, their fraudulent nature cannot be proof that BSI somehow expressed a willingness to receive more unsolicited email.  Indeed,

46

holding otherwise requires the remarkably Orwellian conclusion that "opt out" actually means "opt in."

Third, the district court was incorrect to conclude that BSI somehow consented to receiving Defendants' spam by employing what the court deemed to be inadequate measures to filter and block that spam. BSI's supposed failure to employ "adequate" anti-spam measures does not give Defendants *carte blanche* to send BSI deceptive spam. Neither the CA-UCE, the MD-CEMA, or general principles of tort law requires that BSI first attempt other means of blocking Defendants' deceptive spam before it may use the remedies afforded to it by law.

In both California and Maryland, a plaintiff's deliberate self-exposure to the possibility of harm—that is, assumption of risk—is not a defense to intentional tortious conduct. *See Ordway v. Superior Court*, 198 Cal. App. 3d 98, 108 (1998) (noting assumption of risk "has little or no application in the case of intentional or reckless conduct"); *Janelsins v. Button*, 648 A.2d 1039, 1045 (Md. Ct. Spec. App. 1994) (agreeing with "[o]ther jurisdictions that have considered the issue of assumption of risk as a defense to an intentional tort [and] have overwhelmingly rejected its applicability"). That BSI may not have taken all possible measures to filter or block Defendants' deceptive spam does not mean that Defendants can send it deceptive spam with impunity, any more than a failure to install a deadbolt lock in a high-crime neighborhood would be consent to burglary.

47

The district court's discussion of BSI's SMTP banner and "opt out" requests rests on a similar misapprehension of California and Maryland law. The court concluded, in essence, that these requests failed to raise even a genuine issue about BSI's consent because Defendants always disregard such requests. Asking Defendants to stop sending spam is, the court explained, "like a homeowner posting a sign on his rear basement window saying 'No housebreaking,' while leaving the doors and windows wide open and silverware and jewelry in open sight." JA-763 (Op. at 35). This reasoning has no basis in tort law. And even were the court's analogy accurate, it does not prove the court's point. A thief who enters an unlocked home is still guilty of trespass, and if he takes the homeowner's property, he is still guilty of burglary under the criminal law and liable for conversion under tort law.

Nor can the district court find support for its positions in *Gordon*. JA-760-61 (Op. at 32–33). As an initial matter, *Gordon*'s facts are inapposite. While plaintiff purported to be an Internet services company like BSI, it had no actual customers, used infrastructure leased from another company, and received no income from its supposed business. *See* 575 F.3d at 1045, 1056. More importantly, the *Gordon* plaintiff brought claims under the federal CAN-SPAM Act, which, unlike the CA-UCE or MD-CEMA, permits ISPs to sue only if they have been "adversely affected" by a violation of the Act. *See id.* at 1052–53

48

(citing 15 U.S.C. § 7706(g)(1)). It was on this particular statutory requirement—not on general principles of tort law—that the Ninth Circuit based its decision. It interpreted "adversely affected" to require a harm "both real and of the type experienced by ISPs," and held that the plaintiff could not show such harm because his "claimed harms almost exclusively relate to litigation preparation." *Id.* at 1053, 1056; *see also Asis Internet Servs.*, 2010 WL 1267763, at *13 (observing that plaintiff had standing to sue under the CA-UCE, but not the CAN-SPAM Act, because "section 17529.5(b) lacks the 'adversely affected' language of the CAN-SPAM act").

In sum, the undisputed facts of this case do not prove that BSI manifested any sort of consent to receive Defendants' deceptive spam.[22]

**B.    Barring BSI's Claims on Consent Grounds Would Frustrate the Purposes of the CA-UCE and MD-CEMA and Depart from Well-Established Law**

Besides its inconsistency both with the record and with fundamental principles of tort law, the district court's application of *volenti non fit injuria* to

---

[22] Relatedly, the district court erred in stating that "BSI has already had a trial on the issue of consent" in Phase II and that "[t]he jury implicitly accepted Defendants' view and rejected BSI's." JA-762-63 (Op. at 34–35). The district court's Phase II jury instructions said nothing about consent—rather, they instructed the jury to focus on whether BSI "primarily and substantially" provides ISP services or "primarily or substantially" engages in anti-spam litigation. JA-438-439 (6/28/12 Trial Tr. at 5–6 (Phase II Jury Instructions)). The jury's finding that BSI was not a "*bona fide*" ICSP/EMSP consequently says nothing about its view on whether BSI consented to the receipt of spam.

49

BSI's claims also sabotages the very policies that the CA-UCE and MD-CEMA seek to advance.  The CA-UCE and MD-CEMA contemplate private enforcement as integral to reducing deceptive spam.  But as this very litigation proves, suing spammers is an uncertain and expensive process.  Given this uncertainty and expense, it is reasonable—indeed, prudent—for a potential plaintiff to attempt to retain as many unsolicited and deceptive emails as it can, both to bolster the evidence supporting its claim and to ensure that it is adequately compensated for bringing suit.  The district court's holding impermissibly curtails the reach of the CA-UCE's and MD-CEMA's private enforcement mechanisms.

Nothing compels the district court to apply *volenti non fit injuria* to BSI's claims.  Neither California nor Maryland has held that the doctrine applies where the plaintiff's willingness to suffer legal injury is motivated by the corresponding statutory remedy.  In fact, the California Supreme Court has repeatedly permitted claims under the Unruh Civil Rights act to proceed even when brought by repeat or "professional" plaintiffs.  *See, e.g.*, *Munson*, 208 P.3d at 633 (declining to adopt interpretation of the Act that defendant argued would diminish purportedly abusive claims by serial litigants, and noting that the court is "bound to interpret the Unruh Civil Rights Act in accordance with the legislative intent"); *Angelucci*, 158 P.3d at 729 (similarly observing that concern about abusive litigation not a sufficient

50

reason to "insert[] additional elements of proof into the cause of action defined by the statute").

Federal law is in harmony on this point. The U.S. Supreme Court has held that a plaintiff who is given false information about housing on account of the plaintiff's race—a violation of the Fair Housing Act—could bring suit under the Act even though he "approached the real estate agent fully expecting that he would receive false information." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 374 (1982). As the Supreme Court explained, so long as the plaintiff was protected by the statute and had suffered injury within the meaning of the statute, it did not matter whether he had intentionally taken steps to bring about that injury. *Id.*

In short, neither the CA-UCE nor the MD-CEMA contains a requirement that an ICSP or EMSP must try to filter, block, or otherwise avoid deceptive spam before it can sue upon that spam. This Court should not condone the district court's creation of one through a novel and unsupported application of California and Maryland common law, especially when doing so would thwart the private enforcement schemes that the California and Maryland legislatures sought to create.

## IV. THE HYPERTOUCH-KRAFT SETTLEMENT AGREEMENT DOES NOT BIND BSI

The district court finally erred in holding that BSI was bound by a prior settlement agreement between Kraft and Hypertouch and could not sue Kraft for

51

any deceptive emails routed to BSI through Hypertouch's servers.  The court concluded that this 2006 agreement, which had released Hypertouch's present and future claims against Kraft in a previous litigation, applied to BSI because BSI "obviously" qualified as an "assignee[]" of Hypertouch under the agreement's release provisions.  *See* JA-732 (Op. at 4 n.5).  But BSI is not Hypertouch's "assign."  Moreover, and as the district court ignored, even if BSI were somehow the "assign" of Hypertouch, the settlement agreement's release of future claims against Kraft would still permit BSI to sue for emails that Hypertouch received after the agreement's signing.

The settlement agreement between Hypertouch and Kraft contains two separate releases:  (1) a release of Hypertouch's then-existing claims against Kraft ("Present Claims Release") and (2) a release of Hypertouch's possible future claims against Kraft ("Future Claims Release").  The Present Claims Release applies to Hypertouch's claims against Connexus's predecessor company, Vendare Media, but the Future Claims Release expressly provides that such claims are not released.  *See* JA-556 (Settlement Agreement at 4).  The agreement is governed by California law.  *See* JA-561 *(id.* at 9).

Given this structure of the settlement agreement, the spam routed to BSI through Hypertouch servers can be divided into three categories:  (1) all spam routed through Hypertouch servers before the settlement; (2) non-Connexus spam

52

routed through Hypertouch servers after the settlement; and (3) Connexus spam

routed through Hypertouch servers after the settlement.  As the district court

recognized, this third category—Connexus spam received by Hypertouch after the

settlement—is not covered under either release.  *See* JA-732 *(*Op. at 4 n.5).[23]  The

court erred, however, in concluding that the releases barred BSI from suing Kraft

over email in the other two categories.

### A.    BSI May Sue on Unlawful Spam Routed through Hypertouch's Servers Before the Settlement

First, the settlement agreement does not bar BSI from suing over email

routed through Hypertouch's servers prior to the execution of the settlement

agreement, because BSI is not an "assign" of Hypertouch.  The Present Claims

Release states that Kraft and Hypertouch

> for themselves, *their parents and subsidiaries, and each of their*
> *respective officers, directors, agents, representatives, employees,*
> *predecessors, successors, assigns, insurers, attorneys, accountants,*
> *guarantors, and guarantees* . . . , hereby mutually remise, release,
> acquit, absolve and forever discharge each other, and their parents and
> subsidiaries,   and   their   respective   officers,   directors,   agents,
> representatives,   employees,   predecessors,   successors,   assigns,
> insurers, attorneys, accountants, guarantors, and guarantees . . . of and
> from any and all manner of action or actions, cause or causes of
> action, in law or in equity, claims, suits, debts, liens, contracts,
> agreements, promises, liabilities, demands, damages, losses, interest,
> costs, expenses, and guarantees, of any nature whatsoever, known or

---

[23] The district court reasoned that this category of claims was nevertheless
barred by BSI's lack of standing and the doctrine of *volenti non fit injuria*,
discussed *supra* at 31-52.

53

> unknown, fixed or contingent, direct or derivative, subrogated or assigned, suspected or unsuspected, arising *from or relating to the Action or electronic mail advertising Gevalia products received as of the date of this Agreement which the Releasors have now against the Releasees.*

JA-554 (Settlement Agreement at 2) (emphases added).

"Assigns," as the U.S. Supreme Court has noted, has a "histor[y] of legal meaning." *Kennedy v. Plan Adm'r for DuPont Sav. & Inv. Plan*, 555 U.S. 285, 292 (2009). California courts, for example, have consistently defined "assign" to mean a transfer of legal rights. *See, e.g.*, *Commercial Disc. Co. v. Cowen*, 116 P.2d 599, 602 (Cal. 1941) ("The word assign, in the ordinary legal sense, means to transfer title of ownership of property."); *Noble v. Draper*, 73 Cal. App. 4th 1, 13 (2008) ("An assignment is a 'transfer or setting over of property, or of some right or interest therein, from one person to another . . . .'") (citation omitted). Nothing in the Settlement Agreement suggests that Kraft and Hypertouch intended "assigns" to have anything other than this customary legal meaning. First, the agreement is a legal document. Second, "assigns" is used as a noun rather than as a verb. Third, "assigns" is listed alongside other legal titles such as "officers," "directors," and "guarantors," and is part of a sentence that provides for the release of intangible legal rights such as "action or actions," "claims," "contracts," and "liabilities." JA-554 (Settlement Agreement at 2).

The district court thus erred when it concluded that the term "assigns" in the Settlement Agreement "would obviously include BSI." JA-732 (Op. at 4 n.5). That Joe and Paul Wagner do business together does not make one the "assign" of the other. Nor does the routing of email through Hypertouch's servers make BSI an "assign." Email messages are not causes of action or contractual rights. Lest we all create legal relationships whenever we forward an email to friends or coworkers, BSI's receipt of email routed through Hypertouch cannot by itself make it Hypertouch's "assign."

Consider the following hypothetical case. Two brothers owning adjacent parcels of land construct a pond extending across their property line. A third party dumps pollutants onto one brother's property that contaminates the entire pond. If one brother settles with the polluter, granting a release that includes his "assigns," the other brother still has a cause of action because he is suing to enforce his own rights and not as an assignee of his brother's claims. This holds just as true for claims brought under the CA-UCE and MD-CEMA—statutes that clearly envision a single email creating liability to multiple plaintiffs. *See* Cal. Bus. & Prof. § 17529.5(b) (Addendum 6); Md. Code Ann., Com. Law § 14-3003 (Addendum 12).

## B.    BSI May Sue on Unlawful Spam Routed through Hypertouch's Servers After the Settlement

Second, even if BSI were somehow the "assign" of Hypertouch, the Settlement Agreement still permits BSI to sue Kraft for the emails routed through Hypertouch's servers *after* the agreement was signed.  The Future Claims Release, unlike the Present Claims Release, does not include Hypertouch's "assigns":

> *Hypertouch, its parents and subsidiaries and each of their respective officers, directors, and employees* . . . expressly and knowingly waive any rights they may have to bring an action against Engwall and its parents and subsidiaries . . . from any and all manner of action or actions, cause or causes of action, in law or in equity, claims, suits, debts, liens, contracts, agreements, promises, liabilities, demands, damages, losses, interest, costs, expenses, and guarantees, of any nature whatsoever, known or unknown, fixed or contingent, direct or derivative, subrogated or assigned, suspected or unsuspected, *which the Future Claim Releasors may have in the future attributable to electronic mail sent at any time between the date of this Agreement and January 1, 2016 against the Engwall Future Claim Releasees* . . . in exchange for cooperation by Engwall specified in Section 3(c), below.

JA-555 (Settlement Agreement at 3) (emphases added).  As this language makes clear, the Future Claims Release is limited to Hypertouch, its parents and subsidiaries, and any officers, directors, or employees of those companies, none of which describes BSI.

The district court, likely aware of this difference in language, determined that *BSI* could not bring claims for subsequently received spam because *Hypertouch* failed to notify Kraft about the emails, pursuant to the agreement's

56

Cooperation Provision.  *See* JA-732 *(*Op. at 4 n.5).  But this conclusion misreads the plain language of the settlement agreement.  The Cooperation Provision states, in relevant part:

> **c.** **Cooperation of Engwall:**  In consideration for the release and waiver of Future Claims, Engwall will cooperate with Hypertouch in the event that Hypertouch receives allegedly unlawful electronic mail advertising Gevalia or other Engwall products.  *As a condition precedent to that cooperation*, Hypertouch must provide to Engwall a copy of the allegedly unlawful electronic mail within twenty (20) business days of receipt of that electronic mail.

JA-556 (Settlement Agreement at 4 (emphasis added)).  Nothing in the Settlement Agreement *requires* Hypertouch—which cannot sue regardless—to notify Kraft about subsequently received emails.  Even more fundamentally, and as the district court completely ignores, whether *Hypertouch* has followed a provision of the Future Claims Release has nothing to do with whether *BSI* is subject to that release in the first place.

## <u>CONCLUSION</u>

The judgment should be reversed and the case should be remanded for further proceedings.

## <u>REQUEST FOR ORAL ARGUMENT</u>

BSI respectfully requests oral argument on all issues raised herein.

This the 9th day of January, 2014.

Respectfully Submitted,

STEPTOE & JOHNSON LLP

By: /s/ *Richard K. Willard*
Richard K. Willard
Jill C. Maguire
Benjamin B. Watson
Steptoe & Johnson LLP
1330 Connecticut Avenue, NW
Washington, DC  20036
Telephone: (202) 429-3000
Fax: (202) 429-3902
E-Mail: rwillard@steptoe.com

*Counsel for Plaintiff-Appellant  Beyond Systems, Inc.*

Of Counsel:

Stephen H. Ring
LAW OFFICES OF STEPHEN H. RING, PC
506 Main Street, Suite 215
Gaithersburg, MD 20878

Michael S. Rothman
LAW OFFICE OF MICHAEL S. ROTHMAN
401 East Jefferson Street, Suite 201
Rockville, MD 20850-0000

*Counsel for Plaintiff-Appellant  Beyond Systems, Inc.*

## ADDENDUM

### California Business & Professions Code § 17529

### § 17529.  Legislative findings and declarations

The Legislature hereby finds and declares all of the following:

(a)  Roughly 40 percent of all e-mail traffic in the United States is comprised of unsolicited commercial e-mail advertisements (hereafter spam) and industry experts predict that by the end of 2003 half of all e-mail traffic will be comprised of spam.

(b)  The increase in spam is not only an annoyance but is also an increasing drain on corporate budgets and possibly a threat to the continued usefulness of the most successful tool of the computer age.

(c)  Complaints from irate business and home-computer users regarding spam have skyrocketed, and polls have reported that 74 percent of respondents favor making mass spamming illegal and only 12 percent are opposed, and that 80 percent of respondents consider spam very annoying.

(d)  According to Ferris Research Inc., a San Francisco consulting group, spam will cost United States organizations more than ten billion dollars ($10,000,000,000) this year, including lost productivity and the additional equipment, software, and manpower needed to combat the problem.  California is 12 percent of the United States population with an emphasis on technology business, and it is therefore estimated that spam costs California organizations well over 1.2 billion dollars ($1,200,000,000).

(e)  Like junk faxes, spam imposes a cost on users, using up valuable storage space in e-mail inboxes, as well as costly computer band width, and on networks and the computer servers that power them, and discourages people from using e-mail.

(f)  Spam filters have not proven effective.

(g)  Like traditional paper "junk" mail, spam can be annoying and waste time, but it also causes many additional problems because it is easy and inexpensive to create, but difficult and costly to eliminate.

(h)  The "cost shifting" from deceptive spammers to Internet business and e-mail users has been likened to sending junk mail with postage due or making telemarketing calls to someone's pay-per-minute cellular phone.

(i)  Many spammers have become so adept at masking their tracks that they are rarely found, and are so technologically sophisticated that they can adjust their systems to counter special filters and other barriers against spam and can even electronically commandeer unprotected computers, turning them into spam-launching weapons of mass production.

(j)  There is a need to regulate the advertisers who use spam, as well as the actual spammers, because the actual spammers can be difficult to track down due to some return addresses that show up on the display as "unknown" and many others being obvious fakes and they are often located offshore.

(k)  The true beneficiaries of spam are the advertisers who benefit from the marketing derived from the advertisements.

(l)  In addition, spam is responsible for virus proliferation that can cause tremendous damage both to individual computers and to business systems.

(m)  Because of the above problems, it is necessary that spam be prohibited and that commercial advertising e-mails be regulated as set forth in this article.

CREDIT(S):
Added by Stats. 2003, c. 487 (S.B. 186), § 1).

## California Business & Professions Code § 17529.1

### § 17529.1    Definitions

For the purpose of this article, the following definitions apply:

(a)  "Advertiser" means a person or entity that advertises through the use of commercial e-mail advertisements.

(b)  "California electronic mail address" or "California e-mail address" means any of the following:

   (1)  An e-mail address furnished by an electronic mail service provider that sends bills for furnishing and maintaining that e-mail address to a mailing address in this state.

   (2)  An e-mail address ordinarily accessed from a computer located in this state.

   (3)  An e-mail address furnished to a resident of this state.

(c)  "Commercial e-mail advertisement" means any electronic mail message initiated for the purpose of advertising or promoting the lease, sale, rental, gift offer, or other disposition of any property, goods, services, or extension of credit.

(d)  "Direct consent" means that the recipient has expressly consented to receive e-mail advertisements from the advertiser, either in response to a clear and conspicuous request for the consent or at the recipient's own initiative.

(e)  "Domain name" means any alphanumeric designation that is registered with or assigned by any domain name registrar as part of an electronic address on the Internet.

(f)  "Electronic mail" or "e-mail" means an electronic message that is sent to an e-mail address and transmitted between two or more telecommunications devices, computers, or electronic devices capable of receiving electronic messages, whether or not the message is converted to hard copy format after receipt, viewed upon

3

transmission, or stored for later retrieval. "Electronic mail" or "e-mail" includes electronic messages that are transmitted through a local, regional, or global computer network.

(g)    "Electronic mail address" or "e-mail address" means a destination, commonly expressed as a string of characters, to which electronic mail can be sent or delivered. An "electronic mail address" or "e-mail address" consists of a user name or mailbox and a reference to an Internet domain.

(h)  "Electronic mail service provider" means any person, including an Internet service provider, that is an intermediary in sending or receiving electronic mail or that provides to end users of the electronic mail service the ability to send or receive electronic mail.

(i)    "Initiate" means to transmit or cause to be transmitted a commercial e-mail advertisement or assist in the transmission of a commercial e-mail advertisement by providing electronic mail addresses where the advertisement may be sent, but does not include the routine transmission of the advertisement through the network or system of a telecommunications utility or an electronic mail service provider through its network or system.

(j)  "Incident" means a single transmission or delivery to a single recipient or to multiple recipients of an unsolicited commercial e-mail advertisement containing substantially similar content.

(k)  "Internet" has the meaning set forth in paragraph (6) of the subdivision (e) of Section 17539.

(l)    "Preexisting or current business relationship," as used in connection with the sending of a commercial e-mail advertisement, means that the recipient has made an inquiry and has provided his or her e-mail address, or has made an application, purchase, or transaction, with or without consideration, regarding products or services offered by the advertiser.

Commercial e-mail advertisements sent pursuant to the exemption provided for a preexisting or current business relationship shall provide the recipient of the commercial e-mail advertisement with the

4

ability to "opt-out" from receiving further commercial e-mail advertisements by calling a toll-free telephone number or by sending an "unsubscribe" e-mail to the advertiser offering the products or services in the commercial e-mail advertisement.    This opt-out provision does not apply to recipients who are receiving free e-mail service with regard to commercial e-mail advertisements sent by the provider of the e-mail service.

(m)  "Recipient" means the addressee of an unsolicited commercial e-mail advertisement. If an addressee of an unsolicited commercial e-mail advertisement has one or more e-mail addresses to which an unsolicited commercial e-mail advertisement is sent, the addressee shall be deemed to be a separate recipient for each e-mail address to which the e-mail advertisement is sent.

(n)  "Routine transmission" means the transmission, routing, relaying, handling, or storing of an electronic mail message through an automatic technical process.  "Routine transmission" shall not include the sending, or the knowing participation in the sending, of unsolicited commercial e-mail advertisements.

(o)    "Unsolicited commercial e-mail advertisement" means a commercial e-mail advertisement sent to a recipient who meets both of the following criteria:

    (1)  The recipient has not provided direct consent to receive advertisements from the advertiser.

    (2)   The recipient does not have a preexisting or current business relationship, as defined in subdivision (l), with the advertiser promoting the lease, sale, rental, gift offer, or other disposition of any property, goods, services, or extension of credit.

CREDIT(S):
(Added by Stats. 2003, c. 487 (S.B. 186), § 1.  Amended by Stats. 2004, c. 183 (A.B. 3082), § 14)).

## California Business & Professions Code § 17529.5

### § 17529.5   Unlawful activities relating to commercial e-mail advertisements; additional remedies

(a)  It is unlawful for any person or entity to advertise in a commercial e-mail advertisement either sent from California or sent to a California electronic mail address under any of the following circumstances:

(1)   The e-mail advertisement contains or is accompanied by a third-party's domain name without the permission of the third party.

(2)   The e-mail advertisement contains or is accompanied by falsified, misrepresented, or forged header information.  This paragraph does not apply to truthful information used by a third party who has been lawfully authorized by the advertiser to use that information.

(3)   The e-mail advertisement has a subject line that a person knows would be likely to mislead a recipient, acting reasonably under the circumstances, about a material fact regarding the contents or subject matter of the message.

(b)(1)(A)  In addition to any other remedies provided by any other provision of law, the following may bring an action against a person or entity that violates any provision of this section:

(i)  The Attorney General.

(ii)  An electronic mail service provider.

(iii)   A recipient of an unsolicited commercial e-mail advertisement, as defined in Section 17529.1.

(B)   A person or entity bringing an action pursuant to subparagraph (A) may recover either or both of the following:

(i)  Actual damages.

6

(ii)   Liquidated damages of one thousand dollars ($1,000) for each unsolicited commercial e-mail advertisement transmitted in violation of this section, up to one million dollars ($1,000,000) per incident.

(C)   The recipient, an electronic mail service provider, or the Attorney General, if the prevailing plaintiff, may also recover reasonable attorney's fees and costs.

(D)   However, there shall not be a cause of action under this section against an electronic mail service provider that is only involved in the routine transmission of the e-mail advertisement over its computer network.

(2)   If the court finds that the defendant established and implemented, with due care, practices and procedures reasonably designed to effectively prevent unsolicited commercial e-mail advertisements that are in violation of this section, the court shall reduce the liquidated damages recoverable under paragraph (1) to a maximum of one hundred dollars ($100) for each unsolicited commercial e-mail advertisement, or a maximum of one hundred thousand dollars ($100,000) per incident.

(3) (A)   A person who has brought an action against a party under this section shall not bring an action against that party under Section 17529.8 or 17538.45 for the same commercial e-mail advertisement, as defined in subdivision (c) of Section 17529.1.

(B)   A person who has brought an action against a party under Section 17529.8 or 17538.45 shall not bring an action against that party under this section for the same commercial e-mail advertisement, as defined in subdivision (c) of Section 17529.1.

(c)   A violation of this section is a misdemeanor, punishable by a fine of not more than one thousand dollars ($1,000), imprisonment in a county jail for not more than six months, or both that fine and imprisonment.

CREDIT(S):
(Added by Stats. 2003, c. 487 (S.B. 186), § 1, Amended by Stats. 2004, c. 571 (S.B. 1457), § 1; Stats. 2005, c. 247 (S.B. 97), § 1).

**Maryland Commercial Law Code § 14-3001**

### § 14-3001. Definitions

(a) In general. -- In this subtitle the following words have the meanings indicated.

(b) Commercial electronic mail. –

(1) "Commercial electronic mail" means electronic mail that advertises real property, goods, or services for sale or lease.

(2) "Commercial electronic mail" does not include electronic mail to which an interactive computer service provider has attached an advertisement in exchange for free use of an electronic mail account.

(c) Interactive computer service provider. –

(1) "Interactive computer service provider" means an information service, system, or access software provider that provides or enables computer access by multiple users to a computer service.

(2) "Interactive computer service provider" includes a service or system that provides access to the Internet and systems operated or services offered by a library or educational institution.

CREDIT(S):
2002, chs. 323, 324.

**Maryland Commercial Law Code § 14-3002**

### § 14-3002. Unauthorized, false, or misleading information through electronic mail

(a) Application. -- This section does not apply to an interactive computer service provider or a telecommunication utility to the extent that the interactive computer service provider or the telecommunication utility merely handles, retransmits, or carries a transmission of commercial electronic mail.

(b) Prohibition. -- A person may not initiate the transmission, conspire with another person to initiate the transmission, or assist in the transmission of commercial electronic mail that:

(1) Is from a computer in the State or is sent to an electronic mail address that the sender knows or should have known is held by a resident of the State; and

(2) (i) Uses a third party's Internet domain name or electronic mail address without the permission of the third party;

(ii) Contains false or misleading information about the origin or the transmission path of the commercial electronic mail; or

(iii) Contains false or misleading information in the subject line that has the capacity, tendency, or effect of deceiving the recipient.

(c) Presumption. -- A person is presumed to know that the intended recipient of commercial electronic mail is a resident of the State if the information is available on request from the registrant of the Internet domain name contained in the recipient's electronic mail address.

(d) Blocking. – An interactive computer service provider:

(1) May block the receipt or transmission through its interactive computer service of commercial electronic mail that it reasonably believes is or will be sent in apparent violation of this section; and

10

(2) May not be held liable for an action under item (1) of this subsection that is voluntarily taken in good faith.

CREDIT(S):
2002, chs. 323, 324.

## Maryland Commercial Law Code § 14-3003

### § 14-3003.  Penalty

A person who violates this subtitle is liable for reasonable attorney's fees and for damages:

(1) To the recipient of commercial electronic mail, in an amount equal to the greater of $ 500 or the recipient's actual damages;

(2) To the third party without whose permission the third party's Internet domain name or electronic mail address was used, in an amount equal to the greater of $500 or the third party's actual damages; and

(3) To an interactive computer service provider, in an amount equal to the greater of $ 1,000 or the interactive computer service provider's actual damages.

CREDIT(S):
2002, chs. 323, 324.

**CERTIFICATE OF COMPLIANCE WITH RULE 28.1(e) or 32(a)**
**Certificate of Compliance With Type-Volume Limitation,**
**Typeface Requirements, and Type Style Requirements**

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because this brief contains 13,699 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14 point Times New Roman.

Dated: January 9, 2014                    Respectfully submitted by:

                                          STEPTOE & JOHNSON LLP

                                          By: /s/ *Jill C. Maguire*
                                          Richard K. Willard
                                          Jill C. Maguire
                                          Steptoe & Johnson LLP
                                          1330 Connecticut Avenue, NW
                                          Washington, DC  20036
                                          Telephone: (202) 429-3000
                                          Fax: (202) 429-3902
                                          E-Mail: jmaguire@steptoe.com

                                          *Counsel for Plaintiff-Appellant Beyond*
                                              *Systems, Inc.*

## CERTIFICATE OF SERVICE

I certify that on January 9, 2014 the foregoing document was served on all

parties or their counsel of record through the CM/ECF system if they are registered

users or, if they are not, by serving a true and correct copy at the addresses listed

below via U.S. mail.


John K. Roche
PERKINS COIE LLP
700 13th St., N.W., Suite 600
Washington, D.C. 20005-3960
*Counsel for Appellees Kraft Foods, Incorporated, Vict. Th. Engwall & Co., Kraft Foods Global, Incorporated*

J. Douglas Baldridge
Ari N. Rothman
VENABLE LLP
575 7th Street, N.W.
Washington, DC 20004-1601
*Counsel for Appellee Connexus Corporation*

Dated:       January 9, 2014

Respectfully submitted by:

STEPTOE & JOHNSON LLP

By: /s/ *Jill C. Maguire*
Richard K. Willard
Jill C. Maguire
Steptoe & Johnson LLP
1330 Connecticut Avenue, NW
Washington, D.C. 20036
Tel: (202) 429-3000
Fax: (202) 429-3902
Email: jmaguire@steptoe.com

*Counsel for Plaintiff-Appellant Beyond
Systems, Inc.*