RECORD NO. 13-2137

In the

# United States Court of Appeals

### For The Fourth Circuit

**BEYOND SYSTEMS, INC.,**

*Plaintiff-Appellant,*

**v.**

**KRAFT FOODS, INCORPORATED; VICT. TH. ENGWALL & CO.;
KRAFT FOODS GLOBAL, INCORPORATED; and
CONNEXUS CORPORATION,**

*Defendants-Appellees.*

**ON APPEAL FROM THE U.S. DISTRICT COURT
FOR THE DISTRICT OF MARYLAND AT GREENBELT**

**BRIEF OF APPELLEES KRAFT FOODS, INCORPORATED; VICT. TH.
ENGWALL & CO.; and KRAFT FOODS GLOBAL, INCORPORATED**

John K. Roche
PERKINS COIE LLP
700 13th St., N.W., Suite 600
Washington, D.C. 20005-3960
(202) 434-1627

Of Counsel:
Darrell J. Graham
John E. Bucheit
ROESER BUCHEIT & GRAHAM LLC
Two N. Riverside Plaza, Suite 1420
Chicago, IL 60606
(312) 621-0301

*Counsel for Appellees Kraft Foods Inc., Vict. Th. Engwall & Co., and Kraft Foods Global*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case.  In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form.  Counsel has a continuing duty to update this information.

No. _____     Caption: _____

Pursuant to FRAP 26.1 and Local Rule 26.1,

_____
(name of party/amicus)

_____

 who is _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.      Is party/amicus a publicly held corporation or other publicly held entity?     YES     NO


2.      Does party/amicus have any parent corporations?                    YES     NO
        If yes, identify all parent corporations, including grandparent and great-grandparent corporations:




3.      Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                YES     NO
        If yes, identify all such owners:

4.      Is there any other publicly held corporation or other publicly held entity that has a direct
        financial interest in the outcome of the litigation (Local Rule 26.1(b))?        YES      NO
        If yes, identify entity and nature of interest:

5.      Is party a trade association? (amici curiae do not complete this question)      YES      NO
        If yes, identify any publicly held member whose stock or equity value could be affected
        substantially by the outcome of the proceeding or whose claims the trade association is
        pursuing in a representative capacity, or state that there is no such member:

6.      Does this case arise out of a bankruptcy proceeding?                            YES      NO
        If yes, identify any trustee and the members of any creditors' committee:

Signature: _____          Date: _____

Counsel for: _____

## CERTIFICATE OF SERVICE
**************************

I certify that on _____ the foregoing document was served on all parties or their
counsel of record through the CM/ECF system if they are registered users or, if they are not, by
serving a true and correct copy at the addresses listed below:

_____                    _____
       (signature)                                         (date)

# TABLE OF CONTENTS

DISCLOSURE OF CORPORATE AFFILIATIONS

TABLE OF CONTENTS.................................................................i

TABLE OF AUTHORITIES ........................................................ iii

ABBREVIATIONS ....................................................................1

STATEMENT OF ISSUES .........................................................1

STATEMENT OF THE CASE......................................................1

    I.     OVERVIEW OF THE UNDISPUTED FACTS ..............................1

    II.    THE LEGISLATIVE FRAMEWORK GOVERNING
          BSI'S CLAIMS ..................................................................4

          A.    CAN-SPAM Act's Preemption of State Law
                Regulation ......................................................4

          B.    Prop. 64 Amends California's False Advertising
                Law to Abolish Private Attorney General Actions................7

          C.    The MD-CEMA and Maryland's Consumer
                Protection Act ........................................................8

    III.    THE EVIDENCE PRESENTED AT TRIAL ................................10

          A.    The Business Front:  BSI's Skeletal ISP Services...............10

          B.    The Origins of BSI's Litigation Mill and Its
                Methods for Collecting Spam ...............................12

          C.    BSI'S Litigation Activities ........................................17

          D.    Relevant Proceedings Below ................................21

SUMMARY OF THE ARGUMENT ...............................................24

STANDARD OF REVIEW ..........................................................25

i

ARGUMENT ...................................................................................25

I.    STATE AND FEDERAL STANDING
REQUIREMENTS ........................................................25

II.    PROPERLY CONSTRUED, THE MD-CEMA AND CA-
UCE LIMIT STANDING TO *BONA FIDE* ICSPS OR
EMSPS GENUINELY AND ADVERSELY AFFECTED
BY THE ALLEGED STATUTORY HARM ...............................27

    A.    The District Court Properly Rejected BSI's Literal
Interpretation of the Statutes in Accordance with
the "Plain Meaning" Rule .....................................27

    B.    The District Court Properly Looked to Other
Sources of Legislative Intent Given the State
Statutes' Ambiguity ..............................................33

    C.    A *Bona Fide,* Genuinely Affected Standing
Requirement Is Consistent with Related Statutory
Provisions, Common Law, and Analogous Federal
Law .......................................................................36

    D.    Kraft's Interpretation Avoids Preemption; BSI's
Invites It ...............................................................45

III.    THE DISTRICT COURT PROPERLY DISMISSED
BSI'S CLAIMS FOR LACK OF ARTICLE III
STANDING ................................................................51

IV.    THE DISTRICT COURT PROPERLY GRANTED
SUMMARY JUDGMENT BASED ON CONSENT ...................52

V.    THE DISTRICT COURT CORRECTLY RULED THAT
EMAIL ROUTED TO BSI THROUGH HYPERTOUCH
WAS BARRED BY KRAFT'S SETTLEMENT
AGREEMENT WITH HYPERTOUCH ................................55

CONCLUSION ................................................................58

REQUEST FOR ORAL ARGUMENT…………………………………....58

CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

# TABLE OF AUTHORITIES

## Cases-Federal

*Altria Group, Inc. v. Good*, 129 S. Ct. 538 (2008) ....................................45

*Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564 (1985) ............................25

*Anderson v. Sara Lee Corp.*, 508 F.3d 181(4th Cir. 2007) .....................................49

*Asis Internet Services*, 2010 WL 1267763 (N.D. Cal. April 1, 2010)........ 39, 47, 48

*Burns v. United States*, 501 U.S. 129 (1991)...........................................27

*Cantrell v. City of Long Beach*, 241 F.3d 674 (9th Cir. 2001) ...............................27

*Ente Nazionale Per L'Energia Electrrica v. Baliwag Nav. Inc.*, 774 F.2d 648 (4th Cir. 1985)..................................................................25

*Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658 (D.C. Cir. 1996) ..............................26

*Gladstone Realtors v. Village of Bellwood*, 441 U.S. 91 (1979)............................51

*Goode v. City of Philadelphia*, 539 F.3d 311 (3d Cir. 2008) ................................27

*Gordon v. Virtumundo*, 575 F.3d 1040 (9th Cir. 2009).................................. passim

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ................................26

*Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.*, 418 F.3d 168 (2d Cir. 2005) ..............................................................26

*Omega World Travel, Inc. v. Mummagraphics, Inc.*, 469 F.3d 348 (4th Cir. 2006) ................................................................................. passim

*Phillips Petroleum Co. v. Shutts*, 472 U.S. 797 (1985) .............................27

*Rodriguez v. MEBA Pension Trust*, 827 F.2d 69 (4th Cir. 1989)..........................46

*S.D. Myers v. City of County of San Francisco*, 336 F.3d 1174 (9th Cir. 2003).....30

*United States v. Alvarez*, 132 S. Ct. 2537 (2012) ............................. 49, 50

*United States v. U.S. Gypsum Co.*, 333 U.S. 364 (1948)......................................25

*Watt v. Alaska*, 451 U.S. 259 (1981) .......................................................30

## Cases-State

*AIU Ins. Co. v. Superior Court*, 51 Cal.3d 807 (1990)............................................40

*Anderson v. Council of Owners of Gables on Tuckerman*, 404 Md. 560 (2008) ....33

*Angelucci v. Century Supper Club*, 41 Cal.4th 160 (2007) ..................................7, 32

*Beyond Systems, Inc. v. Realtime Gaming Holding Co.*, 388 Md. 1 (2005) .......9, 41

*Breitenbach v. N.B. Handy Co.*, 366 Md. 467 (2001) ...........................................38

*Busching v. Superior Court*, 12 Cal.3d 44 (1974) ....................................................36

*C.R. Tenet Healthcare Corp.*, 169 Cal.App.4th 1094 (2009)..................................36

*Cilecek v. Inova Health Sys. Serv.*, 115 F.3d 256 (4th Cir. 1997)...........................35

*Citaranis v. Hallowell*, 328 Md. 142 (1992)..............................................................9

*Davis v. State*, 426 Md. 211 (2012) ........................................................41
*Ford Motor Land Dev. v. Comptroller*, 68 Md. App. 342 (1986)...........35
*Forster v. State, Office of Public Defender*, 426 Md. 657 (2012) ..........30
*Grand Ice Cream, Inc. v. County of Alameda*, 178 Cal.App.3d 1174 (1986).........29
*Hale v. Morgan*, 22 Cal.3d 388 (1978)....................................................31
*Hall v. Time Inc.*, 158 Cal.App.4th 847 (2008) .......................................8
*Hardy v. State*, 301 Md. 124 (1975) .......................................................36
*Hypertouch Inc. v. ValueClick, Inc.,* 192 Cal.App.4th 805 (2011) .................. 47, 48
*Janelsins v. Button*, 102 Md.App. 30  (1994) ..........................................53
*Jones v. Corbis Corp.*, 815 F. Supp.2d 1108 (C.D. Cal. 2011) ...............53
*Jones v. Lodge at Torrey Pines Partnership*, 42 Cal.4th 1158 (2008) ...................29
*Jones v. Prince George's Country*, 378 Md. 98 (2003)..................... 29, 37
*Kaczorowski v. Mayor & City Council of Baltimore*, 309 Md. 505 (1987) ............30
*Kleffman v. Vonage Holdings Corp.*, 49 Cal.4th 334, 346, 110 Cal.Rptr.3d 628, 637 (Cal.,2010) ...............................................................................47
*Kwikset Corp. v. Superior Court*, 51 Cal.4th 310 (2011) ....................... 7, 8, 26, 37
*Lakin v Watkins Assoc. Indus.*, 6 Cal.4th 644 (1993) .............................38
*Lungren v. Deukmaejian*, 45 Cal.3d 727 (1998) ....................................30
*MaryCLE, LLC v. First Choice Internet, Inc.*, 166 Md.App. 481 (2006) ..............37
*Munson v. Del Taco, Inc.*, 46 Cal.4th 661 (2009) ...................................32
*Norman v. Borison*, 192 Md.App. 405 (2010)................................... 26, 37
*Palos Verdes Faculty Assn. v. Palos Verdes Peninsula Unified Sch. Dist.*, 21 Cal.3d 659 (1978).......................................................................35
*People v. Lungren*, 14 Cal.4th 294 (1996).............................................31
*Solano County Emp. Assn. v. County of Solano*, 130 Cal. App.3d 256 (1st Dist. 1982)........................................................................................41
*Starbucks Corp. v. Super Court*, 168 Cal.App.4th 1436 (2008)............... 28, 29, 37
*State v. Petrushansky*, 183 Md. 67 (1944).............................................29
*Wright v. State*, 24 Md. App. 309 (1975) ..............................................36

## Statutes-Federal

15 U.S.C. § 7701(a)(1)..........................................................................5
15 U.S.C. § 7701(a)(11).........................................................................6
15 U.S.C. § 7701, *et seq*................................................................. passim
15 U.S.C. § 7707(b)(1).....................................................................6, 46

## Statutes-California

CAL BUS. & PROF. CODE §§ 17204, 17206 ..............................................................40
CAL BUS. PROF. CODE § 17529.5(a)(b)(1)(B) ........................................................40
CAL. BUS. & PROF. CODE § 17500, *et seq.* ...............................................7, 9, 38, 39
CAL. BUS. & PROF. CODE § 17535 .........................................................8, 26, 39
Prop. 64 ........................................................................................................7, 39

## Statutes-Maryland

MD CODE COM LAW § 13-100, *et seq.* ...........................................9, 38, 39
MD CODE COM LAW § 13-301(1), (9) ...................................................................9
MD CODE COM. LAW § 13-105 .............................................................................42
MD CODE COM. LAW § 13-408(a) ...................................................................9, 26
MD CODE COM. LAW § 14-3002(3) .....................................................................40
MD CODE COM. LAW § 14-3003(3) .....................................................................34
MD. CODE COM. LAW §14-3001 .........................................................................34

## Legislative Materials-Federal

150 Cong. Rec. E72-02 (Jan. 28, 2004 (remarks of Rep. Dingell)..........................5
S. Rep. No. 108-102 at 21 (2003) ............................................................................5

## Legislative Materials-State

Md Gen. Ass. Floor Report, House Bill 915, Commercial Law – Electronic Mail –
    Prohibitions at 2......................................................................................9

## Rules

FED. R. CIV. PRO. § 52(a) ......................................................................................25

**Treatises, Law Reviews, Restatements, Dictionaries**

BLACK'S LAW DICTIONARY (8th ed. 2004) ............................................................40

Restatement (2d) of Torts § 902 ........................................................................40

RESTATEMENT 2D OF TORTS § 892A; Cal. Civ. Code § 3515 ..................................53

Roger Ford, *Preemption of State Spam Laws by the Federal CAN-SPAM Act*, 72 U. Chi. L. Rev. 355 (2005) ............................................................................................4

## ABBREVIATIONS

For clarity and simplicity, we adopt the abbreviations used in Appellant's Brief at p. ix.

## STATEMENT OF ISSUES

(1)    Whether the district court properly determined that a non-*bona fide* plaintiff, primarily in the business of collecting spam for purposes of bringing anti-spam litigation, should be granted standing to sue for millions of dollars in statutory damages under the Maryland and California statutes at issue, despite suffering no genuine injury as a result of the statutory violations alleged.

(2)    Whether the district court properly construed the Maryland and California anti-spam statutes to require plaintiffs to be a *bona fide* electronic mail service provider (California law) and interactive computer service provider (Maryland law), genuinely affected by the violations alleged, in order to avoid preemption under CAN-SPAM's (15 U.S.C. § 7701, *et seq*.) preemption clause.

(3)    Whether the district court properly dismissed BSI's claims on the grounds that they are barred by the common law doctrine *volenti non fit injuria,* in light of the undisputed evidence that BSI had intentionally invited, and thus consented to, the harm it alleges as the basis for bringing its claims.

## STATEMENT OF THE CASE

### I.    OVERVIEW OF THE UNDISPUTED FACTS

The facts material to this appeal are undisputed.  BSI is in the business of

1

intentionally attracting and collecting commercial email and suing the companies that send it under state and federal anti-spam laws.  By its own admission, all of BSI's activities relate to litigation, to which its owner Paul Wagner devotes forty or more hours a week.  Between 2002 and 2008, BSI filed over two-dozen spam-related lawsuits, in which it sought millions of dollars in statutory damages for email it purposely made no attempt to avoid and, with the help of Wagner's brother Joe and his company Hypertouch, went to considerable lengths to collect.

The strategy behind BSI's litigation scheme is simple:  (i) Place email servers in two states – Maryland and California – that have hefty statutory penalties for unsolicited commercial email; (ii) use those servers to seek out and collect as much commercial email as possible; (iii) route the email through one brother's server in California first, which then automatically forwards them to the other brother's server in Maryland; (iv) archive the email indefinitely; (v) mine them for deep-pocket defendants to sue, sometimes years after the email were received; (vi) bring separate lawsuits – one in California, one in Maryland – asserting multiple claims on the same email; (vii) leverage the high cost of litigation and sheer volume of emails collected and archived over the years to coerce large settlements, regardless of whether the email is actually unlawful.[1]

---

[1]  The email on which BSI is suing Kraft were promotional email advertising Kraft's Gevalia coffee.  Kraft maintains that these email comply with state and federal laws regulating commercial email, and BSI's claim to the contrary is not

Following a two-week trial, the advisory jury impaneled by the district court concluded that BSI is not a *bona fide* "interactive computer service provider" or "electronic mail service provider" under either of the two statutes at issue, Maryland's Commercial Electronic Mail Act or California's Restrictions on Unsolicited Commercial E-Mail Advertisers Act. Adopting the jury's verdict and based on its own additional findings of fact, the district court ruled that BSI does not have standing to sue Kraft or Connexus for alleged violations of either the MD-CEMA or CA-UCE.

Significantly, BSI does not challenge the jury's verdict that it is not a *bona fide* service provider of any kind, nor does it take serious issue with the findings of fact on which the district court based its decision. Its argument, in a nutshell, is that it nevertheless has standing to sue under the MD-CEMA and CA-UCE as a "private attorney general," even though it is not a *bona fide* service provider, and was not genuinely harmed by the email on which it has sued. The principal question before this Court, therefore, is whether the MD-CEMA or CA-UCE intended to grant standing to plaintiffs such as BSI, who are engaged primarily in

---

before the Court at this point. It is undisputed that Kraft's emails were sent by independent contractors, clearly identified Kraft in the advertisement, and informed recipients how to contact Kraft either by phone, email or regular mail to complain about and stop their receipt of the emails if they no longer wanted to receive them. At no point prior to filing suit, however, did BSI notify Kraft of any objection to its receipt of the emails.

the business of harvesting commercial email for the purpose of pursuing anti-spam litigation even though they suffered no harm.

## II. THE LEGISLATIVE FRAMEWORK GOVERNING BSI'S CLAIMS

### A. CAN-SPAM Act's Preemption of State Law Regulation

Since the advent of unsolicited commercial email ("spam"), legislatures have grappled with how to strike an appropriate balance between the need to protect consumers from abusive email practices, with the social and economic utility of legitimate commercial email and its constitutionally protected status as commercial speech.  *See, e.g.*, *Omega World Travel, Inc. v. Mummagraphics, Inc.*, 469 F.3d 348, 357 (4th Cir. 2006) ("*Omega*") (noting the "deterrent effect on commercial speech" state anti-spam laws may have).  By 2004, thirty-five different states had enacted statutes regulating unsolicited commercial email, in many cases to widely disparate effect.  *See* Roger Ford, *Preemption of State Spam Laws by the Federal CAN-SPAM Act*, 72 U. CHI. L. REV. 355, 363 (2005).  Some states tailored their statutes to target only those commercial email practices that were materially false or fraudulent and intended to deceive email recipients.  Others tried to go further, enacting statutes that imposed what amounted to strict liability for minor or unintended inaccuracies, or which otherwise sought to ban unsolicited commercial email altogether.  *Id.* at 356. The ensuing result, this Court observed in *Omega*, was a "patchwork" of inconsistent state laws attempting to regulate an inherently

4

interstate activity. *Omega*, 469 F.3d at 355-356.

In 2003, Congress enacted the Assault of Non-Solicited Pornography and Marketing Act ("CAN-SPAM") to address the mélange of varying state law governing commercial email. To aid with its enforcement, CAN-SPAM conferred a private right of action on "internet service providers" ("ISPs"), but only to the extent they are "adversely affected" by the violations alleged. Wary that the Act's substantial statutory damages would incentivize opportunistic claims, Congress was clear that standing under the statute for private claims was restricted to legitimate, or *bona fide*, service providers genuinely affected by alleged violations. *See* 150 Cong. Rec. E72-02 (Jan. 28, 2004 (remarks of Rep. Dingell); *Gordon v. Virtumundo*, 575 F.3d 1040, 1049-52 (9th Cir. 2009).

One of the central purposes of the Act, Congress also made clear, was to establish "one national standard" for regulating abusive email practices that, at the same time, preserved the "unique opportunities for [] development and growth of frictionless commerce" that legitimate commercial email offers. *See* S. Rep. No. 108-102 at 21 (2003); 15 U.S.C. § 7701(a)(1). The need for such a uniform standard derived from states' varying attempts to regulate spam, including attempts to ban all commercial email:

> [m]any states have enacted legislation intended to regulate or reduce unsolicited commercial electronic mail, but these statutes impose different standards and requirements. As a result, they do not appear to have been successful in addressing the problems associated with

5

> unsolicited commercial electronic mail, in part because, since an electronic mail address does not specify a geographic location, it can be extremely difficult for law-abiding businesses to know with which of these disparate statutes they are required to comply.

15 U.S.C. § 7701(a)(11); *see also Omega*, 469 F.3d at 356 (absent a national standard, "one state's Internet laws may impose compliance costs on businesses throughout the country"); *Gordon*, 575 F.3d at 1063 ("[A] single e-mail [can] instantaneously implicate the laws of multiple jurisdictions as it journeys through cyberspace, traveling over various facilities before reaching its intended recipient, whose location is often unknown.").

To address these concerns, Congress codified its intent that CAN-SPAM preempt the field of email regulation by including an express preemption clause providing that the Act "supersedes any statute, regulation, or rule of a State . . . that expressly regulates the use of electronic mail." 15 U.S.C. § 7707(b)(1). To preserve state laws that did not conflict with the Act's purpose and effect, Congress carved out a limited exception to its preemptive scope, exempting state law that "prohibits falsity or deception in any portion of a commercial electronic mail message or information attached thereto." *Id.* As the Court observed in *Omega*, "Congress was operating in the vein of tort when it drafted [CAN-SPAM's] pre-emption clause[]." *Omega*, 469 F.3d at 354. To that end, state laws regulating commercial email avoid preemption only to the extent they are consistent with traditional principles of tort law governing claims based on fraud or

6

misrepresentation.  *Id.* at 344-45.

### B.    Prop. 64 Amends California's False Advertising Law to Abolish Private Attorney General Actions

Among the number of state legislatures enacting anti-spam legislation around the time CAN-SPAM was passed were California and Maryland. California enacted the CA-UCE in 2003, as part of the State's Business and Profession Code's prohibitions against deceptive advertising, colloquially known as the "false advertising law." ("FAL").  CAL. BUS. & PROF. CODE § 17500, *et seq.* At the time of CA-UCE's enactment, both the FAL and California's related Unfair Competition Law ("UCL") expressly allowed suits by so-called "private attorneys general," authorizing "any person acting for the interests of itself, its members or the general public" to bring a claim.  *See Kwikset Corp. v. Superior Court*, 51 Cal.4th 310, 320-21 (2011).  Claims under the FAL could therefore be brought by virtually anyone, either on their own behalf or the public generally, whether or not they or anyone else had been affected by the alleged violation.

The unintended consequences of the FAL's and UCL's unlimited standing provision are well-documented.  With no real check on who could bring claims, what emerged was a cottage industry of opportunistic plaintiffs and attorneys who made their livelihood pursuing frivolous claims for statutory damages and attorneys' fees based on alleged statutory violations that had caused no actual harm.  *Angelucci v. Century Supper Club*, 41 Cal.4th 160, 178 n. 10 (2007).  The

result, as reported by the California Attorney General in 2004, was to "clog" California's courts with frivolous claims that, among other things, "cost California jobs and economic prosperity." JA693-94.

In November 2004, the California electorate voted into law Proposition 64 ("Prop. 64"), a ballot-initiative intended to "narrow the category of persons who could sue businesses" under the FAL and UCL by abolishing previously-allowed actions by unaffected plaintiffs on behalf of the general public. *Hall v. Time Inc.*, 158 Cal.App.4th 847, 853 (2008). To that end, Prop. 64 amended the FAL to limit standing to plaintiffs who have "suffered injury in fact and [] lost money or property as a result of a violation of this chapter," which includes the CA-UCE. CAL. BUS. & PROF. CODE § 17535. The purpose of the amendment, the California Supreme Court observed in *Kwikset*, was to reestablish common law principles of tort standing as a requirement to bring an FAL or UCL claim by "confin[ing] standing to those actually injured by a defendant's business practices." *Kwikset*, 51 Cal. 4th at 321, 335.

### C.    The MD-CEMA and Maryland's Consumer Protection Act

The MD-CEMA was enacted by the Maryland General Assembly in 2003 under Title 14 of the Maryland Commercial law, entitled "Miscellaneous Consumer Protection Provisions." MD CODE COM. LAW § 14-3001, *et seq.* MD-CEMA prohibits, *inter alia*, the transmission of a commercial email that "contains

8

false or misleading information" in its subject line or about its origin or transmission path. MD CODE COM. LAW § 14-3002(a). A violation of the MD-CEMA, by definition, also violates the related Maryland Consumer Protection Act ("MCPA"), MD CODE COM LAW § 13-100, *et seq.*, which prohibits "unfair or deceptive trade practices" including, "false or misleading" statements or representations that have "the capacity, tendency, or effect of deceiving or misleading consumers." MD CODE COM LAW § 13-301(1) and (9); *see also* Md Gen. Ass. Floor Report, House Bill 915, Commercial Law – Electronic Mail – Prohibitions at 2 (observing prior to MD-CEMA's enactment that, although MCPA did not specifically address it, fraudulent commercial email is a deceptive trade practice); *Beyond Systems, Inc. v. Realtime Gaming Holding Co., LLC*, 388 Md. 1, 16 (2005) (same).

Similar to California's FAL, the MCPA prohibits suits by unaffected plaintiffs, limiting standing to plaintiffs who suffer an actual "injury or loss . . . as the result of a practice prohibited by this title." MD CODE COM. LAW § 13-408(a); *see also Citaranis v. Hallowell*, 328 Md. 142, 152 (1992). The purpose of this restriction, the Maryland Court of Appeals has explained, is "'to prevent aggressive consumers who were not personally harmed by the prohibited conduct, from instituting suit 'as self-constituted private attorneys general' over relatively minor statutory violations'" that are pursued "improperly for harassment and

9

improper coercive tactics.'"  *Citaranis*, 328 Md. at 152 (citation omitted).

## III.    THE EVIDENCE PRESENTED AT TRIAL

### A.    The Business Front:  BSI's Skeletal ISP Services

While BSI attempts to portray itself as a robust service provider, the

undisputed facts paint a much different picture.

BSI is solely owned and operated by Paul Wagner, who runs the company

out of his Washington, D.C. apartment and his parent's basement.  Wagner has

"roughly ten" paying customers, most of whom are family members and friends,

including one of its attorneys in this case.  JA202-207.  BSI does not actually

connect these customers to the Internet.  At most, it installs or provides equipment

such as cabling, routers, or "air cards" that carry or transmit the internet connection

provided by a customer's ISP, such as Comcast or Verizon.  JA221-223, 503.

Although BSI claims to offer several other internet-related services, none

other than email-related service has any relevance to this case.  Of the two

customers BSI called to testify, it provided no email services to one (Thompson-

Markward Hall), and only secondary (*i.e.*, backup) service on a volunteer basis to

the other.  JA211-19, 221-23.  It nevertheless operates two active email servers.

JA172-73.  One is an antiquated "mini" McIntosh computer that Wagner

purchased from his brother for $1.   JA356-62.

Even though he lives in Washington, D.C., Wagner houses BSI's email

servers in Maryland at his parents' home. JA171-73. The servers, which Wagner often leaves unattended for long periods of time, are kept haphazardly in basement and bedroom offices on the floor, in the closets and on random tables, with none of the infrastructure, backup, or safety measures standard in the industry. JA171-73, 254-64, 270-72, 275-77. The servers lack standard redundancy measures, and service disruptions are common. On one occasion, for example, BSI's servers crashed and were down for days while Wagner was out of the country. JA253, 501. On another, Wagner had to ask his mother to reboot BSI's servers to correct an equipment failure. JA271-73, 543.

For its email delivery software, or "mail transfer agent," BSI uses a free "trial" or "beta" version of a program called CommuniGate Pro that, because it has not been fully tested, is prone to cause service disruptions, delivery delays, and lost email. JA272-74. Neither of the parties' expert witnesses was able to identify an email service provider other than BSI that uses free beta software as its mail transfer agent. JA272-74, 243-44.

BSI's website consists of a single page of text that does not provide prospective customers the company's address, phone number, or the name of anyone at BSI to contact to discuss its services. ECF 587, Ex. 4. In lieu of such basic information, the page posts links to two pages that identify the spam-related lawsuits BSI has filed. *Id*. The pages invite anyone with "additional information"

11

about the lawsuits to "please contact us at info2011@beyondsystems.net."  *Id.*

### B.    The Origins of BSI's Litigation Mill and Its Methods for Collecting Spam

In contrast to BSI's nominal business activities is the litigation arm of its enterprise, to which Wagner devotes most of his time and energy.  Combined, he and his brother Joe filed close to 70 lawsuits over the five-year period leading up to trial, many against the same defendants based on the same email.  JA446.  Wagner spends "a good 40 hours a week at least" working on litigation-related matters and, in some weeks, "well over 40" hours a week.  JA675-79.  As he admitted at trial, "all of BSI's activity sort of relates to litigation."  J417.

All told, Wagner has filed on BSI's behalf more than two-dozen spam-related lawsuits.  JA421-22.  Since 2005, BSI has earned over $1 million from these cases.  JA425-26.  Its revenue from business operations is only a third of that, or just north of $300,000.  *Id.*

Wagner began his litigation career in the early 2000s by going after "junk fax" marketers.  JA413-414.  That changed in 2002 following the enactment of the MD-CEMA, at which point Wagner switched his focus to spam litigation.  JA413-15, 510.  Wagner's reason for doing so was simple.  As he explained to his brother at the time, junk fax lawsuits were "truly small potatoes compared to the spam cases that BSI now has on hand;" meaning, of course, that there was "a lot more money to be had in spam litigation."  JA413-15, 516.

12

A month before the MD-CEMA went into effect, Wagner purchased from Joe the "mini-Mac" email server mentioned above for $1. JA355-62. Wagner designated the server as BSI's "mail gateway" and, although he lived in D.C., left it in Maryland in order to avoid any argument that mail sent to the server was not covered by the Maryland Act. JA522-23, 527.

Almost immediately, the Wagner brothers began marketing potential spam cases to prospective law firms. JA513-21. In December 2002, Paul and Joe drafted a "report on illegal spam received by Beyond Systems of Maryland" to send to law firms "to try to get them to see if they were interested in helping [BSI] sue." JA316-22, 513. Among other things, the "report" emphasized that BSI's "email counts" and "corresponding damages" were "increas[ing] daily," and that they expected to obtain more spam from marketers who had "discovered BSI as a target." JA514. Wagner made clear in an email to Joe that the report should emphasize the high-value nature of its prospective litigation given the "incentives" Maryland and California law gave BSI to "trap spam." JA322, 516.

Over the next several years, Paul and Joe Wagner embarked on a strategy to do exactly that: "trap spam." To maximize their potential recovery, the Wagners configured their MX records[2] to deliver all email addressed to BSI domain names

---

[2] The email server responsible for accepting delivery of an email addressed to a particular domain name is determined first by the email exchanger record, or "MX record," created for that domain. JA225-26, 302-06. Once it arrives at the

first to Joe's servers in California.  JA238-39, 304-06.  Upon its arrival, mail was

then automatically routed to its addressed account or inbox by the "routing tables"

Joe created.  JA299-304, 400-04, 428-30.  If an email did not "match" the servers'

routing rules – *i.e.*, it was not addressed to a real user or account, and hence in all

likelihood spam – Hypertouch's servers automatically forwarded it to BSI.  JA299-

300.[3]

Joe Wagner admitted that the brothers set up Hypertouch's routing tables to

intentionally route email to BSI they believed to be commercial email.  JA364-65.

Wagner also admitted that if BSI had not wanted to receive those email –

thousands of which it is suing on in this case – either Hypertouch or BSI could

have easily blocked them with a proverbial flick of the switch.  For example, the

mail delivery software both companies used could be set to reject delivery of

---

designated server, the mail is then routed to its addressed recipient by that server's
internal "routing tables" or "routing rules."  JA304, 401-04, 428-30.

[3]  BSI's attempt at trial to characterize this arrangement as a "routine conveyance,"
intended to free up Hypertouch's server capacity, was refuted by its own expert
witness, Dr. Peter Resnick.  Resnick described the conveyance of BSI email
through Hypertouch's servers as an "uncommon arrangement" and "strange
historical set of facts."  JA239.  Despite his expertise, Resnick was unable to
identify another email provider that configured the delivery of email like BSI.
JA241.  As Resnick testified, a more obvious solution to capacity issues, which is
typically used by legitimate ISPs, would have been for Joe to simply route email to
another one of his own servers.  JA429-30.

commercial email that did not match their servers' routing tables.  JA366-68, 179-85.  The Wagners intentionally turned the setting off, knowing that if left on it would "bounce" the email needed to file suit – "specifically[,] the fraudulent ones."[4]  JA164-65, 308-11, 367-68, 537.  According to Joe, that was "the whole point" of setting up the routing tables the way the brothers did.  BSI "wanted to collect spam."  JA312-13, 371.[5]

Wagner took other affirmative steps, all contrary to prevailing industry practices, to attract and collect even more spam.  The Wagners knew that 99% of the email BSI receives is spam.  JA365-66.  It nevertheless took no action to filter spam, or to block or reject its delivery despite the relative ease of doing so.  JA180-81, 367-68.  Instead, it was BSI's "policy" to accept and archive indefinitely *all* incoming email, including email addressed to non-existent users

---

[4]  When BSI uses the term "fraudulent" in this context, they are referring to commercial email that has no identifiable recipient.

[5]  The Wagners' focus on collecting as much spam as possible was "dramatically portrayed," over a series of contemporaneous emails, both by their "frustration when [BSI] was not getting enough of it" and Paul's "unbridled enthusiasm" when it did.  JA742.  These email are summarized at pages 11-12 of Kraft's Post-Trial brief below (ECF 587), and are included in the Joint Appendix at 523, 530, 535, 537-38 540-41, 543, 548.  An example: in one email, Joe admonished Paul that, because he had "turned on [the] return-path verification" of BSI's mail transfer agent, "you are bouncing [rejecting] a fair bit of email and specifically the fraudulent ones."  JA 537.  Paul responded:  "Thanks!"  Glad you've been through all of this already."  *Id.*  As Joe explained at trial, he was "worried" that, because the software "wasn't set correctly," BSI's email server "was not going to accept spam."  JA308-09.

and accounts. JA181-82. Resnick could not identify a single email provider that, like BSI, accepts all incoming email, makes no attempt to block or filter unsolicited email, and archives all email indefinitely. JA241-42. Nor could the Wagners. JA179-80. Kraft's expert witness, Willis Marti, testified that no legitimate ISP engages in this practice. JA265-69.

BSI also set "spam traps" that, by all accounts, were designed to attract spam by publishing on the Internet fictitious or otherwise unused email accounts created solely for the purpose of collecting spam. Resnick described a spam trap as an email address or account "whose sole purpose is to cause spammers to send spam to it." JA431-32. As he explained:

> One of the ways that a spam trap might happen is if there's an email address that appears on a website, maybe hidden, you know, behind a picture or something. It's just a web page, but they know they've never given that out to anybody as an e-mail address. It's hiding in the hidden text. Many folks who send out unsolicited commercial email . . . will do searches on web pages looking for things that look like email addresses. Well, if one of them comes across this web page and finds something that looks like an e-mail address, they try and send it a piece of spam.

JA236-37.

Just as Resnick described, Hypertouch posted a website on the Internet containing thousands of randomly generated, fictitious names and email addresses to BSI domain names. JA314-15, 328-32, 582-632. The email addresses were hidden behind the website text where, as Resnick explained, they would be picked

up by mechanical "spam crawlers" looking for addresses to which to send spam. JA236-37, 330.  Email sent to the fictitious addresses were delivered to BSI, some directly, others indirectly through Hypertouch's servers.  JA331-32.

### C.    BSI'S Litigation Activities

#### 1.    The Wagners Daisy-Chain Their Servers to Maximize Their Potential Recovery

By routing BSI's email through Hypertouch's California servers, the brothers believed that they could create multiple claims for each email BSI received.  JA296-98.[6]  Hypertouch would sue on emails collected in California first.  BSI would then sue on the same email in Maryland, seeking two sets of statutory damages for each email under California and Maryland law.  JA296-98, 539.

It appears to have been in the context of Hypertouch's 2004 claim against celebrity handyman Bob Villa that Paul and Joe decided to coordinate litigation efforts by targeting the same defendants and suing on the same email.  While discussing the case, Paul proposed to Joe that "[m]aybe as Hypertouch is finishing up with them, Beyond Systems can step in under the Maryland law.  "Ding. Dong. Another package for Mr. Vila."  JA333, 533.

---

[6]  As the district court observed, the Wagners believed that "the same email could be deliberately trapped and routed to every state that has an anti-spam statute to be sued on there," meaning that "one offending e-mail by itself could lead to a substantial payout, several such e-mails to a veritable bonanza."  JA742 n. 10.

BSI and Hypertouch implemented this strategy over the next several years against a number of defendants, promoting it to prospective law firms by touting that they could effectively double if not triple their potential recovery by suing in tandem on the same email. JA539, 569, 571, 576-77. In 2006, Hypertouch filed suit against Kennedy-Western University alleging claims under the CA-UCE based on email marketing the University to prospective students. JA454. Five months later, BSI filed its own complaint in Maryland state court. JA451.

In 2007, Joe Wagner sued marketing company World Avenue, recovering a judgment against the company in California state court. JA388-90. Several months later, BSI sued World Avenue in Maryland federal court over email Hypertouch delivered to BSI. JA388-90, 458. That case settled for $1.1 million, of which $600,000 was paid to BSI. Although not a plaintiff, Hypertouch received $475,000 of the settlement proceeds. Joe Wagner was paid the remaining $25,000. JA337-38, 388-90, 546-47.

Incidentally, many of the email on which BSI is suing Kraft and Connexus in this case are the same email that Hypertouch sued on and settled in *World Avenue.* JA385-86, 390-91.

### 2.    BSI's Present Lawsuit against Kraft and Connexus

The origins of this case date back as far as 2005, when Joe Wagner first threatened to sue Connexus' successor, Vendare, in California state court. JA390-

92, 571.  The case settled before a complaint was filed.  In a "pitch piece" to prospective law firms following the settlement, BSI identified Connexus/Vendare as one of several companies against whom BSI *and* Hypertouch "would have parallel claims for most of the email below – i.e., those [Hypertouch] helped deliver to BSI."  JA569.

BSI filed its present case against Connexus two years later in 2008.  It is undisputed that the email over which BSI is suing Connexus include thousands of email Hypertouch had forwarded BSI in 2005 while Joe Wagner was threatening to sue Vendare.  JA90-92.

As with their other cases, Hypertouch filed the brothers' first complaint against Kraft in April 2005.  JA339.  The parties settled the case on June 29, 2006, executing what Joe Wagner characterized as a "broad release," under which Hypertouch agreed to release on behalf of its "officers, directors, agents, representatives, employees, predecessors, successors, assigns, . . ." all known and unknown claims against Kraft.  JA340, 554-56.  The parties' agreement also included a procedure for handling any commercial email Hypertouch received in the future.  The procedure required the parties' cooperation in identifying the contractor-sender if Wagner believed the email violated state or federal law.  To that end, the agreement required Wagner to notify Kraft of the email within 20 days of their receipt.  JA556.  Kraft, in turn, agreed to help Hypertouch identify the

sender(s) of the email.  *Id.*  Only if Kraft failed to do so could Hypertouch bring a new claim against it based on the new email.  JA341-42.

The purpose of the provision was twofold:  (i) ensure that Kraft would assist Hypertouch in identifying senders of allegedly unlawful spam, as Hypertouch claimed it wanted; (ii) "buy Kraft peace" by preventing Hypertouch from lying in the weeds and again suing Kraft on email to which it did not object or otherwise notify Kraft that it did not want to receive.  JA341-43.

It is clear, in retrospect, that Joe Wagner had little intention of complying with the parties' agreement even before he signed it.  A week before it was executed, Wagner sent an email to Hypertouch's lawyers suggesting they include a stipulation by Kraft of an agency relationship between Kraft and its marketing affiliates (the independent contractors sending the Gevalia advertisements).  Contemplating the BSI suit, Wagner explained that such a stipulation would be "a very valuable admission *for anyone else* who might sue them, especially under their own state's spam laws, *e.g. Maryland* or WA."  JA343-44, 549-50 (emphasis added).

The day Kraft and Hypertouch signed their agreement, the Wagners discussed "having Dan Balsam prepare a draft Complaint and MSJ for 'BSI v. Kraft' in Maryland."  JA551.  Two weeks later, Balsam sent the Wagners a draft complaint for the suit, which another Wagner brother, Steve, forwarded to Paul and

suggested that he, Paul and Joe review and comment on over the weekend.  JA243, 347-48.

Two months later, the Wagners began marketing BSI's suit, based on the same email on which Hypertouch has sued, against Kraft to prospective law firms. JA576.  The prospectus, which described the brothers' "top 5 potential spam suits," stated that almost 10,000 of the email on which BSI intended to sue had been delivered to BSI through Hypertouch, including 381 email that Joe had already sued on and settled with Kraft he sent BSI *after* "Hypertouch's Settlement Agreement was signed."  JA570.  Joe knew that he and Paul were receiving Gevalia email following his settlement agreement with Kraft, but he chose not to notify Kraft of this fact as contemplated by the settlement agreement.  JA349-50.

### D.    Relevant Proceedings Below

In January 2010, Kraft moved for summary judgment on the grounds that BSI was not a *bona fide* service provider with standing to sue under the MD-CEMA or CA-UCE, and that a contrary interpretation of the statutes allowing BSI to go forward with its claims was preempted by CAN-SPAM.  Kraft further moved for summary judgment under its settlement agreement with Hypertouch, on the ground that the email on which BSI was suing were the same email that Hypertouch had already sued and were covered by the settlement agreement.

In June 2010, the district court issued a bench ruling granting Kraft's motion

as to the Hypertouch email, dismissing them from the case. JA142-48. The district court denied the remainder of Kraft's motion on the ground that issues of fact remained regarding the nature of BSI's activities and alleged solicitation of email for purposes of bringing suit. JA149-63.

To resolve these issues, the court ordered a preliminary trial to determine whether BSI had standing to proceed with its claims under the MD-CEMA and CA-UCE before moving forward with issues of liability. JA773. The ensuing "mini-trial," conducted before an advisory jury, was divided into two phases to reflect the parties' competing interpretations of the statutes. Phase I was limited to whether BSI satisfied its minimalist interpretation of the statutes' definitions of ICSP and EMSP, which it contended was sufficient to confer standing. JA733-34. No evidence was presented in Phase I regarding BSI's litigation activities, or its efforts to solicit and collect spam. JA734. In Phase II, the jury was asked to decide whether BSI was a *bona fide* service provider in light of the evidence demonstrating that it had manufactured the claims at issue, had solicited and thus consented to receive the email on which it sued, and thus had not been genuinely affected by the statutory violations it alleged. JA734-35.[7]

Based on the limited evidence presented in Phase I, the jury concluded that

---

[7]  Although BSI now suggests that the district court's jury instruction as to what constitutes a *bona fide* ICSP or EMSP was improper, it did not object to the instruction below. JA441.

22

BSI satisfied the *de minimus* standard proffered by BSI of what constitutes an ICSP and EMSP under the statutes. *Id.* After hearing the Phase II evidence, however, the jury determined that BSI was not a *bona fide* ICSP or EMSP. *Id*.

Following extensive post-trial briefing, the district court adopted the jury's Phase II verdict and held that BSI lacked standing to pursue its claims under either statute. JA764. Among other things, the district court concluded that the statutes' definitions of ISCP and EMSP were ambiguous, requiring it to look beyond the statutory text to determine whether the Maryland and California legislatures intended to grant standing to non-*bona fide* plaintiffs who, like BSI, suffered no actual harm as a result of the statutory violations alleged. JA750-57. The district court concluded that the statutes' related provisions, legislative history, established principles of common law, public policy, and "basic common sense" reflected the legislatures' intent to limit standing under the statutes to legitimate service providers actually affected by the violations they allege. JA731, 36, 49-57. A contrary interpretation of the statutes, the court concluded, would conflict with the standing requirements of CAN-SPAM, create a different standard for liability contrary to the national standard Congress intended to establish, and thus would be preempted. JA738, 753, 756. Finally, the court found, the undisputed evidence established that BSI's claim was barred by the doctrine of consent. JA757-64

# SUMMARY OF THE ARGUMENT

BSI's position in this case is simple: the Maryland and California legislatures intended to grant it standing to pursue tens of millions of dollars in statutory damages, even though it is not a *bona fide* service provider, is instead in the business of manufacturing and litigating spam claims, and suffered no actual injury as a result of the statutory violations it has alleged. BSI's only support for its argument boils down to a single, meritless contention, properly rejected by the district court, that the "plain language" of both the MD-CEMA and CA-UCE must be literally interpreted and, because neither expressly states a *bona fide*, genuinely affected requirement, the state legislatures did not intend for one to apply.

As we demonstrate below, BSI's entire argument is built upon a faulty premise unsupported by either Maryland or California law generally, or any relevant indicia of legislative intent. The issue for this Court to decide is not, as BSI contends, whether the district court improperly created an "extra-statutory" term by holding that BSI lacked standing to sue as a non-*bona fide* plaintiff. Properly framed, the issue instead is whether it is reasonable to presume, given the statutes' silence on the issue, that the state legislatures intended to grant standing to recover millions of dollars in statutory damages to non-genuine plaintiffs who gratuitously manufactured the claims at issue. Applying well-settled rules of statutory construction, the district court properly ruled that the answer to this

question is plainly no. All relevant evidence of legislative intent, including the statutes' overall structure (ARG. §II.A, B, below), established principles of common-law (ARG. § II .B, below), analogous federal law (ARG. §II.C., below), and – as the district court aptly noted – the basic "common sense that ought to inform the analysis of any legal conclusion," dictate the exact opposite of what BSI claims.

## STANDARD OF REVIEW

Kraft agrees with BSI that the district court's conclusions of law are reviewed *de novo.* Its decision to adopt the advisory jury's Phase II verdict and related factual findings, however, are reviewed under the "clearly erroneous" standard of FED. R. CIV. PRO. § 52(a) (district court's findings of fact in action tried without a jury or with advisory jury "must not be set aside unless clearly erroneous"). *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 575 (1985). A factual finding is clearly erroneous when, construing the evidence in the light most favorable to the prevailing party, "the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been committed." *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948); *Ente Nazionale Per L'Energia Electrrica v. Baliwag Nav. Inc.*, 774 F.2d 648, 654 (4th Cir. 1985).

## ARGUMENT

## I.    STATE AND FEDERAL STANDING REQUIREMENTS

A plaintiff must have "constitutional standing to invoke the authority of an

25

Article III court." *See*, *e.g.*, *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 664 (D.C. Cir. 1996). Article III requires plaintiffs to satisfy three elements: (i) they must have suffered a concrete "injury-in-fact"; (ii) the injury must be "fairly traceable to the challenged action of the defendant;" and (iii) "it must be likely . . . that the injury will be redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).

Maryland state law standing requirements for consumer protection claims are in accord, limiting standing to those who suffer actual "injury or loss" as the result of the alleged violation. MD CODE COM. LAW § 13-408(a); *Norman v. Borison*, 192 Md.App. 405, 420 (2010). The standing requirements under California's False Advertising Law, which includes the CA-UCE, are even more stringent, requiring not only injury-in-fact but also proof of economic injury. CAL. BUS. & PROF. CODE § 17535 (to have standing under FAL, plaintiff must have "suffered injury in fact and [] lost money or property as a result of a violation of this chapter"); *Kwikset*, 51 Cal. 4th at 322, 324 ("[T]he Proposition 64 requirement that injury be economic renders standing under section 17204 substantially narrower than federal standing under [A]rticle III . . . .") (citations omitted).

A federal plaintiff suing in diversity must establish both state *and* federal standing requirements. *See*, *e.g.*, *Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.*, 418 F.3d 168, 173 (2d Cir. 2005); *Cantrell v. City of Long*

26

*Beach*, 241 F.3d 674, 683 (9th Cir. 2001). Absent Article III standing, a diversity

claim may not proceed even though standing exists under state law. *Phillips*

*Petroleum Co. v. Shutts*, 472 U.S. 797, 804 (1985); *Goode v. City of Philadelphia*,

539 F.3d 311, 321 (3d Cir. 2008).

## II.   PROPERLY CONSTRUED, THE MD-CEMA AND CA-UCE LIMIT STANDING TO *BONA FIDE* ICSPS OR EMSPS GENUINELY AND ADVERSELY AFFECTED BY THE ALLEGED STATUTORY HARM

### A.   The District Court Properly Rejected BSI's Literal Interpretation of the Statutes in Accordance with the "Plain Meaning" Rule

Although it avoids calling it by name here, BSI claims the state statutes

should be given literal affect in accord with the "plain meaning rule" of statutory

construction. But even if it applied, the plain meaning rule does not compel the

interpretation BSI would like.

First, courts have largely rejected the notion that legislative intent may be

conclusively determined from statutory silence alone given the inherent certainty

of what it means. In *Burns v. United States*, 501 U.S. 129 (1991), for example, the

Supreme Court rejected the argument that Congress' failure to expressly state a

notice requirement was dispositive. As the Court explained: "[n]ot every silence is

pregnant. In some cases Congress intends silence to rule out a particular statutory

application, while in others Congress' silence signifies merely an expectation that

nothing more need be said . . . In still other instances, silence may reflect the fact

that Congress has not considered the issue at all." *Id.*

Maryland and California law is in accord. Contrary to BSI's claim, courts in both have routinely rejected similar appeals to interpret statutory silence as conclusive of legislative intent under the plain meaning rule. Several examples are summarized at pages 8-12 of Kraft's Opposition to BSI's Motion for Judgment as a Matter of Law, below. (ECF No. 592.) In each, the court instead inferred or implied terms necessary to give statutes a reasonable interpretation consistent with other evidence of legislative intent.

*Starbucks Corp. v. Super Court*, 168 Cal.App.4th 1436 (2008) is directly on point and analogous to the case here. At issue was whether a job applicant, who was not convicted of a marijuana-related offense, had standing to sue under a California statute prohibiting employers from asking about such convictions on job applications. *Id.* at 1444. Plaintiffs argued, much like BSI's argument here, that the "plain meaning" of "applicant" in the statute did not require a plaintiff to actually have such a conviction to sue. *Id.*

The court rejected the argument, holding that, consistent with common law standing requirements, the statute implicitly required plaintiffs to be "aggrieved persons with an injury the statute was designed to remedy." *Id.* at 1440. A literal interpretation of the statute, the court concluded, would otherwise "turn [it] into a veritable financial bonanza for litigants like plaintiffs" unaffected by the violation

28

alleged. *Id.* at 1449, 1451 ("There are better ways to filter out impermissible questions on job applications" than allowing "bounty hunter" lawsuits" by "unaffected job applicants."). *See also Jones v. Prince George's Country*, 378 Md. 98, 118 (2003) (turning to common law where statute was silent as to standing requirement for wrongful death action: "because no current Maryland rule or statute covers standing to bring a wrongful death action . . . the issue would logically seem to be governed by Maryland common law standing principles."); *Grand Ice Cream, Inc. v. County of Alameda*, 178 Cal.App.3d 1174, 1181-82 (1986) (rejecting plaintiff's argument that statute's lack of limitations period "was evidence that no such limitation was intended" because it would "lead to an illogical and absurd result").

BSI's argument here – as well as the ends to which it wants to take it – is no different than what the *Starbucks* court rejected, which leads to a second principle of the "plain meaning" rule BSI ignores:  "[r]eal intent must prevail over literal intent." *State v. Petrushansky*, 183 Md. 67, 71 (1944); *Jones v. Lodge at Torrey Pines Partnership*, 42 Cal.4th 1158, 1162 (2008) (rejecting claim that courts "must follow" a statute's "plain meaning without engaging in other kinds of statutory interpretation").  In applying the rule, courts in both states have made clear they "are not limited to the words of the statute as they are printed in the Annotated Code," but instead "may and often must consider other 'external manifestations' or

29

'persuasive evidence' . . . that fairly bears on the fundamental issue of legislative purpose or goal . . . ." *Kaczorowski v. Mayor & City Council of Baltimore*, 309 Md. 505, 514 (1987) ("[T]he plain meaning rule does not force [courts] to read legislative provisions in rote fashion and in isoloation."); *Lungren v. Deukmaejian*, 45 Cal.3d 727, 735 (1998) ("[T]he plain meaning rule does not prohibit a court from determining whether . . . such a construction of one provision is consistent with other provisions of the statute. The meaning of a statute may not be determined from a single word or sentence: the words must be construed in context."); *see also Watt v. Alaska*, 451 U.S. 259, 265-66 (1981) ("[A]scertainment of the meaning apparent on the face of a single statute need not end the inquiry. This is because the plain-meaning rule is 'rather an axiom of experience than rule of law, and does not preclude consideration of persuasive evidence if it exists.'").

Accordingly, Maryland and California courts alike routinely reject literal statutory constructions inconsistent with reason and common sense. *See*, *e.g.*, *Forster v. State, Office of Public Defender*, 426 Md. 657, 692-93 (2012) (courts "should reject a proposed statutory interpretation if its consequences are inconsistent with common sense"); *S.D. Myers v. City of County of San Francisco*, 336 F.3d 1174, 1179 (9th Cir. 2003) (statutes "under scrutiny must be given a reasonable and common sense interpretation consistent with the apparent purpose and interpretation of the lawmakers, practical rather than technical in nature,

which, upon application will result in wise policy rather than mischief or absurdity . . . ."); *People v. Lungren*, 14 Cal.4th 294, 305 (1996) (when presented with competing statutory interpretations, courts should reject construction that would lead to an "unwise" result in favor of interpretation that is reasonable, fair, and consistent with legislative intent.).

The district court here did exactly that, rejecting as "patently unreasonable" an interpretation of the statutes that would, as in *Starbucks*, turn them into a "veritable financial bonanza" for opportunistic plaintiffs or, for that matter, anyone with a cell phone or wireless router (*see* ARG. § II.B., C., below). [8]  JA752.  As to BSI's claim that a *bona fide* requirement would effectively rewrite the statute, the district court explained it best with its observation that: "[r]equiring an entity to actually be what it proposes to be in order to qualify for benefits under a statute is not in reality adding an extra-statutory requirement at all.  A legislature need not insert the equivalent of 'real,' genuine,' or 'actual' as a pre-qualifier for every type of entity it invests with a private cause of action.  As a matter of common sense, legitimacy of the entity is presumed."  JA751.

---

[8]  BSI admits that the Maryland and California statutes are penal in nature (BSI Br. 34).  It therefore must concede they are to be strictly construed to avoid due process concerns.  *See, e.g., Hale v. Morgan*, 22 Cal.3d 388, 401 (1978) ("we have looked with disfavor on ever-mounting penalties and have narrowly construed the statutes" to avoid "[t]he exercise of a reasoned discretion [being] replaced by an adding machine.").

31

The few examples BSI claims support a contrary rule are inapposite. (BSI Br. 41-42.) One involved a criminal statute – requiring the court to narrowly construe the statute in the defendant's favor to avoid due process issues. The other two address California's Unruh Act, a civil rights statute with its own heightened policy concerns not at issue here. Neither of these two cases is relevant to standing; both address instead the elements of liability an aggrieved plaintiff who *does* have standing must establish to prove a claim. *Munson v. Del Taco, Inc.*, 46 Cal.4th 661 (2009) (whether plaintiff required to prove intentional discrimination to establish ADA violation under Unruh Act); *Angelucci v. Century Supper Club*, 41 Cal.4th 160 (2007) (whether, as an element of his cause of action, Unruh Act required plaintiff to establish he requested nondiscriminatory treatment and was refused).

The court's discussion in *Angelucci*, in fact, supports the district court's decision here. At the conclusion of its opinion, the court reiterated California's strong public policy against suits by opportunistic plaintiffs looking to exploit generous statutory damages provisions with gratuitous claims, citing as an example Prop. 64's abolition of private attorney general suits. *Id.* at 178, n. 10. The court went on to note with approval the various common law defenses available to such sham litigation, including among others the "unclean hands" and "avoidable harm" doctrines, both of which rest on the same underlying principle as *volenti non fit*

*injuria* barring BSI's claims here. *Id.* at 179. The court declined to decide whether such defenses barred the plaintiff's claim, however, not for the reason BSI implies, but because those arguments had not been "developed as an independent basis for judgment" in the lower courts. *Id.* at 180.

**B.    The District Court Properly Looked to Other Sources of Legislative Intent Given the State Statutes' Ambiguity**

The district court's decision to look beyond the purported "plain meaning" of the state statutes to other sources of legislative intent was also appropriate given the statutes' ambiguity, a finding BSI does not contest on appeal. *See*, *e.g.*, *Anderson v. Council of Owners of Gables on Tuckerman*, 404 Md. 560, 571-72 (2008) (plain meaning rule applies only if the statutory language at issue is clear and unambiguous).

As the district court concluded, the statutes' definitions of ICSP and EMSP are "essentially the same" as CAN-SPAM's definition of "internet access service" provider the Ninth Circuit in *Gordon* found to be so broad as to be effectively meaningless. JA750; 575 F.3d at 1051 (literally construed, CAN-SPAM's definition of service provider as an "'internet service that enables users to access online content or email'" could "encompass the proprietor of an Internet coffee shop or, as one district suggested, 'any person who allows another person to use their computer to access the Internet.'"). BSI does not dispute this comparison, nor

does it argue that the definitions of ICSP and EMSP are any less expansive. And for good reason: according to its own witnesses, the statutes' definitions of "service provider" are so broad as to encompass virtually anyone who provides a friend or neighbor an internet connection through a wireless router, blue-tooth enabled cell phone, or by plugging in cords to their computer. JA178-79, 205; JA229-32.

Granting anyone with a blue-tooth connection standing to sue as a "service provider" could not have been what the Maryland or California legislatures reasonably intended, particularly given the distinction both statutes make between "service providers" and "recipients" for standing purposes and, in Maryland's case, the damages a plaintiff may recovery. MD CODE COM. LAW § 14-3003(3) (granting twice the statutory damages per violation to ICSPs than it does to a recipient). While BSI suggests that the statutes' grant of a right of action to recipients reflects the intent that standing for EMSPs and ICSPs be broadly construed, the exact opposite is true. By separately defining the two groups of plaintiffs, the legislatures plainly intended there to be a clear distinction between the two. BSI's expansive interpretation of "service provider" would blur that distinction beyond all recognition.[9] *See*, *e.g.*, *Palos Verdes Faculty Assn. v. Palos*

---

[9] The MD-CEMA suffers from the additional ambiguity that its definition is entirely circular, as it defines "service provider" simply as a "provider that provides." *See* MD. CODE COM. LAW §14-3001 (defining ICSP as "an information

*Verdes Peninsula Unified Sch. Dist.*, 21 Cal.3d 659, 659 (1978) ("[T]he various parts of a statutory enactment must be harmonized by considering the particular clause or section in the context of a statutory framework as a whole."); *Ford Motor Land Dev. v. Comptroller*, 68 Md. App. 342, 346-47 (1986) ("A statute must be read so that no part of it is 'rendered surplusage, superfluous, meaningless or nugatory.'").

The statutory text alone thus leaves unanswered the very question it presents – how to distinguish between prospective plaintiffs the state legislatures thought should have standing to sue, and those it did not. While BSI claims the answer can be found in legislative history describing the statutes' objective of eliminating abusive commercial email practices, that purpose is self-evident and, in all events, does not answer the question either. It simply does not follow that the legislatures' concern regarding the problems associated with unlawful email practices means they must have therefore intended – without actually saying so – to effectuate the statutory objective of eliminating unlawful spam by granting unaggrieved plaintiffs the right to harvest and collect commercial email, without regard to its legality, for

---

service, system, or access software provider that provides . . . ."); *cf. Cilecek v. Inova Health Sys. Serv.*, 115 F.3d 256, 259 (4th Cir. 1997) (by adopting a "circular definition" of "employee" under Title VII, "Congress has left the term [ ] essentially undefined").

purposes of bringing "shakedown" lawsuits such as BSI's here.[10]  In fact, all

sources of legislative intent reflect just the opposite.

**C.    A *Bona Fide,* Genuinely Affected Standing Requirement Is Consistent with Related Statutory Provisions, Common Law, and Analogous Federal Law**

**1.    The District Court Properly Construed the Statutes' Standing Provisions in Accord with Traditional Common-Law Principles**

It is a fundamental principal of statutory construction that, "unless expressly

provided, statutes should not be interpreted to alter the common law, and should be

construed to avoid conflict with common law rules."  *C.R. Tenet Healthcare Corp.*,

169 Cal.App.4th 1094, 1111 (2009); *see also Wright v. State*, 24 Md. App. 309,

319 (1975) ("[A] legislative change in the common law should never be presumed

except where the change is specifically and plainly announced by the legislature.").

Absent a contrary intent clearly expressed, therefore, statutes are presumed to

incorporate applicable common law rules and principles.  *See e.g.*, *Busching v.*

*Superior Court*, 12 Cal.3d 44, 52 (1974); *Hardy v. State*, 301 Md. 124, 131 (1975).

BSI's claims are in the nature of tort and, therefore, must be construed in

accordance with common-law principles of tort law.  JA758; *MaryCLE, LLC v.*

---

[10]  Indeed, BSI identifies nothing in the statutes' history to suggest that either legislature thought an appropriate, or even effective, way to fight unlawful spam would be to allow suits by "service providers" who, instead of taking the relatively simple and inexpensive measures available to avoid unsolicited email, choose instead to burden the courts with frivolous suits based on manufactured claims.

*First Choice Internet, Inc.*, 166 Md.App. 481, 528 (2006) (claims under MD-CEMA are tort in nature); *Omega*, 469 F.3d at 352 (state anti-spam statutes must be construed in accordance with traditional tort law). Accordingly, the presumption to be drawn from the statutes' silence as to an injury-in-fact requirement is the opposite of what BSI claims. Genuine injury-in-fact has long been a traditional requirement of common law tort standing. *See*, *e.g.*, *Kwikset*, 51 Cal.4[th] at 321, 335 (Prop. 64 reestablished common law principles of tort standing under FAL by requiring injury-in-fact standing); *Jones*, 378 Md. at 118 (injury-in-fact required for standing to bring common-law tort claims); *Norman*, 192 Md.App. at 420 (same); *Starbucks*, 168 Ca.App.4th at 1450-52 (same); *Gordon*, 575 F.3d at 1067-68 (common law has historically abhorred gratuitous claims by unaffected plaintffs). By their silence, therefore, it must be presumed the state legislatures intended that requirement to apply.[11] Neither the MD-CEMA nor CA-UCE "plainly announce" any intention to the contrary.

> ## 2. The Statutory Schemes Reflect the Legislatures Intent to Limit Standing to *Bona Fide* Service Providers Who Suffer Genuine Injury

Where a statute to be construed is part of a larger statutory scheme,

---

[11] Indeed, as BSI points out, the common law predecessor to anti-spam legislation was trespass-to-chattels, a cause of action predicated on and requiring actual harm to either the plaintiff or the plaintiff's property. *Omega*, 469 F.3d at 358-59 (affirming dismissal of plaintiff's trespass to chattels claim on ground he had failed to establish actual injury).

legislative intent must "be discerned by considering it in light of the statutory scheme" as a whole. *Breitenbach v. N.B. Handy Co.*, 366 Md. 467, 480 (2001); *Lakin v Watkins Assoc. Indus.*, 6 Cal.4th 644, 659 (1993) ("An interpretation that renders related provisions nugatory must be avoided[]; each sentence must be read not in isolation but in the light of the statutory scheme[].") Thus, even though "enacted at different times and not referring to each other," related provisions of a statutory scheme "must be read together . . . interpreted with reference to one another . . . and harmonized, to the extent possible, both with each other and with other provisions . . . ." *Breitenbach*, 366 Md. at 480-81 (citations omitted); *Lakin*, 6 Cal. 4th at 649 (narrower language of one paragraph of statute limited broader language of another because "[t]o adopt the broader reading of the second paragraph would render the narrower language of the first paragraph nugatory.")

Enacted as part of California's FAL and Maryland's MCPA, respectively, the CA-UCE and MD-CEMA are part of broader statutory schemes addressing the same subject matter – *i.e.*, false and deceptive business practices – to which the statues apply. The FAL and MCPA both require, as an element of standing, injury-in-fact and, in California's case, also economic injury. Nothing in either the language or legislative history of the CA-UCE or MD-CEMA suggests that the state legislatures intended to treat plaintiffs bringing claims based on deceptive email practices differently by exempting those plaintiffs, and only those plaintiffs,

from the standing requirements that apply to all other deceptive trade practices claims under the FAL or MCPA. Indeed, without a clear expression of legislative intent to the contrary, it would be incongruous for one part of the FAL or MCPA to require injury-in-fact but not another, even though both are intended to address the same basic claim.

BSI nevertheless urges the Court to adopt the district court's holding in *Asis Internet Services,* 2010 WL 1267763, *7 (N.D. Cal. April 1, 2010), that Prop. 64 did not amend the CA-UCE's standing requirements by abolishing private attorneys general claims for the rest of the FAL. There are multiple problems with this holding. Most significantly, it is directly contradicted by the statutory language of Prop. 64 itself. Prop. 64 limits standing to "any person who has suffered injury in fact and has lost money or property as a result of a violation *of this chapter,*" which includes the CA-UCE. CAL BUS. & PROF. CODE § 17535. In other words, Prop. 64 expressly encompasses and applies to the CA-UCE. And while Sec. 17535 refers only to claims for injunctive relief, it again would be incongruous to conclude, as *Asis* did, that the California legislature intended to impose heightened standing requirements on claims seeking only injunctive relief, but not on claims seeking to impose millions of dollars in statutory liability. Moreover, the court's conclusion that Prop. 64 does not apply to the CA-UCE because, unlike other provisions of the FAL, it has its own statutory damages

provision is directly contrary to the clear legislative intent that Prop. 64's

requirements apply to both injunctive relief *and* statutory damages claims, as

reflected by among other things the fact they apply to statutory damages claims

under the related UCL.  CAL BUS. & PROF. CODE §§ 17204, 17206; *see also* JA755

(CA-UCE's statutory damages provision "does not necessarily mean that the state

legislature did not intend that a prospective litigant demonstrate at some sort of

actual adverse impact as a pre-requisite to suit.").

### 3.  The Statutes' Damages Provisions Imply That the State Legislatures Intended to Limit Standing to *Bona-Fide*, Genuinely Affected Plaintiffs

The district court's interpretation of the statutes' standing provisions is also

supported by their use of the term "damages" to describe the statutory penalties

they provide.  MD CODE COM. LAW § 14-3002(3); CAL BUS. PROF. CODE §

17529.5(a)(b)(1)(B).  "Damages," in the context of tort law, denotes the existence

of "injury" or "loss."  *See* RESTATEMENT (2D) OF TORTS § 902 (defining "damages"

as "a sum of money awarded to a person injured by the tort of another" and

explaining in comments that "[d]amages flow from an injury"); BLACK'S LAW

DICTIONARY (8th ed. 2004) (defining damages as "compensation for loss or

injury"); *see also AIU Ins. Co. v. Superior Court*, 51 Cal.3d 807, 834 (1990)

("Whatever their semantic differences, the statutory and dictionary definitions of

'damages' share several basic concepts.  Each requires there to be 'compensation'

in 'money,' 'recovered' by a party for 'loss' or 'detriment' it has suffered through the acts of another.").

The statutes, therefore, plainly contemplate proof of "injury" as an element of recovery. *See Beyond Systems, Inc.*, 388 Md. at 16 (MD-CEMA enacted to create private cause of action "to seek redress for *tortious injury* arising from the receipt of misleading or fraudulent, unsolicited, commercial email.") (emphasis added). BSI's interpretation of the statutes' standing provisions to permit suits by unaffected, uninjured plaintiffs would lead to the statutory anomaly of allowing such plaintiffs to recover money intended to compensate for an "injury or "loss" they did not actually suffer. Such an interpretation is entirely illogical, and would render meaningless the legislatures' intentional characterization of the statutes' available remedies as "damages."

> ### 4.    The District Court Properly Construed the State Statutes Consistent with Analogous Federal Law

When faced with ambiguities in their own statutes, Maryland and California courts will look to analogous federal law for guidance. *See*, *e.g.*, *Solano County Emp. Assn. v. County of Solano*, 130 Cal. App.3d 256, 259 (1st Dist. 1982) ("[I]t is well settled that California courts will look to federal law for guidance in interpreting state statutes whose language parallels that of federal statutes"); *Davis v. State*, 426 Md. 211, 214 (2012) ("We have read analogous provisions in our statute to be *in pari material* with [the Federal Omnibus Crime and Safe Streets

Act], as interpreted by federal courts.")  The MCPA, in fact, expressly instructs courts to look to federal law, specifically the Federal Trade Commission Act (of which CAN-SPAM is a part), for interpretative guidance.  MD CODE COM. LAW § 13-105.

That leads here, of course, to the Ninth Circuit's interpretation of CAN-SPAM's analogous definition of "internet access service provider" to include a *bona fide* requirement.  *Gordon*, 575 F.3d at 1050-52.  To give practical meaning to the definition, the *Gordon* court looked to the overall structure and purpose of the statute, finding to be significant the fact that "the purpose of the CAN-SPAM Act was not to stamp spam out of existence," but rather to balance the need for protection against fraudulent email practices with the economic benefits of commercial email generally.  *Id.* at 1049.  To strike this balance, Congress made clear that the right of action it conferred was to be limited to "*bona fide* Internet service providers" adversely affected by alleged statutory violations.  *Id.* at 1050. As *Gordon* explained:

> It is perhaps a sad reality that Congress must specify a *bona fide* IAS provider, as possibly distinct from a non-genuine IAS provider.  But this demonstrates to us that lawmakers were wary of the possibility, if not the likelihood, that the siren song of substantial statutory damages would entice opportunistic plaintiffs to join the fray, which would lead to undesirable results.

*Id.*

BSI's attempts to distinguish *Gordon's* reasonable, common-sense

construction of CAN-SPAM are unpersuasive. First, it does not follow that because the MD-CEMA and CA-UCE granted a right of action to recipients as well as service providers means the state legislatures must have intended to give unqualified standing to non-*bona fide* service providers who collect spam for the sole purpose of litigation. (BSI Br. 42). If that were the case, they would not have needed to define service providers as a separate class of plaintiffs in the respective statutes.

Second, for the reasons discussed above, the fact Congress chose to expressly articulate the axiomatic common-law requirement that a plaintiff must be "adversely affected" to have standing is a distinction without a difference. The related provisions of both state statutes make clear the legislatures intended that a similar, "injury-in-fact" requirement apply to the MD-CEMA and CA-UCE.

Finally, *Gordon* did not "permit [the] plaintiff to proceed under the Washington anti-spam statute" because that state statute lacked a *bona fide* or adversely affected requirement. (BSI Br. 42-43.) To the contrary, the court stated that the defendant in *Gordon* "did not contest Gordon's standing to bring [Washington's] CEMA claims," and thus did no analysis of the CEMA standing requirements. Unlike BSI here, Gordon sued as both a service provider *and* recipient. (ECF No. 599, Ex 2 ¶¶ 1.1, 3.5, 4.2.2.) The court thus found that CEMA was broader than CAN-SPAM, allowing Gordon to proceed with his state

43

law claim, only because it "*authorizes a recipient* of commercial e-mail message . . . to bring a private action," not because of any statutory differences regarding the meaning of interactive service provider under the two statutes or requirement that it be genuinely affected by the violations alleged.  *Gordon,* 575 F.3d at 1058 (emphasis added).

The statutory distinctions between CAN-SPAM and the state statutes here are, in all events, irrelevant with respect to the additional grounds for dismissal articulated in Judge Gould's concurring opinion, who wrote separately to emphasize that that he "would presume a *bona fide* requirement even without [the statute's] legislative history" because, as he observed, the common law "did not develop remedies for people who gratuitously created circumstances that would support a legal claim and acted with the chief aim of collecting a damages award." *Gordon*, 575 F.3d at 1068.  For plaintiffs such as Gordon there and BSI here, who are "seeking to operate a litigation factory," the purported harm they allege "is illusory and more in the nature of manufactured circumstances in an attempt to enable a claim."  *Id.*  Absent a clear statutory directive to the contrary, therefore, "statutory standing should be denied to plaintiffs such as Gordon who purposely structure themselves to look like one of the limited entities eligible to sue but do so for the primary purpose of collecting damages and settlements from litigation."  *Id.* ("That the legislative history specifies *bona fide* IAS providers strengthens our

conclusion that Gordon's suit should be dismissed, but the legislative history is not necessary to reach this conclusion in light of the common-law antecedents that do not favor manufactured claims.").

**D.     Kraft's Interpretation Avoids Preemption; BSI's Invites It**

The district court also correctly found that an interpretation of the state statutes to allow unaffected, non-*bona fide* service providers the right to sue would create an inevitable conflict between state and federal law inconsistent with CAN-SPAM's express preemption clause.

The Supreme Court has "long recognized that state laws that conflict with federal law are without effect," and that "a statute's pre-emptive effect is guided by the rule that the purpose of Congress is the ultimate touchstone in every pre-emption case." *Altria Group, Inc. v. Good*, 129 S. Ct. 538, 543 (2008) (citations and internal quotations omitted). Thus, "Congress may indicate pre-emptive intent through a statute's express language or through its structure and purpose." *Id.* ("Pre-emptive intent may also be inferred if the scope of the statute indicates that Congress intended to occupy the legislative field, or if there is an actual conflict between state and federal law."); *Omega*, 469 F.3d at 352 ("Instead of imposing the narrowest possible construction on preemptive language when read in isolation, we seek 'a fair understanding of congressional purpose,' looking to 'the language of the pre-emption statute and the statutory framework surrounding it,' while also

45

considering "the structure and purpose of the statute as a whole'" (emphasis,

citations, and internal quotations omitted)).

As discussed above, Congress enacted CAN-SPAM to create "one national

standard" to replace states' disparate regulation of commercial email.  The breadth

of CAN-SPAM's preemption clause – providing that the statute "supersedes any

statute, regulation, or rule of a State or political subdivision of that State that

expressly regulates the use of electronic mail to send commercial messages" –

plainly reflects that in order to effectuate that purpose Congress' intended to

occupy the field of commercial email regulation, with one limited exception to be

narrowly construed.  15 U.S.C. § 7707(b)(1); *Rodriguez v. MEBA Pension Trust*,

827 F.2d 69 (4th Cir. 1989) (exception to ERISA's broad preemption provision to

be narrowly construed).  States may enact rules or regulations that "prohibit[]

falsity or deception in any portion of a commercial electronic mail message or

information attached thereto," but only to the extent they do not impose different

standards for such claims in conflict with the "uniform national standard" Congress

intended.  *Id.*; *Omega*, 469 F.3d at 354-56 (Oklahoma statute preempted to the

extent it imposed liability for immaterial false statements in conflict with CAN-

SPAM's requirement that misrepresentations be material).

BSI's brief all but ignores CAN-SPAM's preemptive effect, devoting only

three sentences of its brief to the issue.  (BSI Br. 44.)  It ignores *Omega*, ignores

46

*Gordon*, and makes no attempt to address the holdings or analysis of either on the issue. It also ignores *Kleffman v. Vonage Holdings Corp.*, 49 Cal.4th 334, 346 (Cal. 2010), where the California Supreme Court rejected a proposed construction of the CA-UCE there for the same reason as the district court here – because it would "raise significant preemption problems."

Of the authority BSI does cite – *Hypertouch Inc. v. ValueClick, Inc.,* 192 Cal.App.4th 805, 832 (2011) and *Asis* – one is a California state court decision, the other a California district court opinion. Neither is controlling nor persuasive.

At issue in *Hypertouch* was whether the CA-UCE is preempted by CAN-SPAM because it does not require plaintiffs to establish all elements of a traditional, common laws fraud claim. 192 Cal.App.4th at 832. The court concluded that Congress did not intend to preempt such claims because, in its view, "imposing strict liability for advertising in commercial e-mails that contain materially deceptive content does not alter the type of content that might subject a defendant to liability. Instead, it broadens the class of persons who may be held responsible for such content." *Id.* at 829.

While that conclusion is directly at odds with *Omega*, more importantly, it is inapplicable to the present case. *Omega*, 469 F.3d at 356 ("strict liability standard" contrary to Congress' intent that "a less demanding standard would best balance the competing interests at stake"). At bottom, *Hypertouch* is based on an

47

expansive interpretation of CAN-SPAM's savings clause that has no application

here – that because the clause "does not reference either fraud or common law . . .

the text of the statute betrays no intention by Congress to limit state regulation to

the simple codification of common law fraud . . . ." *Id.* at 826 (citations and

internal quotations omitted).  The opinion thus says nothing about Congress' intent

to preempt state law, or its interpretation, in direct conflict with a requirement

CAN-SPAM does expressly state (*e.g.*, that an ISP must be "adversely affected" to

have standing), or which Congress otherwise made clear the Act was intended to

incorporate, such as the requirement that an ISP be *bona fide*.

*Asis* is also unconvincing.  *Asis* holds that CAN-SPAM does not preempt

what it characterized as the CA-UCE's "broad enforcement" provision based on

the same false distinction the court drew in *Hypertouch* – that the CA-UCE does

not conflict with CAN-SPAM's standing requirements, but merely improves upon

the Act's "enforcement mechanism" by expanding the "class of plaintiffs" allowed

to bring suit.  *Asis*, 2010 WL 1267763 at 13-14; *Hypertouch*, 192 Cal.App.4th at

829.

Construing the CA-UCE's standing provisions to omit an injury-in-fact

requirement, as *Asis* did, does far more than create a new "class of plaintiffs" to

whom Congress did not provide a remedy.  It creates two different and conflicting

standards governing suits by the *same* class of plaintiffs to whom Congress did

provide a remedy, in clear contravention of Congress' intent that CAN-SPAM supplant conflicting state regulation of commercial email by, among other things, limiting ISP standing to *bona fide* service providers adversely affected by unlawful email practices in accordance with traditional tort law principles. *Cf. Anderson v. Sara Lee Corp.*, 508 F.3d 181, 194-95 (4th Cir. 2007) (conflict preemption bars plaintiff from circumventing FLSA's exclusive remedies and procedures by pursuing the same FLSA claims through state law common law claims). An interpretation of the state statutes that treats the same class of plaintiffs differently under state and federal law – in contradiction of the common law tort principles *Omega* found to underlie CAN-SPAM's preemption clause – would in effect write CAN-SPAM's *bona fide*, adversely affected requirement out of the statute altogether by creating a "*de facto* national standard" contrary to the uniform standard Congress intended. *Omega*, 469 F.3d at 356; *Gordon*, 575 F.3d at 1063 ("It would be logically incongruous to conclude that Congress endeavored to erect a uniform standard but simultaneously left states and local lawmakers free to manipulate that standard.").

By eliminating any injury-based requirement, moreover, BSI's interpretation also potentially encroaches upon the First Amendment protection of commercial speech. As the Supreme Court recently held in *United States v. Alvarez*, 132 S. Ct. 2537, 2549 (2012), false speech in and of itself is not devoid of Constitutional

49

protection. For its restriction to pass muster, there must instead be "a direct causal link between the restriction imposed and the injury to be prevented." *Id.* Accordingly, "[e]ven when considering some instances of defamation and fraud, [ ], the Court has been careful to instruct that falsity alone may not suffice to bring the speech outside the First Amendment." *Id.* at 2545.

For that reason, Justice Breyer explained in his concurrence, state statutes and common-law doctrines typically "limit the scope of their application, sometimes by requiring proof of specific harm to identifiable victims; sometimes by specifying that the lies be made in contexts in which a tangible harm to others is especially likely to occur; and sometimes by limiting the prohibited lies to those that are particularly likely to produce harm. *Id.* at 2554-55. "Fraud statutes," like those at issue here, survive First Amendment scrutiny because they are narrowly tailored to "require proof of a misrepresentation that is material, upon which the victim relied, and *which caused actual injury.*" *Id.* at 2555 (emphasis added).

As it pertains to BSI's argument, *Alvarez* thus stands for the proposition that false and misleading statements are actionable as torts not by virtue of the alleged falsehood alone, but rather based on the injury they may inflict, a distinction it must be presumed Congress recognized by limiting standing under CAN-SPAM to service providers "adversely affected" by the violations they allege. Construing the MD-CEMA and CA-UCE to allow suits by unaffected plaintiffs would not

50

only run counter to the basic principles governing tort-based actions, it would upset the careful balance CAN-SPAM intended between promoting commercial email's economic benefits (consistent with First Amendment issues) and eliminating its abuse. *Omega*, 469 F.3d at 354.

## III.  THE DISTRICT COURT PROPERLY DISMISSED BSI'S CLAIMS FOR LACK OF ARTICLE III STANDING

Dismissal was also proper on the ground that BSI failed to establish Article III standing necessary to proceed with its claims in federal court.

If Article III's injury-in-fact requirement means anything, it must mean that a "party may not deliberately act to cause injury to itself, then rely on that injury to satisfy standing requirements." JA756.  Implicit in the requirement is that the harm alleged – whether it be economic or, as BSI points out, the invasion of a statutorily created right – be both real and genuine.  *See*, *e.g.*, *Gladstone Realtors v. Village of Bellwood*, 441 U.S. 91 (1979) (standing requires "[t]he presence of a genuine injury").  None of the cases BSI cites – all of which, at bottom, stand for the unremarkable proposition that a plaintiff need not suffer economic injury to have standing – are to the contrary, nor does BSI explain why a non-genuine plaintiff such as itself, seeking to recover based on a manufactured injury, should be granted access to the courthouse as a matter of constitutional right.  While it is undisputed that BSI received spam, it presented no evidence that it received spam as a result of, in connection with – or even incidental to – the limited email or even

internet-related services it provided by customers.  All evidence, as the jury and district court found, was the opposite.

While BSI now claims that "Defendants' flood of deceptive spam harmed BSI in several ways" (BSI Br. 20), it conceded below that it had failed to make any such showing, telling the district court in briefing *after* the trial that it was "prepared to show that it was, in fact, injured by Defendants' illegal spam."  (ECF 593 at 10, n.3.)  While Wagner testified that BSI upgraded its servers to handle more spam, it presented no evidence that it did this for any reason other than to collect and archive more of it for litigation purposes.  In other words, it presented no evidence that this alleged "harm" was anything other than self-imposed.  Based on the record as a whole, it was not clear error for the district court to find that BSI failed to establish a genuine, injury-in-fact.

## IV.   THE DISTRICT COURT PROPERLY GRANTED SUMMARY JUDGMENT BASED ON CONSENT

Kraft joins in Connexus' brief addressing the district court's grant of summary judgment under the doctrine *volenti non fit injuri,* but writes separately to emphasize the following additional points.

BSI structures its argument around the idea that, because it did not expressly ask for or otherwise "cause" Kraft to send the email at issue, it cannot be said to have "consented" to its receipt.  (BSI Br. 45-47.)  That is not the standard by which the defense applies.

It is a fundamental principle of tort law that "[o]ne who effectively consents to conduct of another intended to invade his interests cannot recover in an action of tort for the conduct or for harm resulting from it." RESTATEMENT 2D OF TORTS § 892A; Cal. Civ. Code § 3515 ("He who consents to an act is not wronged by it.") Critically, the Restatement defines consent as "willingness in fact for conduct to occur;" it therefore need not be express but may instead be implied. *Id.* § 892(1) (consent measured by the plaintiff's "manifested action *or inaction* and need not be communicated to the actor"); *Jones v. Corbis Corp.*, 815 F. Supp.2d 1108, 1114 (C.D. Cal. 2011) (dismissing claim for commercial misappropriation on ground that plaintiff impliedly consented to use of photographs by not objecting to it).

The material issue on which summary judgment turned with respect to Kraft, therefore, was whether BSI's actions (or lack thereof) constituted *implied* consent (*i.e.*, the "willingness in fact for conduct to occur") to the email received, and thus an invitation to the harm it alleges for purposes of bringing this case.[12]  On this

---

[12]  BSI's claim that its actions more appropriately reflect an "assumption of the risk," which it argues is inapplicable to intentional torts, begs the question.  (BSI Br. 47.)  A plaintiff's duty to avoid or mitigate tortious harm is as old as the common law itself, finding its home in several affirmative defenses such as the duty to mitigate, the duty of avoidable consequences, contributory negligence and, of course, consent and assumption of the risk.  As the court observed in *Janelsins v. Button*, 102 Md.App. 30, 40-42 (1994): "According to the Restatement [of Torts], the distinctions between the doctrines of assumption of the risk and consent are only semantic . . . the two doctrines substantively amount to flip sides of a single conceptual principle."

point, the undisputed evidence could not have been more definitive:

- Contrary to industry-wide custom and practice, BSI accepted (and archived indefinitely) all incoming email knowing that 99% was spam. It purposely made no effort to block, filter, or otherwise mitigate spam, despite the relative ease and nominal expense of implementing such measures. *See Gordon*, 575 F.3d at 1054 (legitimate ISPs are expected to "take reasonable precautions, such as implementing spam filters, as part of [their] normal operations").

- For that matter, BSI intentionally avoided taking such preventative measures so that it *would* receive spam generally and, specifically, "fraudulent" email it thought it could sue on that, at one point, its spam filter had been blocking before Wagner turned it off to avoid rejecting it. Joe Wagner set Hypertouch's routing tables to forward such email, which its servers would have otherwise rejected, to BSI. Paul, who knew what they were, agreed to accept them. When they weren't getting through, Paul complained. He wanted to know why and for Joe to fix whatever the problem was. When they did get through, Paul greeted them with "unbridled enthusiasm."

- To make sure they got even more email, Paul and Joe all but painted bulls-eyes on their chests by posting thousands of email addresses for non-existent users on the website knowing that "spammers" would find these "spam traps" and

send email to them.  Email sent to the addresses was then, by virtue of the

brothers' atypical routing arrangement, forwarded directly to BSI's servers.

Joe Wagner's testimony left no room for doubt as to the purpose of all this:

BSI "wanted to collect spam."  Short of a direct admission, it is hard to conceive of

a more compelling set of facts from which the district court could have found that

BSI's claims are barred by its implied consent to the harm alleged.  Its dismissal of

BSI's complaint should thus be affirmed on this basis as well.

## V.   THE DISTRICT COURT CORRECTLY RULED THAT EMAIL ROUTED TO BSI THROUGH HYPERTOUCH WAS BARRED BY KRAFT'S SETTLEMENT AGREEMENT WITH HYPERTOUCH

The settlement agreement (JA553-565) between Kraft and Hypertouch

clearly bars any claim based on email directed to Hypertouch and routed by

Hypertouch to BSI.  BSI's attempt to avoid the plain import of the agreement by

claiming it was not a Hypertouch "assignee" is without merit, and merely serves to

illustrate its groundless theory that it should be able to recover multiple times for

the same email while also raising the question of whether Joe Wagner's signing of

the Hypertouch settlement agreement and Paul Wagner's involvement with that

matter constitute fraud.  (*See* SOC § III.A-C., above.)  Indeed, allowing BSI to

proceed would not only condone their failure to disclose the fact, as both knew at

the time of settlement, BSI intended to sue on the same email on which

Hypertouch just recovered, but it would encourage the two companies to continue

55

what they have been doing – setting up servers in multiple states, routing emails back and forth to each other, and then suing for multiple sets of damages for the same email. The district court saw through this nonsense and this Court should too.

Email directed to BSI that passed through Hypertouch's servers did so *only* because Hypertouch and BSI had an agency or other relationship; email would not get to BSI's servers unless both Hypertouch and BSI agreed to and permitted it. That fact is undisputed, and the record is replete with examples of how the Wagner brothers worked together to receive and then route email to one another in order to maximize damages.

BSI admits that the settlement agreement between Kraft and Hypertouch was broad. It covered "agents, representatives, employees, predecessors, successors, assigns", with regard to both known and unknown claims. JA554. One of three possibilities therefore exists: Hypertouch was the sender of the email to BSI, in which case BSI would have a claim against Hypertouch, but not Kraft. BSI was Hypertouch's agent for receipt of the email. Or, as the district court found (JA732, n. 5), BSI was the assignee of Hypertouch in that Hypertouch possessed the claim on the email directed to its servers (which would not have gotten to BSI's servers but for the brothers' routing agreement), and Hypertouch would have had to assign that claim to BSI. In all cases, the settlement agreement bars BSI from

bringing the same claim based on the same email that Hypertouch already released.

BSI's argument, moreover, completely undermines the purpose of the settlement agreement's cooperation clause. Prior to the settlement, Hypertouch claimed that it was being harmed by the commercial email it received. As part of their agreement, the parties included a release of future claims, directly tied to a cooperation clause (JA556) providing that if Hypertouch received email it considered unlawful, it had to contact Kraft within 20 days of its receipt so that Kraft could help it identify the vendor that sent the email. As long as Kraft provided that assistance, Hypertouch was barred from pursing a claim against Kraft for that future email.

The rationale for this provision was simple: if Hypertouch was genuinely interested in preventing the unsolicited commercial email, then it could do so by notifying Kraft directly. Yet Hypertouch never notified Kraft of post-settlement commercial email. Instead, it passed them on to BSI to sue on as part of the Wagners' joint venture. Had Hypertouch objected to the Kraft email, it would no longer have gotten them, depriving BSI of a deep-pocket defendant to sue and Hypertouch the chance to effectively sue Kraft a second time by proxy under what can only be presumed was the same type of fee-splitting arrangement as the brothers had in the *World Avenue* case. Simply stated, both Hypertouch and BSI engaged in this scheme as partners or joint venturers and are both bound by the

57

settlement agreement, at least with respect to email directed to Hypertouch and

forwarded by agreement of the brothers to BSI.

## **CONCLUSION**

For the reasons stated above, Appellees respectfully request that the

judgment of the district court be affirmed and that Appellees be awarded their

costs.

## **REQUEST FOR ORAL ARGUMENT**

Appellees respectfully request oral argument on all issues raised herein.

Dated:  February 24, 2014                    Respectfully submitted by:

                                             PERKINS COIE LLP
                                             By: /s/ John K. Roche
                                             John K. Roche
                                             Perkins Coie LLP
                                             700 13th St., N.W., Suite 600
                                             Washington, D.C. 20005-3960
                                             Tel.:  (202) 434-1627
                                             Fax:  (202) 654-9106
                                             JRoche@perkinscoie.com

                                             *Counsel for Appellees Kraft Foods Inc.,*
                                             *Kraft Foods Global, and Vict. Th. Engwall*
                                             *& Co.*

Of Counsel:
Darrell J. Graham
John E. Bucheit
ROESER BUCHEIT & GRAHAM LLC
Two N. Riverside Plaza, Suite 1420
Chicago, IL  60606
(312) 621-0301

## CERTIFICATE OF COMPLIANCE WITH RULE 28.1(e) or 32(a)
### Certificate of Compliance With Type-Volume Limitation, Typeface Requirements, and Type Style Requirements

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because this brief contains 13,925 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14 point Times New Roman.

Dated:  February 24, 2014                Respectfully submitted by:

PERKINS COIE LLP
By: /s/ John K. Roche
John K. Roche
Perkins Coie LLP
700 13th St., N.W., Suite 600
Washington, D.C. 20005-3960
Tel.:  (202) 434-1627
Fax:  (202) 654-9106
JRoche@perkinscoie.com

*Counsel for Appellees Kraft Foods Inc.,
Kraft Foods Global, and Vict. Th. Engwall
& Co.*

Of Counsel:
Darrell J. Graham
John E. Bucheit
ROESER BUCHEIT & GRAHAM LLC
Two N. Riverside Plaza, Suite 1420
Chicago, IL  60606
(312) 621-0301

## CERTIFICATE OF SERVICE

I hereby certify that on February 24, 2014, the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below via U.S. mail.

Richard K. Willard
Jill C. Maguire
Steptoe & Johnson LLP
1330 Connecticut Avenue, NW
Washington, D.C. 20036

Stephen H. Ring
STEPHEN H. RING, PC
506 Main Street, Suite 215
Gaithersburg, MD 20878

Michael S. Rothman
LAW OFFICE OF MICHAEL S. ROTHMAN
401 East Jefferson Street, Suite 201
Rockville, MD 20850-0000

*Counsel for Plaintiff-Appellant Beyond Systems, Inc.*

J. Douglas Baldridge
Lisa Jose Fales
Ari N. Rothman
Lauren E. Ingebritson
VENABLE LLP
575 7th Street, N.W.
Washington, DC 20004-1601

*Counsel for Appellee Connexus Corp.*

Darrell J. Graham
John E. Bucheit
Roeser Bucheit & Graham LLC
2 N. Riverside Plaza, Ste. 1420
Chicago, IL 60606

*Counsel for Appellees Kraft Foods Inc., Kraft Foods Global, and Vict. Th. Engwall & Co.*

By: /s/ John K. Roche
John K. Roche
Perkins Coie LLP
700 13th St., N.W., Suite 600
Washington, D.C. 20005-3960
Tel.: (202) 434-1627
Fax: (202) 654-9106
JRoche@perkinscoie.com

*Counsel for Appellees Kraft Foods Inc., Kraft Foods Global, and Vict. Th. Engwall & Co.*

60