RECORD NO. 13-2137

In The
**United States Court of Appeals
For The Fourth Circuit**

**BEYOND SYSTEMS, INC.,**

*Plaintiff-Appellant*,

v.

**KRAFT FOODS, INCORPORATED; VICT. TH. ENGWALL & CO.;
KRAFT FOODS GLOBAL, INCORPORATED; and
CONNEXUS CORPORATION,**

*Defendants-Appellees*.

**ON APPEAL FROM THE U.S. DISTRICT COURT
FOR THE DISTRICT OF MARYLAND AT GREENBELT**

**REPLY BRIEF OF
APPELLANT BEYOND SYSTEMS, INC. IN RESPONSE TO
APPELLEES' CONSOLIDATED BRIEF**

Richard K. Willard
Jill C. Maguire
Benjamin B. Watson
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, NW
Washington, DC 20036
(202) 429-3000

Of Counsel:
Stephen H. Ring                     Michael S. Rothman
LAW OFFICES OF                      LAW OFFICE OF
   STEPHEN H. RING, P.C.               MICHAEL S. ROTHMAN
506 Main St., Ste. 215              401 E. Jefferson St., Ste. 201
Gaithersburg, MD 20878              Rockville, MD 20850
(301) 563-9249                      (301) 251-9660

*Counsel for Appellant Beyond Systems, Inc.*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. ii

ABBREVIATIONS KEY ................................................................. vii

INTRODUCTION ................................................................................1

STANDARD OF REVIEW .................................................................2

ARGUMENT .......................................................................................3

I.      BSI HAS STANDING UNDER STATE LAW AND ARTICLE III .............3

      A.      Neither Maryland nor California Law Requires BSI to Demonstrate Injury in Addition to that Specified in the California and Maryland Statutes ........................................................................3

      B.      The District Court Should Have Applied the Maryland and California Statutes as Written and Not Altered Their Provisions to Suit Its Own Conception of Sound Public Policy ......................................................8

      C.      The Federal CAN-SPAM Act is Irrelevant to Construing and Applying the Standing Requirements of Either the California or Maryland Statute ......................................................12

      D.      BSI's Construction of the California and Maryland Statutes Creates No Tension with the First Amendment ................................................18

II.     BSI DID NOT—AND COULD NOT—MANUFACTURE ITS CLAIMS ................................................................................19

III.    KRAFT AND CONNEXUS SENT DECEPTIVE SPAM TO BSI WITHOUT ITS APPARENT OR ACTUAL CONSENT ...........................23

IV.     BSI IS NOT SUBJECT TO THE SETTLEMENT AGREEMENT BETWEEN HYPERTOUCH AND KRAFT ................................................27

CONCLUSION ..................................................................................29

CERTIFICATE OF COMPLIANCE WITH RULE 28.1(e) OR 32(a)

CERTIFICATE OF SERVICE

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### FEDERAL CASES

*Altria Group, Inc. v. Good*,
555 U.S. 70 (2008)...........................................................................16

*Asis Internet Servs. v. Subscriberbase Inc.*,
No. 09-3503 SC, 2010 WL 1267763 (N.D. Cal. Apr. 1, 2010).................5, 6, 17

*Cent. Hudson Gas & Electr. Corp. v. Pub. Serv. Comm'n of N.Y.*,
477 U.S. 557 (1980)..........................................................................19

*Dunn v. Borta*,
369 F.3d 421 (4th Cir. 2004) ...........................................................10

*Educ. Media Co. at Va. Tech, Inc. v. Insley*,
731 F.3d 291 (4th Cir. 2013) ...........................................................19

*Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*,
204 F.3d 149 (4th Cir. 2000) .............................................................3

*Gordon v. Virtumundo, Inc.*,
575 F.3d 1040 (9th Cir. 2009) ............................................. 12, passim

*Jones v. Corbis*,
815 F. Supp. 2d 1108 (C.D. Cal. 2011) .......................................23, 25

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992).............................................................................3

*Microsoft Corp. v. JDO Media, Inc.*,
No. C04-0515P, 2005 WL 1838609 (W.D. Wash. Aug. 1, 2005) ....................16

*MySpace, Inc. v. Wallace*,
498 F. Supp. 2d 1293 (C.D. Cal. 2007) ............................................16

*Omega World Travel, Inc. v. Mummagraphics, Inc.*,
469 F.3d 348 (4th Cir. 2006) ...........................................................17

*Rhodes v. E.I. du Pont de Nemours & Co.*,
    636 F.3d 88 (4th Cir. 2011) .............................................................10

*United States v. Alvarez*,
    132 S. Ct. 2537 (2012).................................................................19

*United States v. Langley*,
    62 F.3d 602 (4th Cir. 1995) .........................................................16

*W. Va. Ass'n of Club Owners & Fraternal Servs., Inc. v. Musgrave*,
    553 F.3d 292 (4th Cir. 2009) .......................................................19

*White v. Arlen Realty & Dev. Corp.*,
    540 F.2d 645 (4th Cir. 1975) .........................................................3

## STATE CASES

*Angelucci v. Century Supper Club*,
    158 P.3d 718 (Cal. 2007) ...........................................................7, 9

*Arias v. Super. Ct.*,
    209 P.3d 923 (Cal. 2009) ..............................................................6

*Berg v. Byrd*,
    720 A.2d 1283 (Md. Ct. Spec. App. 1998)........................................7

*Blondell v. Littlepage*,
    991 A.2d 80 (Md. 2010) ..............................................................28

*Brazerol v. Hudson*,
    277 A.2d 585 (Md. 1971)............................................................25

*Brooks v. Euclid Sys. Corp.*,
    827 A.2d 887 (Md. Ct. Spec. App. 2003)........................................27

*Chern v. Bank of Am.*,
    544 P.2d 1310 (Cal. 1976) ............................................................6

*Hale v. Morgan*,
    584 P.2d 512 (Cal. 1978) ............................................................12

*Heiner v. Kmart Corp.*,
   84 Cal. App. 4th 335 (2000) ................................................................26

*Hypertouch, Inc. v. ValueClick, Inc.*,
   192 Cal. App. 4th 805 (2011) ...........................................................17

*Janelsins v. Button*,
   648 A.2d 1039 (Md. Ct. Spec. App. 1994)............................................25, 26, 27

*Kleffman v. Vonage Holdings Corp.*,
   232 P.3d 625 (Cal. 2010) ................................................................18

*Lloyd v. Gen. Motors Corp.*,
   916 A.2d 257 (Md. 2007) ................................................................7

*Munson v. Del Taco, Inc.*,
   208 P.3d 623 (Cal. 2009) ................................................................9

*Ordway v. Super. Ct.*,
   198 Cal. App. 3d 98 (1988) ................................................................26

*Peters v. Super. Ct.*,
   79 Cal. App. 4th 845 (2000) ................................................................15

*Simmons v. Ware*,
   213 Cal. App. 4th 1035 (2013) ................................................................28

*Smith v. Super. Ct.*,
   137 P.3d 218 (Cal. 2006) ................................................................12

*Starbucks Corp. v. Super. Ct.*,
   168 Cal. App. 4th 1436 (2008) ................................................................8, 9

*State v. Brantner*,
   758 A.2d 84 (Md. 2000) ................................................................9

*Wickham v. Southland Corp.*,
   168 Cal. App. 3d 49 (1985) ................................................................28

## CONSTITUTIONAL PROVISIONS

U.S. Const. art. III ................................................................3

iv

U.S. Const. amend. I .................................................................................19

**FEDERAL STATUTES**

*The CAN-SPAM Act*

15 U.S.C. § 7706(g) ............................................................................13, 14

15 U.S.C. § 7707(b) ............................................................................15, 17

**STATE STATUTES**

*California's Business & Professions Code*

Cal. Bus. & Prof. Code § 17204 ...............................................................7

Cal. Bus. & Prof. Code § 17206 ...............................................................7

Cal. Bus. & Prof. Code § 17529 ...............................................................9

Cal. Bus. & Prof. Code § 17529.1 ..........................................................24

Cal. Bus. & Prof. Code § 17529.2 ..........................................................20

Cal. Bus. & Prof. Code § 17529.5 ...................................................6, 21, 27

Cal. Bus. & Prof. Code § 17535 .....................................................5, 6, 7

*Maryland's Commercial Law*

Md. Code Ann., Com. Law § 13-301 .......................................................8

Md. Code Ann., Com. Law § 13-408 ...................................................7, 8

Md. Code Ann., Com. Law § 14-3002 ...............................................20, 21

Md. Code Ann., Com. Law § 14-3003 ...............................................21, 27

**FEDERAL LEGISLATIVE MATERIALS**

S. Rep. No. 108-102, *reprinted in* 2004 U.S.C.C.A.N. 2348 .................18

## TREATISES AND ARTICLES

Restatement (Second) Torts § 892(1) ........................................................25

Juan Carlos Perez, *Postini traps legitimate messages, creates Gmail delivery backlog*, *Computerworld* (Feb. 27, 2014 10:40 AM), http://www.computerworld.com/s/article/9246646/Postini_traps_legitima te_messages_creates_Gmail_delivery_backlog .................................................22

## <u>ABBREVIATIONS KEY</u>

| | |
|---|---|
| BSI | Plaintiff Beyond Systems, Inc. |
| CAN-SPAM Act | Controlling the Assault of Non-Solicited Pornography and Marketing Act of 2003, Pub. L. No. 108-187, 117 Stat. 2699 (2003), *codified at* 15 U.S.C. §§ 7701 *et seq.*, 18 U.S.C. § 1037 (2012). |
| Connexus | Connexus Corporation, a named defendant in this case. |
| EMSP | Electronic Mail Service Provider |
| JA | Joint Appendix |
| ICSP | Interactive Computer Service Provider |
| ISP | Internet Service Provider |
| Kraft | Kraft Foods, Incorporated, Kraft Foods Global, Incorporated, and Vict. Th. Engwall & Co., Inc., named defendants in this case. |
| MD-CEMA | Maryland Commercial Electronic Mail Act, Md. Code Ann., Com. Law §§ 14-3001 *et seq*. |
| CA-UCE | Restrictions on Unsolicited Commercial E-Mail Advertisers Act, Cal. Bus & Prof. Code §§ 17529 *et seq*. |

vii

# INTRODUCTION

Defendants' brief is rife with pejorative epithets, referring to BSI as a "professional plaintiff," an "opportunistic plaintiff," a "litigation mill," and a "litigation factory," that brings "shakedown lawsuits" and "frivolous claims" that are "gratuitously manufactured," all in pursuit of a "veritable financial bonanza."

But *ad hominen* attacks are no substitute for legal analysis, and it is telling that Defendants make no attempt to defend the district court's central legal conclusion that an Internet service provider satisfying the statutory requirements of the California and Maryland anti-spam laws is nevertheless disqualified from filing suit if it "primarily or substantially engages in bringing anti-spam litigation." As BSI demonstrated in its opening brief, a federal court sitting in a diversity case has no authority to impose such an extra-statutory requirement based upon its own idea of what would constitute good public policy.

Antipathy toward so-called professional plaintiffs also does not justify requiring proof of some additional injury, apart from the statutory requirement that a plaintiff have received false or deceptive spam emails, in order to establish injury-in-fact sufficient to satisfy the state statutes or Article III. Nor does it justify applying the doctrine of *volenti non fit injuria* to bar recovery in a situation where BSI never consented to receiving spam; indeed, BSI communicated just the opposite.

The public policy of Maryland and California is best evidenced by the language of their anti-spam statutes, their legislative findings, and legislative histories.  These make clear a desire to deter and punish those who send false or deceptive spam by creating a variety of remedies, including lawsuits for statutory damages by Internet service providers who are targeted by spammers.  Nothing in the statutes or their legislative histories shows a desire to protect spammers from lawsuits by providers that primarily or substantially engage in bringing anti-spam litigation if they otherwise meet the statutory requirements for bringing suit.  Whether or not the majority of BSI's gross revenues over the years have derived from the pursuit of litigation, BSI has furthered the legislative purposes of the Maryland and California anti-spam statutes by bringing lawsuits such as this one against those responsible for sending it unlawful spam.

## STANDARD OF REVIEW

Defendants argue that a "clearly erroneous" standard of review applies to the district court's factual findings in this case.  *See* Defs.' Br. at 26.  But this is not an appeal following a bench trial verdict.  Rather, it is an appeal from the grant of Defendants' motions for summary judgment.  All evidence must be viewed in the light most favorable to BSI.  *See* BSI Br. at 30.

2

## ARGUMENT

**I. BSI HAS STANDING UNDER STATE LAW AND ARTICLE III**

**A. Neither Maryland nor California Law Requires BSI to Demonstrate Injury in Addition to that Specified in the California and Maryland Statutes**

By enacting the statutes involved in this case, California and Maryland clearly concluded that the transmission of false or deceptive email advertising was harmful and against public policy.  The state statutes thus create a right not to receive deceptive spam, and when that right is violated, an injury occurs that is sufficient to confer standing under both state law and Article III.  *See, e.g.*, *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 156 (4th Cir. 2000) ("'[I]njury required by Article III may exist solely by virtue of statutes creating legal rights, the invasion of which creates standing.'") (citation omitted); *see also White v. Arlen Realty & Dev. Corp.*, 540 F.2d 645, 649 (4th Cir. 1975) ("Congress gave the debtor a right to specific information and therefore defined 'injury in fact' as the failure to disclose such information."); *see also Lujan v. Defenders of Wildlife*, 504 U.S. 555, 578 (1992) (recognizing that legislatures may "elevat[e] to the status of legally cognizable injuries concrete, *de facto* injuries that were previously inadequate in law").

3

Defendants argue that BSI must prove more than that it received deceptive spam, but there is no legal support for that argument.[1]  Presumably the additional injury that Defendants require would have to be caused by the particular spam at issue in a lawsuit, in contrast to the injury caused from all of the spam that an Internet service provider receives from anywhere.  But that is precisely why these anti-spam statutes provide for statutory damages—the laws recognize that proving harm from any given email would, in the ordinary case, be impracticable, if not impossible.  Moreover, even though the receipt of just one deceptive email is enough to violate Maryland and California law, it is the cumulative harm from the deluge of emails coming from a multitude of senders at once—overwhelming servers, consuming bandwidth and storage, disrupting users and triggering complaints—that caused many states, as well as Congress, to enact anti-spam laws. BSI has experienced all of these harms, even if BSI is unable to calculate specific economic injury due to Defendants' unlawful conduct, and it is precisely these kinds of harms that California and Maryland sought to prevent by granting ISPs (and others) the right to seek and recover substantial statutory damages.  *See* BSI Br. at 35.

---

[1] With respect to Article III standing, Defendants agree that economic injury is not required.  *See* Defs.' Br. at 49-50.  They also agree that the harm alleged may be "the invasion of a statutorily created right."  *Id*. at 49.

4

Furthermore, size does not matter. Receipt of deceptive email causes harm no matter how large or small an ISP may be. The AOLs and Microsofts of the world are in no better position than the BSIs of the world to identify the specific harm caused by the deluge of deceptive spam, much less to quantify the cost imposed by a particular email or group of emails sent by a spammer. Defendants' theory that something beyond the receipt of deceptive spam is required to confer standing on an ISP would, in the end, completely undercut California and Maryland law by making it nearly impossible for *any* ISP to bring suit against an unlawful spammer.

Defendants' reliance on *other* provisions of California and Maryland law completely misses the mark. *See* Defs.' Br. at 37-39. For example, Section 17535 of California's False Advertising Law does indeed require a loss of "money or property" to trigger its remedies, but that provision applies by its express terms only to "[a]ctions *for injunction* under this section," not claims for statutory damages, as in this case. Cal. Bus. & Prof. Code § 17535 (2008) (emphasis added); *see also Asis Internet Servs. v. Subscriberbase Inc*., No. 09-3503 SC, 2010 WL 1267763, at *7 (N.D. Cal. Apr. 1, 2010) ("Plaintiffs who seek injunctive or other equitable relief under the [Unfair Competition Law] or [False Advertising Law] therefore necessarily invoke the provisions amended by Proposition 64, by

5

relying on those sections.").[2]  Indeed, BSI *cannot* pursue its claims for statutory

damages under Section 17535.  *See Chern v. Bank of Am.*, 544 P.2d 1310, 1315

(Cal. 1976) (Section 17535 "do[es] not authorize recovery of damages by private

individuals. Private relief is limited to the filing of actions for an injunction (*Id*., §

17535); and civil penalties are recoverable only by specified Public officers (*Id*.,

§§ 17535.5, 17536).").

Defendants suggest that it would be "incongruous to conclude . . . the

California legislature intended to impose heightened standing requirements on

claims seeking only injunctive relief . . . ."  Defs.' Br. at 39.  But that

"incongruity"—if it can be called that—is purely a creature of state law, explained

by the quite distinct groups of plaintiffs and defendants that the False Advertising

Law and the CA-UCE contemplated.  The district court in *Asis Internet Services*

addressed this very issue:

> [T]he class of entities that could bring suit as potential plaintiffs under
> section 17529.5(b) (1)(B)(2) was significantly more limited than the
> class of entities that could seek injunctive relief for any violation of
> the [False Advertising Law].  Moreover, the target of the [CA-UCE]
> is much narrower than that of the [Unfair Competition Law] and
> [False Advertising Law]—it is crafted to discretely target email
> advertisers, rather than businesses or advertisers generally.

---

[2] Section 17535 codifies Proposition 64, which California voters passed in
2004.  *See Arias v. Super. Ct.*, 209 P.3d 923, 928 (Cal. 2009).

6

2010 WL 1267763, at *8 (footnote omitted). Given the specific scope of the CA-UCE, there is nothing "incongruous" about the California legislature imposing distinct standing requirements for different classes of plaintiffs. *See, e.g.*, *Angelucci v. Century Supper Club*, 158 P.3d 718, 727 (Cal. 2007) ("Standing rules for actions based upon statute may vary according to the intent of the Legislature and the purpose of the enactment.").[3]

Likewise, there is no legal or logical basis to extend Section 13-408 of Maryland's Consumer Protection Act to BSI's claims under the MD-CEMA. Section 13-408 "creates a private cause of action for violations of the [Consumer Protection] Act." *Berg v. Byrd*, 720 A.2d 1283, 1286 (Md. Ct. Spec. App. 1998). While Section 13-408 "expressly restricts the action to persons 'to recover for injury or loss sustained by him,'"—meaning actual damages, *see Lloyd v. Gen. Motors Corp.*, 916 A.2d 257, 277 (Md. 2007)—BSI did not bring its claim under

_____

[3] Kraft also invokes Sections 17204 and 17206 of California's Unfair Competition Law to argue that BSI must show economic injury under the CA-UCE. These provisions do not help Kraft. First, Sections 17204 and 17206 do not encompass the CA-UCE. Second, Section 17204, like Section 17535, is limited to injunctive relief. Section 17206 provides that *government entities* may recover civil penalties, but it does not permit a private plaintiff to recover statutory damages. Neither of these provisions is applicable to BSI's claim for statutory damages under the CA-UCE, and neither provides a basis to require BSI to show economic injury to pursue its statutory claims.

Section 13-408 of the Consumer Protection Act; it brought its claim under the MD-CEMA.

Further, a violation of the MD-CEMA is not, "by definition," a violation of the Maryland Consumer Protection Act.  Defs.' Br. at 8.  In contrast to a violation of the Maryland Consumer Debt Collection Act, for example, a violation of the MD-CEMA is not expressly listed as an "unfair or deceptive trade practice" under the Consumer Protection Act.  *See* Md. Code Ann., Com. Law § 13-301(14)(iii) (2013).  Perhaps BSI could have brought suit under the Consumer Protection Act's general prohibition on "unfair or deceptive trade practices," but it was not compelled to do so and, more importantly, it did not do so.

**B.     The District Court Should Have Applied the Maryland and California Statutes as Written and Not Altered Their Provisions to Suit Its Own Conception of Sound Public Policy**

Defendants' arguments concerning ambiguity and legislative silence, *see* Defs.' Br. at 28-33, miss the point precisely because the language of these statutes is not ambiguous, and the legislatures were not at all silent: they expressly identified the entities and persons permitted to bring suit under the statutes.  BSI falls squarely within the class of plaintiffs permitted to bring suit under these statutes.

For that reason, *Starbucks Corp. v. Superior Court*, 168 Cal. App. 4th 1436 (2008), is inapposite.  *See* Defs.' Br. at 29-30.  In that case, one plaintiff admitted

that he "was bringing the lawsuit 'for other people.'" *Id*. at 1442 (citation omitted). In contrast, BSI is acting for itself and its customers—not the public at large (although a successful lawsuit would certainly benefit others indirectly, as is the case with most litigation that is intended to deter unlawful conduct).

Further, in *Starbucks*, the court found that plaintiffs did not have standing because they fell outside the class of persons—those with low-level marijuana convictions—that the statute was intended to protect. *See id*. at 1449. In contrast, the CA-UCE and MD-CEMA seek to protect a much broader class of persons by deterring deceptive spam generally. *See, e.g.*, Cal. Bus. & Prof. Code § 17529 (listing negative societal impacts of spam). ICSPs and EMSPs clearly fall within this class, and both statutes expressly identify them as entities that may rightfully bring suit to vindicate both their and the general public's interest in reducing deceptive spam.

California and Maryland courts have often observed that it is a job for the legislatures, not the courts, to alter or add statutory elements. *See* BSI Br. at 41-42 (citing *Munson v. Del Taco, Inc*., 208 P.3d 623, 678 (Cal. 2009); *Angelucci*, 158 P.3d at 729; *State v. Brantner*, 758 A.2d 84, 89 (Md. 2000)). Defendants attempt to distinguish BSI's cases on immaterial grounds. *See* Defs.' Br. at 32-33. What is key is that these cases deal with statutory causes of action and make clear that the Maryland and California courts will not usurp the legislative branch by

engrafting extra-statutory requirements—even when parties like Defendants here vociferously complain that they are being subjected to abusive litigation. *See* BSI Br. at 41-42.

Moreover, because it is operating under its diversity jurisdiction, this Court gives even more deference to state legislatures. *See, e.g.*, *Dunn v. Borta*, 369 F.3d 421, 432-33 (4th Cir. 2004) ("Indeed, the Defendants do not contend on appeal that the statute explicitly contains these elements; rather, they urge that these elements should be implied by the judiciary, asserting . . . 'that both of these requirements should be implied into the Virginia Securities Act.' Because the Act fails to mention reliance or causation, however, it would be inappropriate for a court to imply them.") (citation and footnote omitted). The reason for this deference is clear:

> [a] federal court acting under its diversity jurisdiction should respond conservatively when asked to discern governing principles of state law . . . [and] should not interpret state law in a manner that may appear desirable to the federal court, but has not been approved by the state whose law is at issue.

*Rhodes v. E.I. du Pont de Nemours & Co.*, 636 F.3d 88, 96 (4th Cir. 2011) (citation omitted).

The California and Maryland legislatures created a statutory cause of action for EMSPs and ICSPs, understanding that an individual recipient would not be the primary enforcer of the statutes. As this lawsuit undoubtedly makes clear, bringing

10

a claim under these statutes is costly, time-consuming, and challenging.  By providing a specific cause of action to ICSPs and EMSPs—including in Maryland a larger quantum of statutory damages for an ICSP—the legislatures sought to incentivize and motivate such entities to bring lawsuits.

Nor, as Defendants assert, does BSI's construction of the statutes "blur" the distinction between "recipient" and "ICSP" or "EMSP."  Defs.' Br. at 34.  ICSPs and EMSPs are the mail carriers of the Internet.  In contrast to end-users (the recipients), they do not literally read the email they transmit nor do they make decisions based on the false or deceptive information contained within an email, for example.  Rather, they are a link in the chain of delivery to end-users, and they fulfill a role separate from the end-user.  The extreme hypotheticals ginned up by Defendants during the "preliminary" trial, and now recycled on appeal, *see* Defs.' Br. at 34, do not prove otherwise: a "student who sets up the wireless router in her parents' home" and a person "with a blue-tooth connection" are not the addressees of any emails they pass along to others.

Granting enforcement rights to ISPs is a powerful mechanism for states to achieve valid legislative objectives, particularly when the goal is to prevent and punish conduct that is detrimental to the public at large.  Allowing a larger class of plaintiffs to sue creates an even greater deterrent to spammers than do the

11

relatively few cases that government agencies are able to investigate and

prosecute.[4]

### C. The Federal CAN-SPAM Act is Irrelevant to Construing and Applying the Standing Requirements of Either the California or Maryland Statute

Reading the CAN-SPAM Act's standing requirements into the CA-UCE and

the MD-CEMA, as Defendants and the district court have done, also is improper.

*See* BSI Br. at 42-44; *supra* at 8-11.  The statutes are different, and they have

different requirements.  The standing requirements in the CAN-SPAM Act are

narrower than those found in the CA-UCE and MD-CEMA.  *See* BSI Br. at 43-44.

Absent a Congressional mandate to apply the federal law's more restrictive

standing requirements to claims brought under state anti-spam statutes—and no

such mandate exists—the states are permitted to create separate enforcement

schemes.

---

[4] Defendants' reliance on *Hale v. Morgan*, 584 P.2d 512 (Cal. 1978)—to suggest that these consumer protection statutes should be narrowly construed—is misplaced.  Defs.' Br. at 32.  The California Supreme Court has made clear that *Morgan* did not change that "[t]he rule of strict construction of penal statutes has generally been applied in this state to criminal statutes, rather than statutes which prescribe only civil monetary penalties."  *Smith v. Super. Ct.*, 137 P.3d 218, 228 (Cal. 2006) (internal quotations and citation omitted).  Thus *Morgan* "did not purport to alter the general rule that civil statutes for the protection of the public are, generally, broadly construed in favor of that protective purpose."  *Id*.

### 1. *Gordon* is Inapposite

In *Gordon*, the Ninth Circuit Court of Appeals addressed the CAN-SPAM Act, not the CA-UCE or the MD-CEMA. *Gordon v. Virtumundo, Inc.*, 575 F.3d 1040 (9th Cir. 2009). Moreover, there are key factual differences between the plaintiff in *Gordon* and BSI.

Under the CAN-SPAM Act, "Internet access service" providers that are "adversely affected" by deceptive spam can pursue a claim against spammers for statutory damages. 15 U.S.C. § 7706(g) (2012). In *Gordon*, the question was whether the plaintiff was an "Internet access service" provider, as contemplated by federal law. The Ninth Circuit specifically declined "to set forth a general test or define the outer bounds of what it means to be a provider of 'Internet access service'" within the CAN-SPAM Act. *Gordon*, 575 F.3d at 1052. Nevertheless, based on the record before it, the court held that the plaintiff was not one because he leased server space (without physical control over or access to the hardware) and did not actually provide any services to his "customers." *Id*. at 1046, 1052. Importantly, the court also held that the plaintiff, who it viewed as an opportunist, was not "adversely affected" as an "Internet access service" provider— a requirement expressly found in the CAN-SPAM Act—because he essentially set up shop from the start for the sole purpose of bringing lawsuits. *Id*. at 1054-55. He was not (and never had been), the court held, a *bona fide* provider of any

13

Internet services, a requirement that the court also found in the legislative history of the federal statute. *Id*. at 1052.

BSI stands in stark contrast to the plaintiff in *Gordon* on several grounds. First, BSI was in existence and providing Internet services (such as email, listserv, webpage hosting, and domain name services, and providing and maintaining wireless networks and other forms of Internet access) to its customers *six years prior* to the enactment of the CA-UCE, MD-CEMA, and the CAN-SPAM Act. BSI Br. at 14-15. Second, since 2005, BSI has earned over $300,000 from its business operations. *Id*. at 14. Third, BSI has never "opted in" or solicited spam. *Id*. at 15-16. Fourth, BSI did not merely lease publicly available server space from another service provider. It provided its own servers on its own networks, and maintains and services them itself. JA-089 (Compl. ¶ 25).

> ## 2. The Statutory Standing Provisions of the California and Maryland Statutes Do Not Give Rise to Any Preemption Concerns under the CAN-SPAM Act

Defendants correctly note that BSI paid little attention in its opening brief to the issue of federal preemption under the CAN-SPAM Act. *See* Defs.' Br. at 45. This is because preemption is irrelevant to the issues on appeal.

To be sure, the CAN-SPAM Act includes an express preemption provision,[5] as it does a "savings" clause by which Congress left alone the states' authority to regulate false or deceptive spam. The "savings" clause constitutes an explicit Congressional determination that state laws that prohibit falsity or deception in commercial emails can co-exist, and operate in tandem, with federal law. Under such a dual regime, the states are free to create their own enforcement schemes, including the provision of private remedies for violations of their laws. The only requirement is that states do not prohibit spam that is lawful (that is, not false or deceptive).

When it enacted the CAN-SPAM Act, Congress was well aware that California and Maryland, as well as a number of other states, had already enacted legislation (1) regulating unsolicited commercial email advertisements and (2) providing for enforcement through private lawsuits. *See, e.g.*, *Peters v. Super.*

---

[5] The text reads:

> This chapter supersedes any statute, regulation, or rule of a State or political subdivision of a State that expressly regulates the use of electronic mail to send commercial messages, *except to the extent that any such statute, regulation, or rule prohibits falsity or deception in any portion of a commercial electronic mail message or information attached thereto*.

15 U.S.C. § 7707(b)(1) (2012) (emphasis added). This clause has two parts. The portion up to "except" defines the outer boundary of preempted state laws. The latter portion of the provision—the "savings" clause—carves out a subset of state laws that are exempt from preemption.

*Ct.*, 79 Cal. App. 4th 845, 850 (2000) ("[S]tatutes are to be interpreted by assuming

that the Legislature was aware of the existing law at the time of the enactment of

the [legislation]."); *United States v. Langley*, 62 F.3d 602, 605 (4th Cir. 1995)

(en banc) ("It is firmly entrenched that Congress is presumed to enact legislation

with knowledge of the law.").

　　　Defendants erroneously contend that permitting BSI to bring suit "would

effectively write CAN-SPAM's *bona fide*, adversely affected requirement out of

the statute . . . ." Defs.' Br. at 47. That a plaintiff may bring a claim under the

state statute, but not the CAN-SPAM Act, does not re-write the CAN-SPAM Act.

Congress expressly contemplated a dual enforcement regime, and ISPs have

brought suit under both sets of laws. *See, e.g.*, *MySpace, Inc. v. Wallace*, 498 F.

Supp. 2d 1293 (C.D. Cal. 2007) (CAN-SPAM and CA-UCE claims); *Microsoft*

*Corp. v. JDO Media, Inc.*, No. C04-0515P, 2005 WL 1838609 (W.D. Wash. Aug.

1, 2005) (CAN-SPAM and Washington's Commercial Electronic Mail Act claims).

　　　Neither at the time it enacted the CAN-SPAM Act, nor since, has Congress

limited, explicitly or implicitly, the classes of plaintiffs permitted to sue under the

state statutes. Had Congress wanted to restrict the states' ability to regulate, it

could have—and would have—said so clearly, especially since Congress was

legislating "in a field [consumer protection] traditionally occupied by the States."

*Altria Group, Inc. v. Good*, 555 U.S. 70, 77 (2008) (describing the presumption

16

against preemption).  Indeed, beyond requiring that the statutes "prohibit[] falsity or deception[,]" Congress placed no limits of any kind on the states' methods for enforcing their laws.  15 U.S.C. § 7707(b)(1) (2012).

Defendants' criticism of *Hypertouch, Inc. v. ValueClick, Inc.*, 192 Cal. App. 4th 805 (2011), and *Asis Internet Services*, 2010 WL 1267763, is also unavailing. The courts there simply recognized that the CAN-SPAM Act is a separate statute with separate requirements and found no basis to "impose parity" between the standing requirements of the CAN-SPAM Act and the CA-UCE.  *See Asis Internet Servs.*, 2010 WL 1267763, *14 ("This Court will not find that Congress has superseded California's power to authorize this kind of enforcement mechanism without a showing that this was Congress's 'clear and manifest purpose[.]'") (citation omitted); *Hypertouch*, 192 Cal. App. 4th at 830 (Congress "'indicated no intent to limit the mechanisms that California may authorize to enforce [the CA-UCE].'") (citation omitted).

Defendants' preemption cases, *see* Defs.' Br. at 44-48, do not conflict with *Asis* or *Hypertouch*.  In each case, the courts addressed whether the party's *substantive* claim was preempted by the CAN-SPAM Act or raised any preemption concerns.  *See Omega World Travel, Inc. v. Mummagraphics, Inc.*, 469 F.3d 348, 354 (4th Cir. 2006) (claim preempted where plaintiff asserted bare immaterial errors and there was no other falsity present in the spam); *see also Gordon*, 575

17

F.3d at 1062 (claim preempted where plaintiff could not show falsity at all);

*Kleffman v. Vonage Holdings Corp.*, 232 P.3d 625, 626 (Cal. 2010) (considering

whether it is "unlawful to send commercial e-mail advertisements from multiple

domain names for the purpose of bypassing spam filters"). These courts did not

even address—much less conclude—that the CAN-SPAM Act preempts a state's

enforcement scheme or mandates the types of plaintiffs who may bring suit under

the state statutes.

In short, the CAN-SPAM Act's preemption provision relates to *liability*, not

standing. Congress made clear that state statutes prohibiting falsity or deception

were not preempted "because they target behavior that a legitimate business trying

to comply with relevant laws would not be engaging in any way." S. Rep. No.

108-102, at 22 (2004), *reprinted in* 2004 U.S.C.C.A.N. 2348, 2365. That is, as

long as falsity or deception is the object of the statutes, it does not matter *who* is

enforcing the laws.

### D. BSI's Construction of the California and Maryland Statutes Creates No Tension with the First Amendment

Defendants contend that BSI's construction of the statutes "eliminat[es] any

injury-based requirement" and therefore "encroaches upon the First Amendment

protection of commercial speech." Defs.' Br. at 48. Defendants' novel

interpretation of First Amendment jurisprudence is meritless. First, the case upon

which Defendants rely, *United States v. Alvarez*, 132 S. Ct. 2537 (2012), did not

involve commercial speech.  Second, *dicta* from Justice Breyer's concurring

opinion in *Alvarez* did not override the longstanding rule that "to receive any First

Amendment protection, commercial speech 'must concern lawful activity and *not*

*be misleading*.'"  *W. Va. Ass'n of Club Owners & Fraternal Servs., Inc. v.*

*Musgrave*, 553 F.3d 292, 301 (4th Cir. 2009) (emphasis added) (quoting *Cent.*

*Hudson Gas & Electr. Corp. v. Pub. Serv. Comm'n of N.Y.*, 477 U.S. 557, 566

(1980)).  This Circuit has continued to apply that rule after *Alvarez*.  *See, e.g.*,

*Educ. Media Co. at Va. Tech, Inc. v. Insley*, 731 F.3d 291, 298-99 (4th Cir.

2013).

## II.    BSI DID NOT—AND COULD NOT—MANUFACTURE ITS CLAIMS

Central to Defendants' argument that BSI lacks standing is their contention

that BSI somehow "manufactured" its claims and therefore sustained no genuine

injury.  Defendants, however, necessarily ignore that without Defendants' unlawful

email in the first place, BSI would not have a lawsuit to bring.

Similarly, BSI received email to spam trap addresses only because

Defendants used "mechanical 'spam crawlers'" to scour the Internet "for addresses

to which to send" spam (hardly the mark of a legitimate business practice).  Defs.'

Br. at 17-18.  These email addresses passively sit on a website until a "spam

crawler" locates them, allowing a spammer to send email to that address.  A spam

19

trap cannot itself create email, deliver email, or cause email to be sent. *See* JA-236-37 (6/21/12 P.M. Trial Tr. at 56-57 (Resnick Cross-Examination)). The spammer engages in the wrongful conduct, not BSI.[6]

Nor does the routing relationship between BSI and Hypertouch establish that BSI "manufactured" its claims. BSI's use of Hypertouch as a routing intermediary does nothing to change the ultimate destination of the email at issue; the ultimate destination is determined solely by the sender of the email (here, Defendants and their affiliates). Defendants concede that all of the emails at issue in this lawsuit were addressed to domains that *BSI* holds. *See* Defs.' Br. at 13-14. Nor does routing an email have any bearing on who sent it in the first place. The statutory violation occurs during the *initial* transmission of the message by the sender. *See* Cal. Bus. & Prof. Code § 17529.2 (2008) (unlawful to initiate an unsolicited commercial email); Md. Code Ann., Com. Law § 14-3002(b) (2013) (a person may not "initiate the transmission" of unlawful email).[7]

---

[6] As described in BSI's opening brief, both Microsoft and the State of New York have used spam trap addresses to assist in their anti-spam litigation. *See* BSI Br. at 15 n.11.

[7] Not all of these practices are relevant to all of the emails at issue in this case. Defendants have largely failed to tie their broad allegations to the specific emails upon which BSI sues. For example, Defendants gloss over the fact that many emails in this case went to BSI directly, including all Kraft emails remaining in the case, *without* passing through Hypertouch's servers. *See* BSI Br. at 21. These practices therefore provide *no* basis for disposing of the *entire* case.

20

Moreover, it is a common business practice for ISPs to route email through servers in different states. *See* JA-076 (District Ct. Dkt. Report at Dkt. Nos. 593-11 (Klensin Rpt. ¶¶ 33-38); 593-13 (Levine Rpt. ¶¶ 21-23); 593-14 (Resnick Rpt. ¶ 48)). As just one example, BSI's expert Peter Resnick explained at trial how email sent to StLukesHouse.com, a domain hosted by BSI, was first routed through the California-based servers of Postini, Google's email-filtering service. *See* JA-226 (06/21/12 Trial Tr. at 89 (Resnick Cross-Examination)). Adopting Defendants' argument that an ISP somehow "manufactures" (or consents to receiving, *see infra* at 23-26) whatever email it routes through a third-party server would award spammers with broad swaths of immunity not intended by the California or Maryland legislatures.

Further, the statutes permit enforcement by both the email recipient and the ICSP (or EMSP as the case may be) on the same emails. *See* Md. Code Ann., Com. Law § 14-3003 (2013); Cal. Bus. & Prof. Code § 17529.5(b)(1)(A) (2008). A single email can thus give rise to claims in multiple states by multiple parties.[8] The routing relationship is immaterial to BSI's standing to bring its claims.

---

[8] For example, and as occurred in this case, if a spammer in California sends deceptive spam to a recipient in Maryland, he violates California law when he sends deceptive spam *from* California, § 17529.5(a), and violates Maryland law when he sends that deceptive spam *into* Maryland to an address presumed to belong to a resident, Md. Comm. Code § 14-3002(c).

21

Likewise, that BSI has been able to collect a large volume of emails is not

somehow disqualifying, as Defendants argue. BSI has been able to collect this

universe due solely to the large volume of unlawful spam that Defendants have

sent to email addresses that BSI owns or hosts. That BSI does not block all

incoming spam is utterly beside the point.[9] One cannot determine whether spam is

actionable unless the spam is examined for falsity or deception. BSI retains the

emails targeted to its servers, in part (*see supra* at 22 n.9), so that it can examine

them for compliance with state anti-spam statutes. If they are false or deceptive,

then they are actionable. That is entirely *consistent* with the purposes of the

Maryland and California laws. Even if BSI altered its practices to satisfy

---

[9] One clarification of the facts is in order. Defendants assert that BSI fails to filter spam. Defs.' Br. at 53. Filtering simply means detecting and flagging suspected spam—which is something BSI does. *See, e.g.*, JA-076 (District Ct. Dkt. Report at Dkt. Nos. 593-11 (Klensin Rpt. ¶¶ 21-27, 31); 593-12 (P. Wagner Rpt. ¶¶ 20-30)). Even so, there is some risk that in employing filters, legitimate email will be identified as "spam." *See, e.g.*, Juan Carlos Perez, *Postini traps legitimate messages, creates Gmail delivery backlog*, *Computerworld* (Feb. 27, 2014 10:40 AM),
http://www.computerworld.com/s/article/9246646/Postini_traps_legitimate_messa ges_creates_Gmail_delivery_backlog ("Google has been scrambling for more than 24 hours to unclog a queue of messages sent to Gmail users that its Postini email filter incorrectly labeled as spam and quarantined."). Given this risk, BSI retains the emails targeted to its servers to preserve emails incorrectly filtered as "spam." *See* JA-183-84 (6/20/12 A.M. Trial Tr. at 45-46 (Paul Wagner Cross-Examination)). BSI has utilized this retention policy since its inception—well before the enactment of the CA-UCE and the MD-CEMA.

Defendants, that would not cure the underlying problem—the transmission of false or deceptive spam.

## III.   KRAFT AND CONNEXUS SENT DECEPTIVE SPAM TO BSI WITHOUT ITS APPARENT OR ACTUAL CONSENT

Defendants' consent arguments collide with two fundamental facts about this case. First, BSI did not indicate to either company that it wished to receive spam. Second, BSI's supposed "willingness" to receive deceptive spam is inseparable from its desire to vindicate its statutory right *not* to receive such spam. Defendants cannot identify any cases that have found consent on similar facts.

Defendants sent unlawful spam to BSI without having any reasonable basis for concluding that BSI wanted them to do so. While Defendants argue that BSI's supposed failure to object implicitly "invited" spam, the cases they cite provide no support. For example, *Jones v. Corbis*, 815 F. Supp. 2d 1108 (C.D. Cal. 2011), found a plaintiff's silence to constitute implied consent only where *other circumstances* reasonably indicated to the defendants that their conduct was welcome. *See id.* at 1114-15 (in light of industry custom, "Plaintiff can point to no evidence showing photographers *had a reason to believe she did not* consent to their use of her name and likeness") (emphasis added).

Indeed, BSI *did* expressly communicate to Defendants that it did not want their spam. *See* BSI Br. at 46-47 (citing BSI's use of SMTP banners and "opt-out"

23

mechanisms, for example). Yet Defendants have argued that this too constituted evidence of consent, and even made the surreal assertion that BSI's attempts to "opt-out" from their spam actually expressed a desire to receive more spam. *See* Connexus Supplemental Post-Trial Mot. for Summ. J. as to Consent, District Ct. Dkt. Report at Dkt. No. 585, at 9 (arguing that BSI consented to receiving spam by, among other things, "clicking on opt-out links"). Of course, any failure to use these "opt-out" features would, under Defendants' theory, constitute BSI's "silence" and thus implied consent. Defendants cannot have it both ways.

Defendants' implied consent argument runs into an additional problem. The CA-UCE already incorporates the defense of "direct consent" into its definition of "unsolicited commercial email" and explicitly defines that term: "that the recipient has *expressly* consented to receive e-mail advertisements from the advertiser, either in response to a clear and conspicuous request for the consent or at the recipient's own initiative." Cal. Bus. & Prof. Code § 17529.1(d) (emphasis added). Implied consent is thus not a valid defense under the CA-UCE.

That BSI and Hypertouch had a routing relationship also is irrelevant to consent. This arrangement between the ISPs may demonstrate BSI's consent to receive email *through Hypertouch*, but it does not demonstrate BSI's consent to receive deceptive spam *from Defendants*. *See also supra* at 20-21. Though Defendants contend that most of Connexus's emails "were addressed and sent first

24

to Hypertouch" and "BSI received these emails only because Joe Wagner

forwarded them to BSI," Defs.' Br. at 53, they ignore the fact, noted above, that *all*

email was addressed and sent to *BSI*-held domains, *see supra* at 20.

Finally, BSI's willingness to sue spammers does not mean it has consented

to receive deceptive spam.  Defendants quote from the Second Restatement of

Torts that actual consent "need not be communicated to the actor."  Restatement

(Second) Torts § 892(1) (2008).  But they fail to cite any case that so holds.  *See*

*Janelsins v. Button*, 648 A.2d 1039, 1042 (Md. Ct. Spec. App. 1994) (no consent

found); *Brazerol v. Hudson*, 277 A.2d 585, 586 (Md. 1971) (plaintiff consented to

entry of dump truck by moving car *at the request of the defendant*).  To the

contrary, "[c]onsent occurs when a plaintiff manifests a willingness that the

defendant engage in conduct *and the defendant acts in response to such a*

*manifestation.*"  *Janelsins*, 648 A.2d at 1043 (emphasis added) (internal quotation

marks and citation omitted); *see also Corbis*, 815 F. Supp. 2d 1108, discussed

*supra* at 23.

More fundamentally, BSI's willingness to sue spammers, even if it were

expressed, would still not be consent to receive deceptive spam.  Defendants

identify no authority stating that one consents to intentional unlawful conduct by

choosing to combat that conduct through legal rather than extralegal means.  While

Defendants cite *Gordon*, the Ninth Circuit very clearly premised its holding in that

25

case on the unique statutory standing requirements of the CAN-SPAM Act and never once discussed consent or the doctrine of *volenti non fit injuria*. Defendants effectively concede as much in their brief—citing only Judge Gould's concurring opinion as support for *Gordon* extending beyond the CAN-SPAM Act. *See* Defs.' Br. at 55. But even Judge Gould articulated his finding as one of statutory standing, *see* 575 F.3d at 1068, and he admitted that it would *not* apply to claims brought under other statutes that permit broad classes of plaintiffs to sue and that do not contain injury requirements beyond those articulated in the statute itself, *see id.* at 1069.

In short, despite their various efforts to impute action to the quintessentially passive role of receiving email, Defendants are still the ones who "manufactured" the violations of the CA-UCE and MD-CEMA at issue in this case. *See supra* at 19-22. BSI, to be sure, knew that it would expose itself to the real possibility that parties like Kraft and Connexus would break the law and send it false and deceptive spam. But this is true of *every* ISP in business. If knowledge that one would receive violative spam was the equivalent of consent, then virtually no one would be permitted to sue under any law—federal or state. *Cf. Ordway v. Super. Ct.*, 198 Cal. App. 3d 98, 108 (1988) (assumption of risk not a defense to intentional conduct); *Janelsins*, 648 A.2d at 1045 (same); *Heiner v. Kmart Corp.*,

26

84 Cal. App. 4th 335, 350 (2000) (contributory negligence not a defense to intentional tortious conduct); *Janelsins*, 648 A.2d at 1046 (same).[10]

## IV.    BSI IS NOT SUBJECT TO THE SETTLEMENT AGREEMENT BETWEEN HYPERTOUCH AND KRAFT

Kraft's argument as to why BSI is bound by Hypertouch's release of claims rests on novel and unfounded definitions of "assign" and "agent."  A single email may be—and often is—routed through multiple entities using equipment located in different states, which may give rise to claims by more than one party under the laws of more than one state.  Both the CA-UCE and MD-CEMA in fact contemplate a single email creating liability to multiple parties.  *See* Cal. Bus. & Prof. Code § 17529.5(b) (2008); Md. Code Ann., Com. Law § 14-3003 (2013).  As argued in its opening brief, BSI is suing Kraft in this case on its own claims and not as an assignee of the claims of Hypertouch.  *See* BSI Br. at 53-57.

BSI is likewise not an "agent" of Hypertouch.  Agency is a carefully defined legal concept, and Kraft can point to no evidence that BSI became an agent of Hypertouch with regard to the matters at issue in this case.  Two companies may work together without one becoming the agent of the other.  *See, e.g.*, *Brooks v.*

---

[10] Contrary to Defendants' arguments, *Janelsins* recognizes that a knowing self-exposure to a possible harm may constitute assumption of risk but not consent. *See* 648 A.2d at 1044 n.7 (a homeowner "may knowingly and voluntarily encounter a risk of daytime housebreaking, but does not consent to it").

*Euclid Sys. Corp.*, 827 A.2d 887, 898-99 (Md. Ct. Spec. App. 2003) (selling

agreement between securities issuer and broker-dealer did not create principal-

agent relationship); *Wickham v. Southland Corp.*, 168 Cal. App. 3d 49, 59 (1985)

(convenience store franchisee not agent of franchisor).

Finally, BSI and Hypertouch are not partners or joint venturers. A joint

venture requires (1) joint control, (2) sharing of profits and losses, and (3) joint

ownership. *See Simmons v. Ware*, 213 Cal. App. 4th 1035, 1049 (2013); *see also*

*Blondell v. Littlepage*, 991 A.2d 80, 92-93 (Md. 2010). Kraft has provided no

evidence that these elements exist between BSI and Hypertouch—much less any

evidence that would support granting summary judgment on this theory. The

district court declined to find a joint venture or agency relationship between BSI

and Hypertouch, and so should this Court.

Kraft's argument for applying the Future Claims Release to BSI is even

more attenuated. Kraft ignores that the Future Claims Release, unlike the Present

Claims Release, does not extend to "assigns" or "agents." *See* JA-555 (Settlement

Agreement). Instead Kraft relies on the district court's misreading of the

Cooperation Provision—whose actual language appears nowhere in Kraft's brief—

to conclude that *Hypertouch*'s failure to notify Kraft of subsequently received

spam somehow bars *BSI* from pursuing claims on that spam. As explained in

BSI's opening brief, the Cooperation Provision imposes an obligation on Kraft, not

28

Hypertouch. *See* BSI Br. at 56-57. More fundamentally, whether Hypertouch complied with a provision of the Settlement Agreement has nothing to do with the separate question of whether BSI is subject to that Agreement in the first place.

Finally, the record contradicts Kraft's suggestion that it would have stopped sending spam if only Hypertouch had given it notice. Such notice has proven to have little effect on Kraft's spam activities—it continued to send deceptive spam to BSI even after BSI filed suit against it. *See* JA-030 (District Ct. Dkt. Report at Dkt. No. 170-3 (P. Wagner Rpt. at ¶ 3)). Kraft cannot argue that Hypertouch's alleged lack of cooperation has had any relevance, legal or otherwise, to this case.

## **CONCLUSION**

The judgment should be reversed and the case should be remanded for further proceedings.

This the 21st day of July, 2014.

Respectfully Submitted,

STEPTOE & JOHNSON LLP

By: /s/ *Richard K. Willard*
Richard K. Willard
Jill C. Maguire
Benjamin B. Watson
Steptoe & Johnson LLP
1330 Connecticut Avenue, NW
Washington, DC  20036
Telephone: (202) 429-3000
Fax: (202) 429-3902
E-Mail: rwillard@steptoe.com

*Counsel for Plaintiff-Appellant Beyond Systems, Inc.*

Of Counsel:

Stephen H. Ring
LAW OFFICES OF STEPHEN H. RING, PC
506 Main Street, Suite 215
Gaithersburg, MD 20878

Michael S. Rothman
LAW OFFICE OF MICHAEL S. ROTHMAN
401 East Jefferson Street, Suite 201
Rockville, MD 20850-0000

*Counsel for Plaintiff-Appellant Beyond Systems, Inc.*

30

## CERTIFICATE OF COMPLIANCE WITH RULE 28.1(e) or 32(a)
### Certificate of Compliance With Type-Volume Limitation, Typeface Requirements, and Type Style Requirements

1.     This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because this brief contains 6,999 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14 point Times New Roman.

Dated: July 21, 2014                 Respectfully submitted by:

STEPTOE & JOHNSON LLP

By: /s/ *Jill C. Maguire*
Richard K. Willard
Jill C. Maguire
Benjamin B. Watson
Steptoe & Johnson LLP
1330 Connecticut Avenue, NW
Washington, DC  20036
Telephone: (202) 429-3000
Fax: (202) 429-3902
E-Mail: jmaguire@steptoe.com

*Counsel for Plaintiff-Appellant Beyond
    Systems, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on July 21, 2014 the foregoing document was served on all

parties or their counsel of record through the CM/ECF system if they are registered

users or, if they are not, by serving a true and correct copy at the addresses listed

below via U.S. mail.

John K. Roche
PERKINS COIE LLP
700 13th St., N.W., Suite 600
Washington, D.C. 20005-3960

Darrell J. Graham
John E. Bucheit
ROESER BUCHEIT & GRAHAM LLC
20 N. Wacker Dr., Ste. 1330
Chicago, IL 60606
*Counsel for Appellees Kraft Foods, Incorporated, Vict. Th. Engwall & Co., Kraft Foods Global, Incorporated*

J. Douglas Baldridge
Ari N. Rothman
VENABLE LLP
575 7th Street, N.W.
Washington, DC 20004-1601
*Counsel for Appellee Connexus Corporation*

Dated:         July 21, 2014

Respectfully submitted by:

STEPTOE & JOHNSON LLP

By: /s/ *Jill C. Maguire*
Richard K. Willard
Jill C. Maguire
Benjamin B. Watson
Steptoe & Johnson LLP
1330 Connecticut Avenue, NW
Washington, D.C. 20036
Tel: (202) 429-3000
Fax: (202) 429-3902
Email: jmaguire@steptoe.com

*Counsel for Plaintiff-Appellant Beyond Systems, Inc.*

2